

www.centerforce.org

| Northern California Office | Central California Office | The House At San Quentin |
|---|---|---|
| 2955 Kerner Blvd., 2nd Floor | 3122 N. Millbrook, Suite F | 2 Main Street |
| San Rafael, CA 94901 | Fresno, CA 93703 | San Quentin, CA 94964 |
| Phone: 415/456-9980 | Phone: 559/241-6160 | Phone: 415/456-4200 |
| Fax:    415/456-2146 | Fax:    559/241-6161 | |

December 29, 2005

To Whom It May Concern,

It is with pleasure to write this letter of support for, and confirmation of services rendered to, Mr. Antonio Silveyra. I am a facilitator for Centerforce's Men's Jail Parenting Project at Marin County Jail. I have known Mr. Silveyra for approximately three months, and have had the opportunity to work with him while incarcerated at Marin County Jail.

Mr. Silveyra completed six sessions of a 10-session parenting class while at Marin County Jail. He was unable to complete the entirety of the class due to his recent transfer into a state prison. However, while in the class I observed Mr. Silveyra to be an active, positive and insightful participant. He was always engaged in all areas of class discussions, exercises and activities. He understands the importance of group process and its dynamics. He contributes appropriately and seems committed to his own personal goals of becoming a better father as evidenced by his openness to receive feedback and to seek greater support from this facilitator or peer leaders in the group.

If given another opportunity to be a part of his family, the community and his continued commitment to better himself, I believe that Mr. Silveyra can be successful in his endeavors. If you have any further questions, please do not hesitate to call me at 415-507-2662 or 415-846-3789.

Thank you for your consideration.

Sincerely,

Cesar Lagleva

December 15, 2005

To Whom It May Concern:

This letter is to acknowledge that Antonio F. Silveyra enrolled himself in the F.A.T.H.E.R.S. Program (Fathers as Teachers: Helping, Encouraging, Reading, Supporting) at Marin County Jail. This student has completed 8 out of 12 classes, and has attended all classes offered so far in this cycle.

The F.A.T.H.E.R.S. Program teaches family literacy and parenting skills through the use of children's picture books. Its primary goal is to break the cycle of incarceration by raising inmates' awareness of the critical importance of their role as their child's first teacher. Continual emphasis is placed on their conscious role modeling, instructing them how to use children's books to develop communication, and address sensitive and difficult issues with their children. Based on family literacy concepts, the program provides fifteen (15) hours of instruction in child development, language acquisition, learning styles, positive discipline, children's games, reading aloud, and selection of age-appropriate children's books.

For further information, you may contact:

Jane Curtis, Inmate Literacy Coordinator
Marin Literacy Program, San Rafael Public Library
1100 E Street
San Rafael, California
(415) 458-5042

Signed _____
F.A.T.H.E.R.S. instructor

**TEEN CHALLENGE**
**INTERNATIONAL**
The Proven Cure For The Drug Epidemic
NorWestCal Nevada

web: www.teenchallenge.net
email: info@teenchallenge.net

**Administrative Office**
*mailing address:*
P.O. Box 24309
San Jose, CA 95154-4309
*shipping address:*
4608 Meridian Ave.
San Jose CA 95124
(408) 445-0661
(408) 445-0651

**SOUTHBAY**

**Alum Rock Women**
**& Children's Center**
4601 Alum Rock Ave.
San Jose, CA 95127
(408) 272-4416
(408) 272-8729

**Asbury Family Center**
444 N. 26th St.
San Jose, CA 95116
(408) 293-2050
(408) 293-1984

**Thrift Store**
2127 S. Winchester Blvd.
Campbell, CA 95008
(408) 445-0661

**EASTBAY**

**Oakland Men's Center**
P.O. Box 5097
Oakland, CA 94605
(510) 562-1141
Fax: (510) 562-4035

**Thrift Store**
3437 Chestnut Ave.
Concord, CA 94518
(888) 339-3193

**NORTHERN NEVADA**

**Reno Adolescent Center**
P.O. Box 1136
Sparks, NV 89432
(775) 424-6777
Fax: (775) 424-3026

**SOUTHERN NEVADA**

**Las Vegas Outreach**
P.O. Box 13410
Las Vegas, NV 89112
(702) 314-1300

**REDWOOD**

**Men's Center**
P.O. Box 2595
McKinleyville, CA 95519
(707) 268-0614
Fax: (707) 268-0612

**Women's Center**
1435 7th Street
Eureka, CA 95501
(707) 268-0614
Fax: (707) 268-0612

**ATTN: ICE Detention Center**

This letter is to inform you that Mr. Antonio F. Silveyra was a resident in Teen Challenge, which is located at 2221 90th Ave in Oakland, California. Teen Challenge is a 12-18 month Christian residential program for men ages 18+. He came to Teen Challenge on Oct 04, 2004 to Dec 12, 2004. Mr. Silveyra did participated in our Work-study program and our God's Gang youngster every Friday at 3pm to 5pm. He also helps cook some meal for the student that lives here.

In my experience with individuals with challenged backgrounds, I believe Mr. Silveyra will benefit by the change of disposition of past criminal charges from Felony to Misdemeanor. This would promote better job opportunities, and help provide for his family in the future.

Thank you for your consideration,

Ronnie Napuran

Education Coordinator

# State of California
## State of California

# Certificate of Completion

## This certifies that

Antonio Fabian Silveyra

**Has been awarded this certificate for successfully completing the Re-Entry Program**

**This** ___28th___ **day of** ___March___ ___2007___

Re-Entry
Instructor

Supervisor of Academic
Instruction

Supervisor of Correctional
Education Programs

Log #. 672



Accredited By
Western Association
Schools and Colleges

# CERTIFICATE OF COMPLETION

*This certificate is awarded to*

## Antonio F. Silveyra

In recognition of personal recovery work accomplished with satisfactory performance while a participant in phase 1 of the Bay Area Community Resources 90 Day Treatment Program

BAY AREA COMMUNITY RESOURCES DAY TREATMENT PROGRAM

DECEMBER 2005

A PROGRAM OF BAY AREA COMMUNITY RESOURCES

JOSE LUIS GOMEZ
BACR CRIMINAL JUSTICE PROGRAM MANAGER
MILTON PAUL, STAFF
MICHELLE JOHNSON, STAFF
KAY KSANDA, STAFF
JAMES SELLERS, STAFF



# Certificate of Attendance

to

# Antonio Silveyra

for completing 26 hours of instruction
in the
English video-learning, reading and writing class

**MARIN LITERACY PROGRAM**

A joint program of the San Rafael Public Library and the Marin County Free Library

December, 2005

San Rafael, California

*Instructor*

*Supervisor*

# Certificate of Participation

awarded to

## Antonio Silveyra

For completing 13.0 hours of education in
An Introduction Pearl Harbor and WWII

presented by

MARIN LITERACY PROGRAM

A joint program of the San Rafael Public Library and the Marin County Free Library

November 11, 2005
San Rafael, California

Instructor
Supervisor

DRIVER RECORD INFORMATION

STATE OF CALIFORNIA
DMV
A PUBLIC SERVICE AGENCY

**IDENTIFICATION OF DRIVER BASED ON INFORMATION SUBMITTED**

SILVEYRA, ANTONIO FABIAN

| DRIVER LICENSE OR ID CARD # | F.O. | BATES NO. | TYPE APP. | DATE | MISC. INFO. SUBMITTED BY REQUESTER | REQ. CODE | RECORD DATE |
|---|---|---|---|---|---|---|---|
| C186999 | OAK POL I | 123104 | 243L | LOUANN TELE | | 00559 | 031507 |

| BIRTHDATE | | | SEX | HEIGHT | WEIGHT | EYES | HAIR | | |
| 041964 | | | M | 600 | 195 | BROWN | BLACK | | |

**DRIVER LICENSE INFORMATION**

| CLASS C | ISSUED 082300 | EXPIRES 041905 | EXT. |
|---|---|---|---|

DMV USE ONLY
CL DA7 03/15 BLK 999

| VIOLATION OR ACC. DATE | CONVICTION DATE | SECTION(S) VIOLATED LOCATION OR ACCIDENT OR OUT-OF-STATE VIOLATION(S) | STATUTE | TYPE | DUP. LIC. ISSUED | LIC. HELD |
|---|---|---|---|---|---|---|
| | | | | | | 1119 |

ANY ACCIDENTS SHOWN ABOVE DO NOT NECESSARILY INDICATE DRIVER RESPONSIBILITY

RESTRICTIONS

**COURT DISPOSITION**

| JAIL OR CYA | AMT. | DOCKET, CITATION OR FR FILE NUMBER | LOCATION OF COURT OR ACCIDENT REPORT NUMBER | VEHICLE LICENSE |
|---|---|---|---|---|

SUBJECT ISSUED ID CARD 01/10/05 EXPIRES 04/19/10
M A:SILVEYRA, ANTHONY

NONE TO REPORT

NONE TO REPORT

| DEPARTMENT ACTION | MAIL ORDER DATE | EFFECTIVE DATE | AUTHORITY SECTION(S) OTHER STATE TAKING ACTION | THRU DATE OR TERM | REASON FOR ACTION | SERVICE OF ORDER | | FR FILE NUMBER |
|---|---|---|---|---|---|---|---|---|
| | | | | | | TYPE | DATE | |

CA CORRECTION CENTER
SHERRY HORTON/RE ENTRY PROGRAM
P O BOX 790
SUSANVILLE    CA   96127

SEE REVERSE FOR EXPLANATION OF CODES

DL414 (REV 04/97)



**Narcotics Anonymous®**

IP No. 20

# Hospitals & Institutions Service and the NA Member

## Hospitals and Institutions Service and the NA Member

Many Narcotics Anonymous members have found Hospitals and Institutions service to be an important part of their personal recovery. Our members, who actively participate in H&I service, are very important resources in our fellowship. A commitment to H&I service is one of the many ways to become involved with the NA service structure and help us feel a part of our fellowship.

We know that active addiction leads to jails, institutions, and death. Also, NA's primary purpose is to carry the message of recovery to the addict who still suffers. It is not surprising that carrying the NA message of recovery into hospitals and institutions is one of our priorities. NA members have consistently supported this belief by forming Hospitals and Institutions (H&I) committees around the world.

Still, some NA members have been reluctant to become involved in H&I service because they have never been incarcerated, arrested, or institutionalized. With our personal experience and proper preparation, all of us are uniquely qualified to carry our message of recovery.

This pamphlet is intended to be a brief introduction to Narcotics Anonymous H&I service, and to encourage more members to avail themselves of this opportunity to serve.

## What Is an H&I Meeting?

The purpose of an H&I meeting is to carry the message of recovery to addicts who do not have full access to regular Narcotics Anonymous meetings. H&I meetings, except for those in long-term facilities, are intended to introduce those addicts in attendance to the basics of the NA program.

In order to form a clear understanding of an H&I meeting, it is important to learn about our service structure. An H&I meeting is generally a service provided by an area service committee's H&I subcommittee. These meetings occur in hospitals, treatment centers, correctional facilities, and adolescent institutions. Rather than being an NA group, it is vital that an H&I meeting always be held under the direction of an H&I subcommittee.

## How Do I Get Involved?

An area H&I subcommittee is the center for planning and organization. This is the ideal place to start getting involved! The first thing to do is to show up at an area H&I subcommittee meeting and attend an orientation for new and interested members. These orientation meetings help members become familiar with the information and clean time requirements necessary for service in H&I. At these meetings, members are selected to carry our message into facilities. Usually, the next step is to attend an H&I meeting as an observer. Through this process members gain a basic understanding of H&I service and decide on a level of involvement.

## Why Do I Get Involved?

Hospitals and institutions service offers addicts an opportunity to demonstrate gratitude, fulfill responsibility, and share the NA message without expectations. It is also an effective tool that helps us stay clean, and keeps us coming back. The H&I message is the same as the NA message: "That an addict, any addict, can stop using drugs, lose the desire to use, and find a new way to live."[1] The gift we share is hope and freedom from active addiction through the program

[1] Basic Text, p. 65

of Narcotics Anonymous. Any NA member who wants to carry this message is encouraged to get involved with H&I service. There are many ways to serve in Narcotics Anonymous, and many of us have found H&I service to be the most rewarding aspect of our recovery. We hope that this pamphlet will encourage you to get involved with H&I service and experience these rewards for yourself!

Copyright © 1986, 1996 by
Narcotics Anonymous World Services, Inc.
All rights reserved

World Service Office
PO Box 9999
Van Nuys, CA 91409 USA
Tel. (818) 773-9999
Fax (818) 700-0700
Website: www.na.org

World Service Office–EUROPE
48 Rue de l'Eté
B-1050 Brussels, Belgium
Tel. +32/2/646-6012
Fax +32/2/649-9239

World Service Office–CANADA
150 Britannia Rd. E. Unit 21
Mississauga, Ontario, L4Z 2A4, Canada
Tel. (905) 507-0100
Fax (905) 507-0101



This is NA Fellowship-approved literature.

Narcotics Anonymous, , , and The NA Way
are registered trademarks of
Narcotics Anonymous World Services, Incorporated.

ISBN 0-912075-29-5          English          2/01
WSO Catalog Item No. EN-3120

U.S. Department of Homeland Security
Detention and Removal Operations
1115 N. Imperial Ave.
El Centro, CA 92243



**U.S. Immigration
And Customs
Enforcement**

September 26, 2007

Antonio Fabian Silveyra Garcia
1115 N. Imperial Ave.
El Centro, California 92243

Re: SILVEYRA-Garcia, Antonio Fabian A18 499 789

Dear Mr. Silveyra:

On September 17, 2007, we received your request, for Immigration and Customs Enforcement to exercise prosecutorial discretion in your case.  Mr. Silveyra you have been charged with Section 237(a) (2) (A) (iii) of the Immigration and Nationality Act, as amended, in that, at any time after admission, you have been convicted of an aggravated felony as defined in Section 101(a) (43) (G) of the Act, a theft offense, (Including receipt stolen property), for which the term of imprisonment is at least one year.

After careful consideration of all the factors in your case, it has been determined that your request for the exercise of prosecutorial discretion is denied.

Sincerely,

Robert M Culley
(A)Field Office Director

194 Cal.App.3d 1470                                                                    Page 1

194 Cal.App.3d 1470, 240 Cal.Rptr. 328, 65 A.L.R.4th 705
**(Cite as: 194 Cal.App.3d 1470)**

People v. **Soriano**
Cal.App. 1 Dist.,1987.

Court of Appeal, First District, Division 2,
California.
The PEOPLE, Plaintiff and Respondent,
v.
Danilo **SORIANO**, Defendant and Appellant.
In re Danilo **SORIANO** on Habeas Corpus.
A035242, A038232.

Sept. 24, 1987.

Philippine resident of United States brought petition
for writ of habeas corpus seeking to withdrawn his
guilty plea. The Superior Court, City and County
of San Francisco, Victor M. Campilongo and Jack
K. Berman, JJ., denied petition and appeal was
taken. The Court of Appeal, Rouse, Acting P.J.,
held that Philippine resident of United States was
denied effective assistance of counsel in entering
his guilty plea by counsel's failure to adequately
advise of immigration consequences of plea,
warranting habeas relief.

Affirmed in part, petition for writ granted, and
conviction vacated and remanded.
West Headnotes
**[1] Criminal Law 110      1412**

110 Criminal Law
    110XXX Post-Conviction Relief
        110XXX(A) In General
            110k1411 Error Coram Nobis
                110k1412 k. In General. Most Cited
Cases
    (Formerly 110k997.3)
Writ of coram nobis will properly issue only when
petitioner can establish that some fact existed
which, without his fault or negligence, was not
presented to court at trial and which would have
prevented rendition of judgment, that new evidence
does not go to merits of issues of fact determined at

trial, and that he did not know, nor could he have,
with due diligence, discovered facts upon which he
relies any sooner than point at which he petitions
for writ.

**[2] Criminal Law 110      273.1(4)**

110 Criminal Law
    110XV Pleas
        110k272 Plea of Guilty
            110k273.1 Voluntary Character
                110k273.1(4) k. Ascertainment by
Court; Advising and Informing Accused. Most
Cited Cases

**Criminal Law 110      275.3**

110 Criminal Law
    110XV Pleas
        110k275 Plea of No Contest or Nolo
Contendere
            110k275.3 k. Requisites and Proceedings
for Entry. Most Cited Cases
    (Formerly 110k275)
Under statute requiring that prior to acceptance of
plea of guilty or nolo contendere to crime court
must advise defendant of immigration consequences
of conviction, critical issue is whether defendant has
been advised that his guilty plea may have
immigration consequences, and the exact language
of the warning given by the court is not crucial, and
thus a defendant warned of possibility that he might
be excluded from residency, denied naturalization
or right to reenter, but who is not specifically
warned of deportation is adequately advised.
West's Ann.Cal.Penal Code § 1016.5.

**[3] Criminal Law 110      1618(3)**

110 Criminal Law
    110XXX Post-Conviction Relief
        110XXX(C) Proceedings
            110XXX(C)2 Affidavits and Evidence
                110k1616 Sufficiency

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

194 Cal.App.3d 1470                                                    Page 2

194 Cal.App.3d 1470, 240 Cal.Rptr. 328, 65 A.L.R.4th 705
**(Cite as: 194 Cal.App.3d 1470)**

110k1618 Particular Issues
110k1618(3) k. Plea. Most Cited Cases
(Formerly 110k997.15(6))

Citizen of Philippines, who was lawful permanent resident of United States, failed to make sufficient showing at hearing on petition for writ of error coram nobis seeking to withdraw guilty plea that he could not understand proceeding due to his limited grasp of English language to overcome his own statement at time guilty plea was entered, that he understood advisement that guilty plea could have immigration consequences, and thus failed to establish entitlement to writ. West's Ann.Cal.Penal Code §§ 1016.5, 1016.5(a), 1018.

**[4] Criminal Law 110    1519(8)**

110 Criminal Law
    110XXX Post-Conviction Relief
        110XXX(B) Grounds for Relief
            110k1511 Counsel
                110k1519 Effectiveness of Counsel
                    110k1519(8) k. Plea. Most Cited Cases
(Formerly 110k997.4)

Appropriate means of raising claim of ineffective assistance of counsel in making guilty plea is either by direct appeal or by petition for writ of habeas corpus, and not by writ of coram nobis. U.S.C.A. Const.Amend. 6.

**[5] Criminal Law 110    641.13(1)**

110 Criminal Law
    110XX Trial
        110XX(B) Course and Conduct of Trial in General
            110k641 Counsel for Accused
                110k641.13 Adequacy of Representation
                    110k641.13(1) k. In General. Most Cited Cases

Both Federal and State Constitution gives criminal defendant right to assistance of counsel, and such right entitles defendant to effective counsel. West's Ann.Cal. Const. Art. 1, § 15; U.S.C.A. Const.Amend. 6.

**[6] Criminal Law 110    641.13(4)**

110 Criminal Law
    110XX Trial
        110XX(B) Course and Conduct of Trial in General
            110k641 Counsel for Accused
                110k641.13 Adequacy of Representation
                    110k641.13(2) Particular Cases and Problems
                        110k641.13(4) k. General Qualifications of Counsel. Most Cited Cases

For purpose of ineffective assistance of counsel claim, standard against which counsel's effectiveness will be measured is that of reasonably competent attorney who acts as diligent conscientious advocate. West's Ann.Cal.Penal Code §§ 1016.5, 1016.5(a), 1018.

**[7] Criminal Law 110    641.13(1)**

110 Criminal Law
    110XX Trial
        110XX(B) Course and Conduct of Trial in General
            110k641 Counsel for Accused
                110k641.13 Adequacy of Representation
                    110k641.13(1) k. In General. Most Cited Cases

Strategic choices made after inadequate investigation falls short of providing effective assistance of counsel if reasonable professional judgment would not support limitation on investigation. West's Ann.Cal. Const. Art. 1, § 15; U.S.C.A. Const.Amend. 6.

**[8] Criminal Law 110    641.13(1)**

110 Criminal Law
    110XX Trial
        110XX(B) Course and Conduct of Trial in General
            110k641 Counsel for Accused
                110k641.13 Adequacy of Representation
                    110k641.13(1) k. In General. Most Cited Cases

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

194 Cal.App.3d 1470                                                              Page 3

194 Cal.App.3d 1470, 240 Cal.Rptr. 328, 65 A.L.R.4th 705
(Cite as: 194 Cal.App.3d 1470)

In order for defendant to demonstrate that ineffective assistance requires reversal of his conviction he must first demonstrate that his counsel's performance was deficient, and second, that he was prejudiced by that deficiency. U.S.C.A. Const.Amend. 6.

**[9] Criminal Law 110    641.13(5)**

110 Criminal Law
   110XX Trial
      110XX(B) Course and Conduct of Trial in General
         110k641 Counsel for Accused
            110k641.13 Adequacy of Representation
               110k641.13(2) Particular Cases and Problems
               110k641.13(5) k. Pretrial Proceedings; Sanity Hearing. Most Cited Cases

**Habeas Corpus 197    486(3)**

197 Habeas Corpus
   197II Grounds for Relief; Illegality of Restraint
      197II(B) Particular Defects and Authority for Detention in General
         197k482 Counsel
            197k486 Adequacy and Effectiveness of Counsel
               197k486(3) k. Arraignment and Plea. Most Cited Cases
   (Formerly 197k25.1(6))
Philippine resident of United States was denied effective assistance of counsel in entering his guilty plea by counsel's failure to adequately advise of immigration consequences of plea and by counsel's inadequate investigation of federal immigration law, thus prejudicing petitioner by exposing him to institution of deportation proceedings, and thus petitioner was entitled to writ of habeas corpus to allow withdrawal of his guilty plea. West's Ann.Cal. Const. Art. 1, § 15; U.S.C.A. Const.Amend. 6.

**\*1472 \*\*330** Frank O. Bell, Jr., State Public Defender, Joan Y. Nosse, Deputy State Public Defender, San Francisco, for defendant and appellant.

John K. Van de Kamp, Atty. Gen., Steve White, Chief Asst. Atty. Gen., Dane R. Gillette, Supervising Deputy Atty. Gen., Christopher J. Wei, Deputy Atty. Gen., San Francisco, for plaintiff and respondent.

ROUSE, Acting Presiding Justice.

Defendant Danilo Soriano appeals from denial by the superior court of his petition for a writ of error coram nobis. Defendant **\*1473** sought to withdraw his guilty plea to one count of assault with a firearm (Pen.Code, § 245, subd. (a)(2)) [FN1] and an admission that he had personally used a firearm in committing the offense (§ 12022.5). Defendant's writ petition alleged that he had received ineffective assistance of trial counsel because counsel failed to advise him adequately of the deportation consequences of his guilty plea.

> FN1. Unless otherwise noted all subsequent statutory citations are to the Penal Code.

Also before us is defendant's original petition for a writ of habeas corpus, likewise based on his claim of ineffective assistance. We confine our discussion of the facts to those which are necessarily involved in the resolution of issues raised on appeal.

On February 3, 1985, defendant was charged by complaint with one count of assault with a deadly weapon (§ 245, subd. (a)(2)) and with a personal firearm use enhancement (§ 12022.5). An attorney from the office of the San Francisco Public Defender was appointed to represent defendant. Defendant pleaded not guilty.

Pursuant to a plea bargain, defendant made his first guilty plea on February 22, 1985, but Superior Court Judge Campilongo refused to sentence defendant in accord with the terms of the plea negotiated with the district attorney.

On April 23, 1985, defendant again pleaded guilty and admitted the firearm enhancement. Defendant's guilty plea was negotiated in exchange for a recommendation from the district attorney that

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

194 Cal.App.3d 1470                                                    Page 4

194 Cal.App.3d 1470, 240 Cal.Rptr. 328, 65 A.L.R.4th 705
(Cite as: 194 Cal.App.3d 1470)

defendant be sentenced to two years for the assault and two years for the enhancement and that his total sentence of four years be suspended and defendant placed on three years' probation on condition he serve one year in county jail. (There were other probation conditions, but they are irrelevant to our discussion.) These were the same terms which had been rejected by the judge on defendant's first guilty plea. In accepting defendant's guilty plea the trial court cautioned him, using the precise language of section 1016.5, that his guilty plea could have immigration consequences. On May 21, 1985, defendant was sentenced by Judge Campilongo in accordance with the negotiated plea.

Defendant is a citizen of the Philippines who became a lawful permanent resident of this country on April 20, 1980. At the completion of defendant's one-year term in county jail he was placed on immigration hold by the Immigration and Naturalization Service (INS). While in INS custody he was served with an order to show cause why he should not be deported under the Immigration and Nationality Act. (8 U.S.C. § 1251(a)(4).) That *1474 section makes deportable any alien who "is convicted of a crime involving moral turpitude committed within five years after entry and either sentenced to confinement or confined therefor in a prison or corrective institution, for a year or more...." The crime to which defendant pleaded guilty occurred on February 3, 1985, within five years of his entry into this country.

On April 28, 1986, defendant petitioned the superior court for a writ of error coram nobis. At the hearing on the writ defendant's trial counsel testified to events surrounding defendant's entry of the guilty plea. On May 12, 1986, the petition for the writ was denied. Defendant makes a timely appeal.

**331 Contemporaneous with filing his reply brief in the appeal defendant filed a petition seeking habeas corpus relief within our original jurisdiction, and asking that the petition be consolidated with his appeal. We ordered the two matters considered together.

## I.

### Coram Nobis

As an initial matter we address defendant's contention on appeal that the trial court erred in denying his petition for a writ of error coram nobis.

[1] A writ of coram nobis permits the court which rendered judgment "to reconsider it and give relief from errors of fact."(Witkin, Cal.Criminal Procedure (1963) Judgment & Attack in Trial Court, § 626, p. 616.) The writ will properly issue only when the petitioner can establish three elements: (1) that some fact existed which, without his fault or negligence, was not presented to the court at the trial and which would have prevented the rendition of the judgment; (2) that the new evidence does not go to the merits of the issues of fact determined at trial; and (3) that he did not know, nor could he have, with due diligence, discovered the facts upon which he relies any sooner than the point at which he petitions for the writ. (People v. Shipman (1965) 62 Cal.2d 226, 230, 42 Cal.Rptr. 1, 397 P.2d 993; People v. Trantow (1986) 178 Cal.App.3d 842, 845, 224 Cal.Rptr. 70.)

In his petition for the writ defendant contended that at the time he entered his guilty plea he did not know that the plea would subject him to deportation, and if he had understood that consequence of the plea he would not have made it.

Defendant relies upon People v. Wiedersperg (1975) 44 Cal.App.3d 550, 118 Cal.Rptr. 755.) In Wiedersperg, defendant was a resident alien who *1475 had lived in this country since he was a child. Wiedersperg's attorney did not know of his client's alien status. (Id., at p. 552, 118 Cal.Rptr. 755.) Wiedersperg was found guilty after he submitted the issue of his guilt on the transcript of his preliminary hearing. (Ibid.) In support of his petition for a writ of coram nobis Wiedersperg submitted affidavits declaring that the trial court was unaware of his alien status and would not have rendered the judgment it did had it known he was not native born. (Id., at p. 554, 118 Cal.Rptr. 755.) The

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

194 Cal.App.3d 1470, 240 Cal.Rptr. 328, 65 A.L.R.4th 705
(Cite as: 194 Cal.App.3d 1470)

Court of Appeal decision was an extremely limited one. It found only that the trial court to whom the writ was directed had erred in finding it had no jurisdiction to consider the petition, and that Wiedersperg had stated facts, which if they could be proven, would permit issuance of the writ in the discretion of the trial court. (*Id.,* at p. 555, 118 Cal.Rptr. 755.)

Subsequent to the *Wiedersperg* decision, California enacted section 1016.5 which provides, in pertinent part: "Prior to acceptance of a plea of guilty or nolo contendere to any offense punishable as a crime under state law, except offenses designated as infractions under state law, the court shall administer the following advisement on the record to the defendant: [¶] If you are not a citizen, you are hereby advised that conviction of the offense for which you have been charged may have the consequences of deportation, exclusion from admission to the United States, or denial of naturalization pursuant to the laws of the United States." (§ 1016.5, subd. (a).)

Under section 1018 a defendant may, prior to judgment, withdraw a guilty plea for good cause, and the decision to grant such a request lies in the sound discretion of the trial court. (*People v. Superior Court (Giron)* (1974) 11 Cal.3d 793, 796, 114 Cal.Rptr. 596, 523 P.2d 636.) In this instance, of course, judgment had been entered and defendant could not avail himself of the provisions of section 1018.

[2] The critical issue under section 1016.5 is whether a defendant has been advised that his guilty plea may have immigration consequences. The exact language of the warning given by the court is not crucial. Thus, a defendant who was warned of the possibility that he might be excluded from residency, denied naturalization or the right to reenter but who was **332 not specifically warned of deportation was adequately advised. (*People v. Valenciano* (1985) 165 Cal.App.3d 604, 605-606, 211 Cal.Rptr. 651.)

A similar result has been reached in Oregon where a state statute provides that the court warn a defendant pleading guilty of the immigration

consequences he may suffer. (*Lyons v. Pearce* (1985) 298 Or. 554, 561, 694 P.2d 969, 974.) The Oregon Supreme Court held that by signing a plea agreement form which contained on its face a written warning of immigration consequences, the defendant had received adequate warning within the *1476 language of a statute providing that "The court shall inform the defendant" of such immigration consequences. (*Ibid.*)

[3] Prior to sentencing defendant, the trial court here advised him in the language of section 1016.5. When the court asked if he understood the advisement defendant replied, "Yes, ma'm." In his declaration in support of the writ petition, defendant avers that despite his assent on the record his English comprehension is limited. He declares that at the time of his sentencing "I did not understand anything that was going on and I did not comprehend that my plea of guilty to the sentence as negotiated was sealing my fate for deportation purposes. During all of the proceedings, I watched my attorney, and when she nodded, I said yes."

Defendant is also arguing he was not adequately informed by his trial counsel about the consequences of a guilty plea. According to his declaration counsel told him that if he pled guilty he would serve eight months in county jail. In response to his question as to whether he would be deported if he pled guilty she told him he would not. Thus, defendant's claim is that the fact of which he was ignorant was the legal consequence of a guilty plea. He made the plea from ignorance of its implications because he did not receive adequate assistance of counsel and because he did not understand the court's section 1016.5 admonition to him.[FN2]

---

FN2. Subdivision (b) of the section provides that, in pleas entered after January 1, 1978, if the record does not show the advisement, "the defendant shall be presumed not to have received the required advisement."

We have found only one California case discussing the question of whether in pleas taken after January 1, 1978, absent a

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

194 Cal.App.3d 1470, 240 Cal.Rptr. 328, 65 A.L.R.4th 705
**(Cite as: 194 Cal.App.3d 1470)**

section 1016.5 warning (§ 1016.5, subd.(b)), a defendant can be said to have pleaded guilty without understanding the nature and consequences of the plea. ( *People v. Tran* (1984) 152 Cal.App.3d 680, 199 Cal.Rptr. 539.) In *Tran,* the defendants entered what the court found to be a "slow plea." (*Id.,* at p. 683, 199 Cal.Rptr. 539.) On appeal the defendants were challenging the trial court's failure to give them *Boykin-Tahl* advisements. (*Ibid.* ) The appellate court noted that failure by the trial court to give a section 1016.5 admonishment would similarly vitiate the plea. (*Id.,* p. 683, fn. 3, 199 Cal.Rptr. 539.) Defendants did not assert section 1016.5, subdivision (b) error as grounds for withdrawing their plea, however, so the *Tran* court did not reach the issue.

At the hearing on the petition for the writ the court questioned defendant about his English language training. Defendant conceded that he had attended two years of college in the Philippines. Defendant testified that he had not studied English in college but had studied it before coming to this country. The court also questioned defendant about his waiver of the attorney-client privilege given so that trial counsel could testify about her advice to defendant. In all this colloquy defendant had no apparent difficulty in understanding the questions directed to him by the judge.[FN3] Based **333 upon its *1477 own questioning of defendant the lower court may well have concluded defendant's English competence was quite adequate for him to have understood the section 1016.5 advisement.

FN3. The colloquy between defendant and the court began with the court asking, "Mr. Soriano, first of all, where did you go to school, sir? [¶] MR. SORIANO: University of Philippines. [¶] THE COURT: How high did you go to school? [¶] MR. SORIANO: Second year of college. [¶] THE COURT: At P.C.P. Philippine University? [¶] MR. SORIANO: No, Philippine College. [¶] THE COURT: And when did you come to

this country? [¶] MR. SORIANO: April twentieth, 1980. [¶] THE COURT: You must have studied English in the Philippine Highlands, is that correct? [¶] MR. SORIANO: No. [¶] THE COURT: But you did study English there to some extent? [¶] MR. SORIANO: Yes. [¶] THE COURT: You were originally represented by Ms.... who sits here, right? [ ¶] MR. SORIANO: Yes, Your Honor. [ ¶] THE COURT: Whatever you told her is privileged and she cannot tell anybody. That is, you have that privilege unless you give up that right. [¶] MR. SORIANO: Okay. [¶] THE COURT: Are you willing to give up that right and let her testify as to anything she may have told you or you may have told her? [¶] MR. SORIANO: Okay. [¶] THE COURT: You're willing to give up that right? [¶] MR. SORIANO: Yes, I am willing."

We find petitioner failed to make a sufficient showing at the hearing on the petition to overcome his own statement, made at the time his plea was entered, that he understood the 1016.5 advisement. Defendant sought to prove his English comprehension was so poor that without an interpreter's assistance he was incapable of entering a guilty plea with "sufficient awareness of the relevant circumstances and likely consequences." ( *Brady v. United States* (1970) 397 U.S. 742, 748, 90 S.Ct. 1463, 1469, 25 L.Ed.2d 747.) However, having failed to establish that his English was so faulty that he could not understand the section 1016.5 advisement, defendant failed to meet the first requirement for the writ. He did not show that his language difficulty was a fact unknown to the court and a fact which would have prevented rendition of judgment. (See *People v. Shipman, supra,* 62 Cal.2d 226, 230, 42 Cal.Rptr. 1, 397 P.2d 993; *People v. Trantow, supra,* 178 Cal.App.3d 842, 845, 224 Cal.Rptr. 70 [mere fact of defendant's alienage would not prevent the rendition of judgment].)

[4] As to defendant's second claim-that he was deprived of effective assistance of counsel in making his guilty plea-this claim is not an

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

194 Cal.App.3d 1470, 240 Cal.Rptr. 328, 65 A.L.R.4th 705
**(Cite as: 194 Cal.App.3d 1470)**

appropriate basis for relief by writ of coram nobis. ( *People v. Howard* (1965) 62 Cal.2d 237, 238, 42 Cal.Rptr. 7, 397 P.2d 999; *People v. Adamson* (1949) 34 Cal.2d 320, 327, 332-333, 210 P.2d 13; *People v. Buggs* (1969) 272 Cal.App.2d 285, 289, 77 Cal.Rptr. 450; *People v. Sharp* (1958) 157 Cal.App.2d 205, 208, 320 P.2d 589.) The appropriate means of raising a claim of ineffective assistance of counsel is either by direct appeal or by petition for a writ of habeas corpus. (*People v. Pope* (1979) 23 Cal.3d 412, 426, 152 Cal.Rptr. 732, 590 P.2d 859.) We address defendant's ineffective assistance claim in the subsequent portion of this opinion devoted to his petition for habeas corpus. Accordingly, we find the trial court did not err in denying defendant's petition for a writ of error coram nobis.

**\*1478 II.**

*Habeas Corpus*

This habeas corpus petition presents the interesting, and apparently novel, question in California of whether counsel for a criminal defendant who is an immigrant renders ineffective assistance by failing to adequately research the immigration consequences of a guilty plea by defendant.

Defendant petitions this court for a writ of habeas corpus, asking that he be permitted to withdraw his guilty plea. He contends his counsel below rendering ineffective assistance in that she neglected to adequately inform him of the immigration consequences of his guilty plea. Further, her failure to research federal immigration law meant that she did not seek to negotiate a plea which would not have subjected him to deportation, and she failed to request from the sentencing judge a recommendation against deportation which would have prevented his deportation for this offense.

Defendant's declaration in support of his petition for a writ of coram nobis avers: "I spoke with my attorney on two separate occasions prior to sentencing. At the first interview the public defender asked if I were an immigrant or U.S.

citizen. I told her I was an immigrant. She asked me when I arrived in the United States. I told her April 20, 1980. She then told me if I plead guilty, I would serve just eight months in county jail. If I plead not guilty, I could serve three to four years in State prison. She strongly advised that I plead guilty. I asked her if I would be deported if I plead guilty. She said that I would not. [¶] ... The second time I met with the public defender was approximately one **334 week before the sentencing. I wanted to be sure that I would serve only eight months in county jail and that I would not be deported.... I specifically asked her if the plea of guilty would prevent me from obtaining citizenship. She said that I could apply in three years without any problem after I had finished probation. I then asked her if she was sure that I would not be deported. She assured me that I would not be deported. Based on these assurances, I entered my plea of guilty.... Had I known that I was exposing myself to deportation by pleading guilty, I would never have entered such plea. I would first have sought a disposition which would not render me deportable...."

**[5][6]** Both our federal and state Constitutions give a criminal defendant the right to assistance of counsel. (U.S. Const., 6th Amend.; Cal. Const., art. I, § 15.) The right to counsel entitles a defendant to effective counsel. (*Strickland v. Washington* (1984) 466 U.S. 668, 686, 104 S.Ct. 2052, 2063, 80 L.Ed.2d 674; *People v. Pope* (1979) 23 Cal.3d 412, 423-424, 152 Cal.Rptr. 732, 590 P.2d 859.) The standard against which counsel's effectiveness will be measured is that of " 'reasonably \*1479 competent' " attorney who acts as a "*diligent conscientious advocate.*" (*United States v. DeCoster* (D.C.Cir.1973) 487 F.2d 1197, 1202; accord *People v. Pope, supra,* 23 Cal.3d at p. 423, 152 Cal.Rptr. 732, 590 P.2d 859.)

**[7]** Under this standard a defendant may " reasonably expect that before counsel undertakes to act at all he will make a rational and informed decision on strategy and tactics founded on adequate investigation and preparation." (*People v. Ledesma* (1987) 43 Cal.3d 171, 215, 233 Cal.Rptr. 404, 729 P.2d 839.) Strategic choices made after inadequate investigation (*In re Hall*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

194 Cal.App.3d 1470                                                                    Page 8

194 Cal.App.3d 1470, 240 Cal.Rptr. 328, 65 A.L.R.4th 705
(Cite as: 194 Cal.App.3d 1470)

(1981) 30 Cal.3d 408, 426, 179 Cal.Rptr. 223, 637 P.2d 690) fall short of providing effective assistance if "reasonable professional judgment" would not support the limitation on investigation. (*Strickland v. Washington, supra,* 466 U.S. 668, 690-691, 104 S.Ct. 2052, 2066.)

[8] In order for a defendant to demonstrate that ineffective assistance requires reversal of his conviction he must demonstrate first, that his counsel's performance was deficient, and second, that he was prejudiced by that deficiency. (*Strickland v. Washington, supra,* 466 U.S. 668, 687, 104 S.Ct. 2052, 2064; *People v. Fosselman* (1983) 33 Cal.3d 572, 583-584, 189 Cal.Rptr. 855, 659 P.2d 1144.)

[9] There is conflicting evidence as to what counsel told defendant about deportation. Defendant's affidavit states that counsel told him on two separate occasions in response to his questions that he would not be deported. At the hearing on the writ-petition counsel testified that she had never told defendant he would not be deported if he entered a guilty plea, and that she had warned him that deportation "could" result. She also testified that she had advised him "in a general sense, that is, the same language that is used in the admonition I used in court, that such a plea could have consequences on his immigration status, his naturalization, deportation and exclusion from admission." Conflicting with her account was testimony given at the hearing by a relative of defendant's who had been present during all of defendant's criminal proceedings. This witness testified that, prior to one court appearance, he overheard a hallway conversation between defendant and his counsel in which defendant asked about immigration. Counsel replied by saying that immigration was "no problem."

Unlike the common case of a defendant who contends his counsel was ineffective for failing to investigate witnesses or evidence relating to a possible defense, defendant here maintains his counsel failed to investigate the law of immigration. He argues that under federal law and case authority he would not have been subject to deportation had he not been sentenced, but instead

the imposition of his sentence had been suspended, and had he not been confined for a year, but for a period one day short of a year. (*14808 U.S.C. § 1251(a)(4); **335 *Velez-Lozano v. Immigration and Naturalization Serv.* (D.C. Cir.1972) 463 F.2d 1305, 1307 [defendant whose sentence of three years was suspended and who was placed on probation was "confined" as used in § 1251(a)(4) because "essential element ... is the imposition of sentence rather than the actual serving of sentence" ]; accord *Wood v. Hoy* (9th Cir.1959) 266 F.2d 825, 828; *Mariam v. United States* (D.C.App.1978) 385 A.2d 776, 779 [where the court suspended imposition of sentence defendant was not sentenced to confinement within the meaning of § 1251(a)(4) ].)

At the hearing on the petition for coram nobis, defendant's trial counsel testified. When asked if, at the time she negotiated defendant's plea, she had been aware that imposition of sentence suspended would relieve defendant of deportation she answered that she had not been aware of that aspect of the law. Nor was she aware that a sentence of one day less than a year in county jail would have had a similar impact on his deportation status. She was then asked, "Had you known so, would you have pressed for such a disposition much harder?" She replied, "I would have tried to negotiate the case differently." Trial counsel then explained "the only offer I was able to get from the District Attorney at all that Judge Campilongo would accept, was a four year State Prison sentence suspended. There was no question of imposition of sentence suspended. I might have approached that disposition differently had I been aware, but imposition of sentence suspended was never made an option to me and the same thing is true of the year minus one day in the county jail." After counsel testified that the plea agreement was the most advantageous criminal disposition available, she was asked, "Did you consider whether that was the most advantageous immigration disposition?" She replied, "No, I did not."

Under federal law a convicted alien may still avoid deportation under 8 United States Code section 1251(a)(4) if at the time he is sentenced or within 30 days thereafter the sentencing court makes a

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

194 Cal.App.3d 1470                                                                                    Page 9

194 Cal.App.3d 1470, 240 Cal.Rptr. 328, 65 A.L.R.4th 705
(Cite as: 194 Cal.App.3d 1470)

recommendation against deportation. (8 U.S.C. § 1251(b)(2).) Defendant's trial counsel was not asked at the coram nobis hearing whether she was aware of this provision of the law. The record is silent as to whether or not she sought such a recommendation from the sentencing court.

What is uncontested is that counsel, knowing defendant was an alien, resident in this country less than five years at the time he committed the crime, did not make it her business to discover what impact his negotiated sentence would have on his deportability. We have received an amicus brief [FN4] *1481 in this case from San Francisco Public Defender Jeff Brown pointing out that his "office regards a defendant's immigration status as an important factor to be considered in determining the appropriate plea bargain for one's client." Accordingly, the public defender's office imposes on its staff attorneys, under its "Minimum Standards of Representation," the duty to ascertain "what the impact of the case may have on [the client's] immigration status in this country."

> FN4. Approximately a month before oral argument Public Defender Brown filed a letter with the court which we consider to be an amicus curiae brief under California Rules of Court, rule 14(b).

The American Bar Association's Standards for Criminal Justice, standard 14-3.2, which discusses plea agreements, provides, in pertinent part, that " (b) To aid the defendant in reaching a decision, defense counsel, after appropriate investigation, should advise the defendant of the alternatives available and of considerations deemed important by defense counsel or the defendant in reaching a decision." (3 ABA Standards for Criminal Justice. std. 14-3.2 (2d ed. 1980) p. 73.) The commentary to the standard notes the importance of advising a client of collateral consequences which may follow his conviction. "[W]here the defendant raises a specific question concerning collateral consequences (as where the defendant inquires about the possibility of deportation), counsel should fully advise the defendant of these consequences." ( Id., at p. 75.)

**336 While counsel maintained that she did warn defendant that there might be immigration consequences to his guilty plea, when questioned she described the warning she gave as "the advisement that is given in the course of the guilty plea, that is the general advisement I gave him." Is such a formulaic warning from his own attorney an adequate effort to advise a criminal defendant of the possible consequences of his plea? We think not.

The commentary to the American Bar Association's Standards for Criminal Justice standard 14-3.2 notes that while "the court must inquire into the defendant's understanding of the possible consequences at the time the plea is received ..., this is not a substitute for advice by counsel. The court's warning, coming as it does just before the plea is taken, may not afford time for mature reflection." (3 ABA Standards for Criminal Justice std. 14-3.2, supra, at p. 74.) Similarly, section 1016.5, subdivision (b) itself provides that "[u]pon request, the court shall allow the defendant additional time to consider the appropriateness of the plea in light of the advisement as described in this section." Both commentary and statute are concerned with the self-evident proposition that a defendant's in-court responses to rights advisements should not be made "off the cuff." Instead, they should reflect informed decisions he has reached after meaningful consultation with his attorney.

*1482 Even assuming counsel's version of events is the correct one, her response to defendant's immigration questions was insufficient. By her own admission she merely warned defendant that his plea might have immigration consequences. Had she researched the matter she would have known that his guilty plea, absent a recommendation from the sentencing court against deportation, made him deportable. Defendant states in his declaration that he would not have entered the plea had he known he "was exposing [himself] to deportation."

Defendant received only a pro forma caution from his attorney about the deportation consequences of his guilty plea. Furthermore, whatever advice his counsel did give him was not founded on adequate investigation of federal immigration law. Because

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

194 Cal.App.3d 1470

Page 10

194 Cal.App.3d 1470, 240 Cal.Rptr. 328, 65 A.L.R.4th 705
**(Cite as: 194 Cal.App.3d 1470)**

he was not adequately advised of the immigration consequences of his plea defendant has been prejudiced by the institution of deportation proceedings against him. We conclude that defendant was deprived of effective assistance of counsel in entering his guilty plea and should be allowed to withdraw that plea.

The order denying defendant's petition for a writ of error coram nobis is affirmed; however, his petition for a writ of habeas corpus is granted. Defendant's judgment of conviction is vacated and the case is remanded to the trial court to allow him to withdraw his guilty plea.

SMITH and BENSON, JJ., concur.
Cal.App. 1 Dist.,1987.
People v. Soriano
194 Cal.App.3d 1470, 240 Cal.Rptr. 328, 65 A.L.R.4th 705

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



**FindLaw**
For Legal Professionals

http://caselaw.findlaw.com

# U.S. Supreme Court

## STRICKLAND v. WASHINGTON, 466 U.S. 668 (1984)

### 466 U.S. 668

**STRICKLAND, SUPERINTENDENT, FLORIDA STATE PRISON, ET AL. v. WASHINGTON**

**CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT**

### No. 82-1554.

**Argued January 10, 1984**
**Decided May 14, 1984**

Respondent pleaded guilty in a Florida trial court to an indictment that included three capital murder charges. In the plea colloquy, respondent told the trial judge that, although he had committed a string of burglaries, he had no significant prior criminal record and that at the time of his criminal spree he was under extreme stress caused by his inability to support his family. The trial judge told respondent that he had "a great deal of respect for people who are willing to step forward and admit their responsibility." In preparing for the sentencing hearing, defense counsel spoke with respondent about his background, but did not seek out character witnesses or request a psychiatric examination. Counsel's decision not to present evidence concerning respondent's character and emotional state reflected his judgment that it was advisable to rely on the plea colloquy for evidence as to such matters, thus preventing the State from cross-examining respondent and from presenting psychiatric evidence of its own. Counsel did not request a presentence report because it would have included respondent's criminal history and thereby would have undermined the claim of no significant prior criminal record. Finding numerous aggravating circumstances and no mitigating circumstance, the trial judge sentenced respondent to death on each of the murder counts. The Florida Supreme Court affirmed, and respondent then sought collateral relief in state court on the ground, inter alia, that counsel had rendered ineffective assistance at the sentencing proceeding in several respects, including his failure to request a psychiatric report, to investigate and present character witnesses, and to seek a presentence report. The trial court denied relief, and the Florida Supreme Court affirmed. Respondent then filed a habeas corpus petition in Federal District Court advancing numerous grounds for relief, including the claim of ineffective assistance of counsel. After an evidentiary hearing, the

District Court denied relief, concluding that although counsel made errors in judgment in failing to investigate mitigating evidence further than he did, no prejudice to respondent's sentence resulted from any such error in judgment. The Court of Appeals ultimately reversed, stating that the Sixth Amendment accorded [466 U.S. 668, 669] criminal defendants a right to counsel rendering "reasonably effective assistance given the totality of the circumstances." After outlining standards for judging whether a defense counsel fulfilled the duty to investigate nonstatutory mitigating circumstances and whether counsel's errors were sufficiently prejudicial to justify reversal, the Court of Appeals remanded the case for application of the standards.

*Held:*

1. The Sixth Amendment right to counsel is the right to the effective assistance of counsel, and the benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result. The same principle applies to a capital sentencing proceeding - such as the one provided by Florida law - that is sufficiently like a trial in its adversarial format and in the existence of standards for decision that counsel's role in the proceeding is comparable to counsel's role at trial. Pp. 684-687.

2. A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or setting aside of a death sentence requires that the defendant show, first, that counsel's performance was deficient and, second, that the deficient performance prejudiced the defense so as to deprive the defendant of a fair trial. Pp. 687-696.

(a) The proper standard for judging attorney performance is that of reasonably effective assistance, considering all the circumstances. When a convicted defendant complains of the ineffectiveness of counsel's assistance, the defendant must show that counsel's representation fell below an objective standard of reasonableness. Judicial scrutiny of counsel's performance must be highly deferential, and a fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. A court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. These standards require no special amplification in order to define counsel's duty to investigate, the duty at issue in this case. Pp. 687-691.

(b) With regard to the required showing of prejudice, the proper standard requires the defendant to show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the

outcome. A court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury. Pp. 691-696. [466 U.S. 668, 670]

3. A number of practical considerations are important for the application of the standards set forth above. The standards do not establish mechanical rules; the ultimate focus of inquiry must be on the fundamental fairness of the proceeding whose result is being challenged. A court need not first determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, that course should be followed. The principles governing ineffectiveness claims apply in federal collateral proceedings as they do on direct appeal or in motions for a new trial. And in a federal habeas challenge to a state criminal judgment, a state court conclusion that counsel rendered effective assistance is not a finding of fact binding on the federal court to the extent stated by 28 U.S.C. 2254(d), but is a mixed question of law and fact. Pp. 696-698.

4. The facts of this case make it clear that counsel's conduct at and before respondent's sentencing proceeding cannot be found unreasonable under the above standards. They also make it clear that, even assuming counsel's conduct was unreasonable, respondent suffered insufficient prejudice to warrant setting aside his death sentence. Pp. 698-700.

693 F.2d 1243, reversed.

O'CONNOR, J., delivered the opinion of the Court, in which BURGER, C. J., and WHITE, BLACKMUN, POWELL, REHNQUIST, and STEVENS, JJ., joined. BRENNAN, J., filed an opinion concurring in part and dissenting in part, post, p. 701. MARSHALL, J., filed a dissenting opinion, post, p. 706.

Carolyn M. Snurkowski, Assistant Attorney General of Florida, argued the cause for petitioners. On the briefs were Jim Smith, Attorney General, and Calvin L. Fox, Assistant Attorney General.

Richard E. Shapiro argued the cause for respondent. With him on the brief was Joseph H. Rodriguez. *

[ Footnote * ] Briefs of amici curiae urging reversal were filed for the United States by Solicitor General Lee, Assistant Attorney General Trott, Deputy Solicitor General Frey, and Edwin S. Kneedler; for the State of Alabama et al. by Mike Greely, Attorney General of Montana, and John H. Maynard, Assistant Attorney General, Charles A. Graddick, Attorney General of Alabama, Robert K. Corbin, Attorney General of Arizona, John Steven Clark, Attorney General of Arkansas, John Van de Kamp, Attorney General of California, Duane Woodard, Attorney General of Colorado, Austin

[466 U.S. 668, 671]   J. McGuigan, Chief State's Attorney of Connecticut, Michael J. Bowers, Attorney General of Georgia, Tany S. Hong, Attorney General of Hawaii, Jim Jones, Attorney General of Idaho, Linley E. Pearson, Attorney General of Indiana, Robert T. Stephan, Attorney General of Kansas, Steven L. Beshear, Attorney General of Kentucky, William J. Guste, Jr., Attorney General of Louisiana, James E. Tierney, Attorney General of Maine, Stephen H. Sachs, Attorney General of Maryland, Francis X. Bellotti, Attorney General of Massachusetts, Frank J. Kelley, Attorney General of Michigan, Hubert H. Humphrey III, Attorney General of Minnesota, William A. Allain, Attorney General of Mississippi, John D. Ashcroft, Attorney General of Missouri, Paul L. Douglas, Attorney General of Nebraska, Brian McKay, Attorney General of Nevada, Irwin I. Kimmelman, Attorney General of New Jersey, Paul Bardacke, Attorney General of New Mexico, Rufus L. Edmisten, Attorney General of North Carolina, Robert Wefald, Attorney General of North Dakota, Anthony Celebrezze, Jr., Attorney General of Ohio, Michael Turpen, Attorney General of Oklahoma, Dave Frohnmayer, Attorney General of Oregon, LeRoy S. Zimmerman, Attorney General of Pennsylvania, Dennis J. Roberts II, Attorney General of Rhode Island, T. Travis Medlock, Attorney General of South Carolina, Mark V. Meierhenry, Attorney General of South Dakota, William M. Leech, Jr., Attorney General of Tennessee, David L. Wilkinson, Attorney General of Utah, John J. Easton, Attorney General of Vermont, Gerald L. Baliles, Attorney General of Virginia, Kenneth O. Eikenberry, Attorney General of Washington, Chauncey H. Browning, Attorney General of West Virginia, and Archie G. McClintock, Attorney General of Wyoming; and for the Washington Legal Foundation by Daniel J. Popeo, Paul D. Kamenar, and Nicholas E. Calio.

Richard J. Wilson, Charles S. Sims, and Burt Neuborne filed a brief for the National Legal Aid and Defender Association et al. as amici curiae urging affirmance. [466 U.S. 668, 671]

JUSTICE O'CONNOR delivered the opinion of the Court.

This case requires us to consider the proper standards for judging a criminal defendant's contention that the Constitution requires a conviction or death sentence to be set aside because counsel's assistance at the trial or sentencing was ineffective.

## I

## A

During a 10-day period in September 1976, respondent planned and committed three groups of crimes, which included [466 U.S. 668, 672]  three brutal stabbing murders, torture, kidnaping, severe assaults, attempted murders, attempted extortion, and theft. After his two accomplices were arrested, respondent surrendered to police and voluntarily gave a lengthy statement confessing to the third of the criminal episodes. The State of Florida indicted respondent for kidnaping and murder and appointed an

experienced criminal lawyer to represent him.

Counsel actively pursued pretrial motions and discovery. He cut his efforts short, however, and he experienced a sense of hopelessness about the case, when he learned that, against his specific advice, respondent had also confessed to the first two murders. By the date set for trial, respondent was subject to indictment for three counts of first-degree murder and multiple counts of robbery, kidnaping for ransom, breaking and entering and assault, attempted murder, and conspiracy to commit robbery. Respondent waived his right to a jury trial, again acting against counsel's advice, and pleaded guilty to all charges, including the three capital murder charges.

In the plea colloquy, respondent told the trial judge that, although he had committed a string of burglaries, he had no significant prior criminal record and that at the time of his criminal spree he was under extreme stress caused by his inability to support his family. App. 50-53. He also stated, however, that he accepted responsibility for the crimes. E. g., id., at 54, 57. The trial judge told respondent that he had "a great deal of respect for people who are willing to step forward and admit their responsibility" but that he was making no statement at all about his likely sentencing decision. Id., at 62.

Counsel advised respondent to invoke his right under Florida law to an advisory jury at his capital sentencing hearing. Respondent rejected the advice and waived the right. He chose instead to be sentenced by the trial judge without a jury recommendation.

In preparing for the sentencing hearing, counsel spoke with respondent about his background. He also spoke on [466 U.S. 668, 673]  the telephone with respondent's wife and mother, though he did not follow up on the one unsuccessful effort to meet with them. He did not otherwise seek out character witnesses for respondent. App. to Pet. for Cert. A265. Nor did he request a psychiatric examination, since his conversations with his client gave no indication that respondent had psychological problems. Id., at A266.

Counsel decided not to present and hence not to look further for evidence concerning respondent's character and emotional state. That decision reflected trial counsel's sense of hopelessness about overcoming the evidentiary effect of respondent's confessions to the gruesome crimes. See id., at A282. It also reflected the judgment that it was advisable to rely on the plea colloquy for evidence about respondent's background and about his claim of emotional stress: the plea colloquy communicated sufficient information about these subjects, and by forgoing the opportunity to present new evidence on these subjects, counsel prevented the State from cross-examining respondent on his claim and from putting on psychiatric evidence of its own. Id., at A223-A225.

Counsel also excluded from the sentencing hearing other evidence he thought was potentially damaging. He successfully moved to exclude respondent's "rap sheet." Id., at A227; App. 311. Because he judged that a presentence report might prove more detrimental than helpful, as it would have included respondent's criminal history and

thereby would have undermined the claim of no significant history of criminal activity, he did not request that one be prepared. App. to Pet. for Cert. A227-A228, A265-A266.

At the sentencing hearing, counsel's strategy was based primarily on the trial judge's remarks at the plea colloquy as well as on his reputation as a sentencing judge who thought it important for a convicted defendant to own up to his crime. Counsel argued that respondent's remorse and acceptance of responsibility justified sparing him from the death penalty. Id., at A265-A266. Counsel also argued that respondent had no history of criminal activity and that respondent committed [466 U.S. 668, 674] the crimes under extreme mental or emotional disturbance, thus coming within the statutory list of mitigating circumstances. He further argued that respondent should be spared death because he had surrendered, confessed, and offered to testify against a codefendant and because respondent was fundamentally a good person who had briefly gone badly wrong in extremely stressful circumstances. The State put on evidence and witnesses largely for the purpose of describing the details of the crimes. Counsel did not cross-examine the medical experts who testified about the manner of death of respondent's victims.

The trial judge found several aggravating circumstances with respect to each of the three murders. He found that all three murders were especially heinous, atrocious, and cruel, all involving repeated stabbings. All three murders were committed in the course of at least one other dangerous and violent felony, and since all involved robbery, the murders were for pecuniary gain. All three murders were committed to avoid arrest for the accompanying crimes and to hinder law enforcement. In the course of one of the murders, respondent knowingly subjected numerous persons to a grave risk of death by deliberately stabbing and shooting the murder victim's sisters-in-law, who sustained severe - in one case, ultimately fatal - injuries.

With respect to mitigating circumstances, the trial judge made the same findings for all three capital murders. First, although there was no admitted evidence of prior convictions, respondent had stated that he had engaged in a course of stealing. In any case, even if respondent had no significant history of criminal activity, the aggravating circumstances "would still clearly far outweigh" that mitigating factor. Second, the judge found that, during all three crimes, respondent was not suffering from extreme mental or emotional disturbance and could appreciate the criminality of his acts. Third, none of the victims was a participant in, or consented to, respondent's conduct. Fourth, respondent's [466 U.S. 668, 675] participation in the crimes was neither minor nor the result of duress or domination by an accomplice. Finally, respondent's age (26) could not be considered a factor in mitigation, especially when viewed in light of respondent's planning of the crimes and disposition of the proceeds of the various accompanying thefts.

In short, the trial judge found numerous aggravating circumstances and no (or a single comparatively insignificant) mitigating circumstance. With respect to each of the three convictions for capital murder, the trial judge concluded: "A careful consideration of all matters presented to the court impels the conclusion that there are insufficient mitigating



circumstances . . . to outweigh the aggravating circumstances." See Washington v. State, 362 So.2d 658, 663-664 (Fla. 1978) (quoting trial court findings), cert. denied, 441 U.S. 937 (1979). He therefore sentenced respondent to death on each of the three counts of murder and to prison terms for the other crimes. The Florida Supreme Court upheld the convictions and sentences on direct appeal.

<strong>B</strong>

Respondent subsequently sought collateral relief in state court on numerous grounds, among them that counsel had rendered ineffective assistance at the sentencing proceeding. Respondent challenged counsel's assistance in six respects. He asserted that counsel was ineffective because he failed to move for a continuance to prepare for sentencing, to request a psychiatric report, to investigate and present character witnesses, to seek a presentence investigation report, to present meaningful arguments to the sentencing judge, and to investigate the medical examiner's reports or cross-examine the medical experts. In support of the claim, respondent submitted 14 affidavits from friends, neighbors, and relatives stating that they would have testified if asked to do so. He also submitted one psychiatric report and one psychological report stating that respondent, though not under the influence [466 U.S. 668, 676] of extreme mental or emotional disturbance, was "chronically frustrated and depressed because of his economic dilemma" at the time of his crimes. App. 7; see also id., at 14.

The trial court denied relief without an evidentiary hearing, finding that the record evidence conclusively showed that the ineffectiveness claim was meritless. App. to Pet. for Cert. A206-A243. Four of the assertedly prejudicial errors required little discussion. First, there were no grounds to request a continuance, so there was no error in not requesting one when respondent pleaded guilty. Id., at A218-A220. Second, failure to request a presentence investigation was not a serious error because the trial judge had discretion not to grant such a request and because any presentence investigation would have resulted in admission of respondent's "rap sheet" and thus would have undermined his assertion of no significant history of criminal activity. Id., at A226-A228. Third, the argument and memorandum given to the sentencing judge were "admirable" in light of the overwhelming aggravating circumstances and absence of mitigating circumstances. Id., at A228. Fourth, there was no error in failure to examine the medical examiner's reports or to cross-examine the medical witnesses testifying on the manner of death of respondent's victims, since respondent admitted that the victims died in the ways shown by the unchallenged medical evidence. Id., at A229.

The trial court dealt at greater length with the two other bases for the ineffectiveness claim. The court pointed out that a psychiatric examination of respondent was conducted by state order soon after respondent's initial arraignment. That report states that there was no indication of major mental illness at the time of the crimes. Moreover, both the reports submitted in the collateral proceeding state that, although respondent was "chronically frustrated and depressed because of his economic dilemma," he was not

under the influence of extreme mental or emotional disturbance. All three [466 U.S. 668, 677] reports thus directly undermine the contention made at the sentencing hearing that respondent was suffering from extreme mental or emotional disturbance during his crime spree. Accordingly, counsel could reasonably decide not to seek psychiatric reports; indeed, by relying solely on the plea colloquy to support the emotional disturbance contention, counsel denied the State an opportunity to rebut his claim with psychiatric testimony. In any event, the aggravating circumstances were so overwhelming that no substantial prejudice resulted from the absence at sentencing of the psychiatric evidence offered in the collateral attack.

The court rejected the challenge to counsel's failure to develop and to present character evidence for much the same reasons. The affidavits submitted in the collateral proceeding showed nothing more than that certain persons would have testified that respondent was basically a good person who was worried about his family's financial problems. Respondent himself had already testified along those lines at the plea colloquy. Moreover, respondent's admission of a course of stealing rebutted many of the factual allegations in the affidavits. For those reasons, and because the sentencing judge had stated that the death sentence would be appropriate even if respondent had no significant prior criminal history, no substantial prejudice resulted from the absence at sentencing of the character evidence offered in the collateral attack.

Applying the standard for ineffectiveness claims articulated by the Florida Supreme Court in Knight v. State, 394 So.2d 997 (1981), the trial court concluded that respondent had not shown that counsel's assistance reflected any substantial and serious deficiency measurably below that of competent counsel that was likely to have affected the outcome of the sentencing proceeding. The court specifically found: "[A]s a matter of law, the record affirmatively demonstrates beyond any doubt that even if [counsel] had done each of the . . . things [that respondent alleged counsel had failed to do] [466 U.S. 668, 678] at the time of sentencing, there is not even the remotest chance that the outcome would have been any different. The plain fact is that the aggravating circumstances proved in this case were completely overwhelming . . . ." App. to Pet. for Cert. A230.

The Florida Supreme Court affirmed the denial of relief. Washington v. State, 397 So.2d 285 (1981). For essentially the reasons given by the trial court, the State Supreme Court concluded that respondent had failed to make out a prima facie case of either "substantial deficiency or possible prejudice" and, indeed, had "failed to such a degree that we believe, to the point of a moral certainty, that he is entitled to no relief . . . ." Id., at 287. Respondent's claims were "shown conclusively to be without merit so as to obviate the need for an evidentiary hearing." Id., at 286.

## C

Respondent next filed a petition for a writ of habeas corpus in the United States District Court for the Southern District of Florida. He advanced numerous grounds for relief,

among them ineffective assistance of counsel based on the same errors, except for the failure to move for a continuance, as those he had identified in state court. The District Court held an evidentiary hearing to inquire into trial counsel's efforts to investigate and to present mitigating circumstances. Respondent offered the affidavits and reports he had submitted in the state collateral proceedings; he also called his trial counsel to testify. The State of Florida, over respondent's objection, called the trial judge to testify.

The District Court disputed none of the state court factual findings concerning trial counsel's assistance and made findings of its own that are consistent with the state court findings. The account of trial counsel's actions and decisions given above reflects the combined findings. On the legal issue of ineffectiveness, the District Court concluded that, although trial counsel made errors in judgment in failing to [466 U.S. 668, 679] investigate nonstatutory mitigating evidence further than he did, no prejudice to respondent's sentence resulted from any such error in judgment. Relying in part on the trial judge's testimony but also on the same factors that led the state courts to find no prejudice, the District Court concluded that "there does not appear to be a likelihood, or even a significant possibility," that any errors of trial counsel had affected the outcome of the sentencing proceeding. App. to Pet. for Cert. A285-A286. The District Court went on to reject all of respondent's other grounds for relief, including one not exhausted in state court, which the District Court considered because, among other reasons, the State urged its consideration. Id., at A286-A292. The court accordingly denied the petition for a writ of habeas corpus.

On appeal, a panel of the United States Court of Appeals for the Fifth Circuit affirmed in part, vacated in part, and remanded with instructions to apply to the particular facts the framework for analyzing ineffectiveness claims that it developed in its opinion. 673 F.2d 879 (1982). The panel decision was itself vacated when Unit B of the former Fifth Circuit, now the Eleventh Circuit, decided to rehear the case en banc. 679 F.2d 23 (1982). The full Court of Appeals developed its own framework for analyzing ineffective assistance claims and reversed the judgment of the District Court and remanded the case for new factfinding under the newly announced standards. 693 F.2d 1243 (1982).

The court noted at the outset that, because respondent had raised an unexhausted claim at his evidentiary hearing in the District Court, the habeas petition might be characterized as a mixed petition subject to the rule of Rose v. Lundy, 455 U.S. 509 (1982), requiring dismissal of the entire petition. The court held, however, that the exhaustion requirement is "a matter of comity rather than a matter of jurisdiction" and hence admitted of exceptions. The court agreed with the District Court that this case came within an exception to the mixed petition rule. 693 F.2d, at 1248, n. 7. [466 U.S. 668, 680]

Turning to the merits, the Court of Appeals stated that the Sixth Amendment right to assistance of counsel accorded criminal defendants a right to "counsel reasonably likely to render and rendering reasonably effective assistance given the totality of the circumstances." Id., at 1250. The court remarked in passing that no special standard



applies in capital cases such as the one before it: the punishment that a defendant faces is merely one of the circumstances to be considered in determining whether counsel was reasonably effective. Id., at 1250, n. 12. The court then addressed respondent's contention that his trial counsel's assistance was not reasonably effective because counsel breached his duty to investigate nonstatutory mitigating circumstances.

The court agreed that the Sixth Amendment imposes on counsel a duty to investigate, because reasonably effective assistance must be based on professional decisions and informed legal choices can be made only after investigation of options. The court observed that counsel's investigatory decisions must be assessed in light of the information known at the time of the decisions, not in hindsight, and that "[t]he amount of pretrial investigation that is reasonable defies precise measurement." Id., at 1251. Nevertheless, putting guilty-plea cases to one side, the court attempted to classify cases presenting issues concerning the scope of the duty to investigate before proceeding to trial.

If there is only one plausible line of defense, the court concluded, counsel must conduct a "reasonably substantial investigation" into that line of defense, since there can be no strategic choice that renders such an investigation unnecessary. Id., at 1252. The same duty exists if counsel relies at trial on only one line of defense, although others are available. In either case, the investigation need not be exhaustive. It must include "`an independent examination of the facts, circumstances, pleadings and laws involved.'" Id., at 1253 (quoting Rummel v. Estelle, 590 F.2d 103, 104 (CA5 1979)). The scope of the duty, however, depends [466 U.S. 668, 681] on such facts as the strength of the government's case and the likelihood that pursuing certain leads may prove more harmful than helpful. 693 F.2d, at 1253, n. 16.

If there is more than one plausible line of defense, the court held, counsel should ideally investigate each line substantially before making a strategic choice about which lines to rely on at trial. If counsel conducts such substantial investigations, the strategic choices made as a result "will seldom if ever" be found wanting. Because advocacy is an art and not a science, and because the adversary system requires deference to counsel's informed decisions, strategic choices must be respected in these circumstances if they are based on professional judgment. Id., at 1254.

If counsel does not conduct a substantial investigation into each of several plausible lines of defense, assistance may nonetheless be effective. Counsel may not exclude certain lines of defense for other than strategic reasons. Id., at 1257-1258. Limitations of time and money, however, may force early strategic choices, often based solely on conversations with the defendant and a review of the prosecution's evidence. Those strategic choices about which lines of defense to pursue are owed deference commensurate with the reasonableness of the professional judgments on which they are based. Thus, "when counsel's assumptions are reasonable given the totality of the circumstances and when counsel's strategy represents a reasonable choice based upon



those assumptions, counsel need not investigate lines of defense that he has chosen not to employ at trial." Id., at 1255 (footnote omitted). Among the factors relevant to deciding whether particular strategic choices are reasonable are the experience of the attorney, the inconsistency of unpursued and pursued lines of defense, and the potential for prejudice from taking an unpursued line of defense. Id., at 1256-1257, n. 23.

Having outlined the standards for judging whether defense counsel fulfilled the duty to investigate, the Court of Appeals turned its attention to the question of the prejudice to the [466 U.S. 668, 682] defense that must be shown before counsel's errors justify reversal of the judgment. The court observed that only in cases of outright denial of counsel, of affirmative government interference in the representation process, or of inherently prejudicial conflicts of interest had this Court said that no special showing of prejudice need be made. Id., at 1258-1259. For cases of deficient performance by counsel, where the government is not directly responsible for the deficiencies and where evidence of deficiency may be more accessible to the defendant than to the prosecution, the defendant must show that counsel's errors "resulted in actual and substantial disadvantage to the course of his defense." Id., at 1262. This standard, the Court of Appeals reasoned, is compatible with the "cause and prejudice" standard for overcoming procedural defaults in federal collateral proceedings and discourages insubstantial claims by requiring more than a showing, which could virtually always be made, of some conceivable adverse effect on the defense from counsel's errors. The specified showing of prejudice would result in reversal of the judgment, the court concluded, unless the prosecution showed that the constitutionally deficient performance was, in light of all the evidence, harmless beyond a reasonable doubt. Id., at 1260-1262.

The Court of Appeals thus laid down the tests to be applied in the Eleventh Circuit in challenges to convictions on the ground of ineffectiveness of counsel. Although some of the judges of the court proposed different approaches to judging ineffectiveness claims either generally or when raised in federal habeas petitions from state prisoners, id., at 1264-1280 (opinion of Tjoflat, J.); id., at 1280 (opinion of Clark, J.); id., at 1285-1288 (opinion of Roney, J., joined by Fay and Hill, JJ.); id., at 1288-1291 (opinion of Hill, J., and although some believed that no remand was necessary in this case, id., at 1281-1285 (opinion of Johnson, J., joined by Anderson, J.); id., at 1285-1288 (opinion of Roney, J., joined by Fay and Hill, JJ.); id., at 1288-1291 (opinion of Hill, J.), a majority [466 U.S. 668, 683] of the judges of the en banc court agreed that the case should be remanded for application of the newly announced standards. Summarily rejecting respondent's claims other than ineffectiveness of counsel, the court accordingly reversed the judgment of the District Court and remanded the case. On remand, the court finally ruled, the state trial judge's testimony, though admissible "to the extent that it contains personal knowledge of historical facts or expert opinion," was not to be considered admitted into evidence to explain the judge's mental processes in reaching his sentencing decision. Id., at 1262-1263; see Fayerweather v. Ritch, 195 U.S. 276, 306 -307 (1904).

**D**

Petitioners, who are officials of the State of Florida, filed a petition for a writ of certiorari seeking review of the decision of the Court of Appeals. The petition presents a type of Sixth Amendment claim that this Court has not previously considered in any generality. The Court has considered Sixth Amendment claims based on actual or constructive denial of the assistance of counsel altogether, as well as claims based on state interference with the ability of counsel to render effective assistance to the accused. E. g., United States v. Cronic, ante, p. 648. With the exception of Cuyler v. Sullivan, 446 U.S. 335 (1980), however, which involved a claim that counsel's assistance was rendered ineffective by a conflict of interest, the Court has never directly and fully addressed a claim of "actual ineffectiveness" of counsel's assistance in a case going to trial. Cf. United States v. Agurs, 427 U.S. 97, 102 , n. 5 (1976).

In assessing attorney performance, all the Federal Courts of Appeals and all but a few state courts have now adopted the "reasonably effective assistance" standard in one formulation or another. See Trapnell v. United States, 725 F.2d 149, 151-152 (CA2 1983); App. B to Brief for United States in United States v. Cronic, O. T. 1983, No. 82-660, pp. 3a-6a; Sarno, [466 U.S. 668, 684] Modern Status of Rules and Standards in State Courts as to Adequacy of Defense Counsel's Representation of Criminal Client, 2 A. L. R. 4th 99-157, 7-10 (1980). Yet this Court has not had occasion squarely to decide whether that is the proper standard. With respect to the prejudice that a defendant must show from deficient attorney performance, the lower courts have adopted tests that purport to differ in more than formulation. See App. C to Brief for United States in United States v. Cronic, supra, at 7a-10a; Sarno, supra, at 83-99, 6. In particular, the Court of Appeals in this case expressly rejected the prejudice standard articulated by Judge Leventhal in his plurality opinion in United States v. Decoster, 199 U.S. App. D.C. 359, 371, 374-375, 624 F.2d 196, 208, 211-212 (en banc), cert. denied, 444 U.S. 944 (1979), and adopted by the State of Florida in Knight v. State, 394 So.2d, at 1001, a standard that requires a showing that specified deficient conduct of counsel was likely to have affected the outcome of the proceeding. 693 F.2d, at 1261-1262.

For these reasons, we granted certiorari to consider the standards by which to judge a contention that the Constitution requires that a criminal judgment be overturned because of the actual ineffective assistance of counsel. 462 U.S. 1105 (1983). We agree with the Court of Appeals that the exhaustion rule requiring dismissal of mixed petitions, though to be strictly enforced, is not jurisdictional. See Rose v. Lundy, 455 U.S., at 515 -520. We therefore address the merits of the constitutional issue.

## II

In a long line of cases that includes Powell v. Alabama, 287 U.S. 45 (1932), Johnson v. Zerbst, 304 U.S. 458 (1938), and Gideon v. Wainwright, 372 U.S. 335 (1963), this Court has recognized that the Sixth Amendment right to counsel exists, and is needed, in order to protect the fundamental right to a fair trial. The Constitution guarantees a fair trial through [466 U.S. 668, 685] the Due Process Clauses, but it defines the basic elements of a

fair trial largely through the several provisions of the Sixth Amendment, including the Counsel Clause:

> "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defence."

Thus, a fair trial is one in which evidence subject to adversarial testing is presented to an impartial tribunal for resolution of issues defined in advance of the proceeding. The right to counsel plays a crucial role in the adversarial system embodied in the Sixth Amendment, since access to counsel's skill and knowledge is necessary to accord defendants the "ample opportunity to meet the case of the prosecution" to which they are entitled. Adams v. United States ex rel. McCann, 317 U.S. 269, 275 , 276 (1942); see Powell v. Alabama, supra, at 68-69.

Because of the vital importance of counsel's assistance, this Court has held that, with certain exceptions, a person accused of a federal or state crime has the right to have counsel appointed if retained counsel cannot be obtained. See Argersinger v. Hamlin, 407 U.S. 25 (1972); Gideon v. Wainwright, supra; Johnson v. Zerbst, supra. That a person who happens to be a lawyer is present at trial alongside the accused, however, is not enough to satisfy the constitutional command. The Sixth Amendment recognizes the right to the assistance of counsel because it envisions counsel's playing a role that is critical to the ability of the adversarial system to produce just results. An accused is entitled to be assisted by an attorney, whether retained or appointed, who plays the role necessary to ensure that the trial is fair. [466 U.S. 668, 686]

For that reason, the Court has recognized that "the right to counsel is the right to the effective assistance of counsel." McMann v. Richardson, 397 U.S. 759, 771 , n. 14 (1970). Government violates the right to effective assistance when it interferes in certain ways with the ability of counsel to make independent decisions about how to conduct the defense. See, e. g., Geders v. United States, 425 U.S. 80 (1976) (bar on attorney-client consultation during overnight recess); Herring v. New York, 422 U.S. 853 (1975) (bar on summation at bench trial); Brooks v. Tennessee, 406 U.S. 605, 612 -613 (1972) (requirement that defendant be first defense witness); Ferguson v. Georgia, 365 U.S. 570, 593 -596 (1961) (bar on direct examination of defendant). Counsel, however, can also deprive a defendant of the right to effective assistance, simply by failing to render "adequate legal assistance," Cuyler v. Sullivan, 446 U.S., at 344 . Id., at 345-350 (actual conflict of interest adversely affecting lawyer's performance renders assistance ineffective).

The Court has not elaborated on the meaning of the constitutional requirement of

effective assistance in the latter class of cases - that is, those presenting claims of "actual ineffectiveness." In giving meaning to the requirement, however, we must take its purpose - to ensure a fair trial - as the guide. The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.

The same principle applies to a capital sentencing proceeding such as that provided by Florida law. We need not consider the role of counsel in an ordinary sentencing, which may involve informal proceedings and standardless discretion in the sentencer, and hence may require a different approach to the definition of constitutionally effective assistance. A capital sentencing proceeding like the one involved in this case, however, is sufficiently like a trial in its adversarial format and in the existence of standards for decision, see Barclay [466 U.S. 668, 687] v. Florida, 463 U.S. 939, 952 -954 (1983); Bullington v. Missouri, 451 U.S. 430 (1981), that counsel's role in the proceeding is comparable to counsel's role at trial - to ensure that the adversarial testing process works to produce a just result under the standards governing decision. For purposes of describing counsel's duties, therefore, Florida's capital sentencing proceeding need not be distinguished from an ordinary trial.

### III

A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

### A

As all the Federal Courts of Appeals have now held, the proper standard for attorney performance is that of reasonably effective assistance. See Trapnell v. United States, 725 F.2d, at 151-152. The Court indirectly recognized as much when it stated in McMann v. Richardson, supra, at 770, 771, that a guilty plea cannot be attacked as based on inadequate legal advice unless counsel was not "a reasonably competent attorney" and the advice was not "within the range of competence demanded of attorneys in criminal cases." See also Cuyler v. Sullivan, supra, at 344. When a convicted defendant [466 U.S. 668, 688] complains of the ineffectiveness of counsel's assistance, the defendant must show that counsel's representation fell below an objective standard of reasonableness.

More specific guidelines are not appropriate. The Sixth Amendment refers simply to "counsel," not specifying particular requirements of effective assistance. It relies instead on the legal profession's maintenance of standards sufficient to justify the law's presumption that counsel will fulfill the role in the adversary process that the Amendment envisions. See Michel v. Louisiana, 350 U.S. 91, 100 -101 (1955). The proper measure of attorney performance remains simply reasonableness under prevailing professional norms.

Representation of a criminal defendant entails certain basic duties. Counsel's function is to assist the defendant, and hence counsel owes the client a duty of loyalty, a duty to avoid conflicts of interest. See Cuyler v. Sullivan, supra, at 346. From counsel's function as assistant to the defendant derive the overarching duty to advocate the defendant's cause and the more particular duties to consult with the defendant on important decisions and to keep the defendant informed of important developments in the course of the prosecution. Counsel also has a duty to bring to bear such skill and knowledge as will render the trial a reliable adversarial testing process. See Powell v. Alabama, 287 U.S., at 68 -69.

These basic duties neither exhaustively define the obligations of counsel nor form a checklist for judicial evaluation of attorney performance. In any case presenting an ineffectiveness claim, the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances. Prevailing norms of practice as reflected in American Bar Association standards and the like, e. g., ABA Standards for Criminal Justice 4-1.1 to 4-8.6 (2d ed. 1980) ("The Defense Function"), are guides to determining what is reasonable, but they are only guides. No particular set of detailed rules for counsel's conduct can satisfactorily take [466 U.S. 668, 689] account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant. Any such set of rules would interfere with the constitutionally protected independence of counsel and restrict the wide latitude counsel must have in making tactical decisions. See United States v. Decoster, 199 U.S. App. D.C., at 371, 624 F.2d, at 208. Indeed, the existence of detailed guidelines for representation could distract counsel from the overriding mission of vigorous advocacy of the defendant's cause. Moreover, the purpose of the effective assistance guarantee of the Sixth Amendment is not to improve the quality of legal representation, although that is a goal of considerable importance to the legal system. The purpose is simply to ensure that criminal defendants receive a fair trial.

Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. Cf. Engle v. Isaac, 456 U.S. 107, 133 -134 (1982). A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to



evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy." See Michel v. Louisiana, supra, at 101. There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way. See Goodpaster, [466 U.S. 668, 690] The Trial for Life: Effective Assistance of Counsel in Death Penalty Cases, 58 N. Y. U. L. Rev. 299, 343 (1983).

The availability of intrusive post-trial inquiry into attorney performance or of detailed guidelines for its evaluation would encourage the proliferation of ineffectiveness challenges. Criminal trials resolved unfavorably to the defendant would increasingly come to be followed by a second trial, this one of counsel's unsuccessful defense. Counsel's performance and even willingness to serve could be adversely affected. Intensive scrutiny of counsel and rigid requirements for acceptable assistance could dampen the ardor and impair the independence of defense counsel, discourage the acceptance of assigned cases, and undermine the trust between attorney and client.

Thus, a court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct. A convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment. The court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance. In making that determination, the court should keep in mind that counsel's function, as elaborated in prevailing professional norms, is to make the adversarial testing process work in the particular case. At the same time, the court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.

These standards require no special amplification in order to define counsel's duty to investigate, the duty at issue in this case. As the Court of Appeals concluded, strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic [466 U.S. 668, 691] choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

The reasonableness of counsel's actions may be determined or substantially influenced

by the defendant's own statements or actions. Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. In particular, what investigation decisions are reasonable depends critically on such information. For example, when the facts that support a certain potential line of defense are generally known to counsel because of what the defendant has said, the need for further investigation may be considerably diminished or eliminated altogether. And when a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable. In short, inquiry into counsel's conversations with the defendant may be critical to a proper assessment of counsel's investigation decisions, just as it may be critical to a proper assessment of counsel's other litigation decisions. See United States v. Decoster, supra, at 372-373, 624 F.2d, at 209-210.

## B

An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment. Cf. United States v. Morrison, 449 U.S. 361, 364 -365 (1981). The purpose of the Sixth Amendment guarantee of counsel is to ensure [466 U.S. 668, 692] that a defendant has the assistance necessary to justify reliance on the outcome of the proceeding. Accordingly, any deficiencies in counsel's performance must be prejudicial to the defense in order to constitute ineffective assistance under the Constitution.

In certain Sixth Amendment contexts, prejudice is presumed. Actual or constructive denial of the assistance of counsel altogether is legally presumed to result in prejudice. So are various kinds of state interference with counsel's assistance. See United States v. Cronic, ante, at 659, and n. 25. Prejudice in these circumstances is so likely that case-by-case inquiry into prejudice is not worth the cost. Ante, at 658. Moreover, such circumstances involve impairments of the Sixth Amendment right that are easy to identify and, for that reason and because the prosecution is directly responsible, easy for the government to prevent.

One type of actual ineffectiveness claim warrants a similar, though more limited, presumption of prejudice. In Cuyler v. Sullivan, 446 U.S., at 345 -350, the Court held that prejudice is presumed when counsel is burdened by an actual conflict of interest. In those circumstances, counsel breaches the duty of loyalty, perhaps the most basic of counsel's duties. Moreover, it is difficult to measure the precise effect on the defense of representation corrupted by conflicting interests. Given the obligation of counsel to avoid conflicts of interest and the ability of trial courts to make early inquiry in certain situations likely to give rise to conflicts, see, e. g., Fed. Rule Crim. Proc. 44(c), it is reasonable for the criminal justice system to maintain a fairly rigid rule of presumed prejudice for conflicts of interest. Even so, the rule is not quite the per se rule of prejudice that exists for the Sixth Amendment claims mentioned above. Prejudice is

presumed only if the defendant demonstrates that counsel "actively represented conflicting interests" and that "an actual conflict of interest adversely affected his lawyer's performance." Cuyler v. Sullivan, supra, at 350, 348 (footnote omitted). [466 U.S. 668, 693]

Conflict of interest claims aside, actual ineffectiveness claims alleging a deficiency in attorney performance are subject to a general requirement that the defendant affirmatively prove prejudice. The government is not responsible for, and hence not able to prevent, attorney errors that will result in reversal of a conviction or sentence. Attorney errors come in an infinite variety and are as likely to be utterly harmless in a particular case as they are to be prejudicial. They cannot be classified according to likelihood of causing prejudice. Nor can they be defined with sufficient precision to inform defense attorneys correctly just what conduct to avoid. Representation is an art, and an act or omission that is unprofessional in one case may be sound or even brilliant in another. Even if a defendant shows that particular errors of counsel were unreasonable, therefore, the defendant must show that they actually had an adverse effect on the defense.

It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding. Virtually every act or omission of counsel would meet that test, cf. United States v. Valenzuela-Bernal, 458 U.S. 858, 866 -867 (1982), and not every error that conceivably could have influenced the outcome undermines the reliability of the result of the proceeding. Respondent suggests requiring a showing that the errors "impaired the presentation of the defense." Brief for Respondent 58. That standard, however, provides no workable principle. Since any error, if it is indeed an error, "impairs" the presentation of the defense, the proposed standard is inadequate because it provides no way of deciding what impairments are sufficiently serious to warrant setting aside the outcome of the proceeding.

On the other hand, we believe that a defendant need not show that counsel's deficient conduct more likely than not altered the outcome in the case. This outcome-determinative standard has several strengths. It defines the relevant inquiry in a way familiar to courts, though the inquiry, as is inevitable, is anything but precise. The standard also reflects the profound importance of finality in criminal proceedings. [466 U.S. 668, 694]  Moreover, it comports with the widely used standard for assessing motions for new trial based on newly discovered evidence. See Brief for United States as Amicus Curiae 19-20, and nn. 10, 11. Nevertheless, the standard is not quite appropriate.

Even when the specified attorney error results in the omission of certain evidence, the newly discovered evidence standard is not an apt source from which to draw a prejudice standard for ineffectiveness claims. The high standard for newly discovered evidence claims presupposes that all the essential elements of a presumptively accurate and fair proceeding were present in the proceeding whose result is challenged. Cf. United States v. Johnson, 327 U.S. 106, 112 (1946). An ineffective assistance claim asserts the absence

of one of the crucial assurances that the result of the proceeding is reliable, so finality concerns are somewhat weaker and the appropriate standard of prejudice should be somewhat lower. The result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome.

Accordingly, the appropriate test for prejudice finds its roots in the test for materiality of exculpatory information not disclosed to the defense by the prosecution, United States v. Agurs, 427 U.S., at 104 , 112-113, and in the test for materiality of testimony made unavailable to the defense by Government deportation of a witness, United States v. Valenzuela-Bernal, supra, at 872-874. The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.

In making the determination whether the specified errors resulted in the required prejudice, a court should presume, absent challenge to the judgment on grounds of evidentiary insufficiency, that the judge or jury acted according to law. [466 U.S. 668, 695]
    An assessment of the likelihood of a result more favorable to the defendant must exclude the possibility of arbitrariness, whimsy, caprice, "nullification," and the like. A defendant has no entitlement to the luck of a lawless decisionmaker, even if a lawless decision cannot be reviewed. The assessment of prejudice should proceed on the assumption that the decisionmaker is reasonably, conscientiously, and impartially applying the standards that govern the decision. It should not depend on the idiosyncracies of the particular decisionmaker, such as unusual propensities toward harshness or leniency. Although these factors may actually have entered into counsel's selection of strategies and, to that limited extent, may thus affect the performance inquiry, they are irrelevant to the prejudice inquiry. Thus, evidence about the actual process of decision, if not part of the record of the proceeding under review, and evidence about, for example, a particular judge's sentencing practices, should not be considered in the prejudice determination.

The governing legal standard plays a critical role in defining the question to be asked in assessing the prejudice from counsel's errors. When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt. When a defendant challenges a death sentence such as the one at issue in this case, the question is whether there is a reasonable probability that, absent the errors, the sentencer - including an appellate court, to the extent it independently reweighs the evidence - would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.

In making this determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury. Some of the factual findings will have

been unaffected by the errors, and factual findings that were affected will have been affected in different ways. Some errors will have had a pervasive effect on the inferences to [466 U.S. 668, 696] be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect. Moreover, a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support. Taking the unaffected findings as a given, and taking due account of the effect of the errors on the remaining findings, a court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors.

## IV

A number of practical considerations are important for the application of the standards we have outlined. Most important, in adjudicating a claim of actual ineffectiveness of counsel, a court should keep in mind that the principles we have stated do not establish mechanical rules. Although those principles should guide the process of decision, the ultimate focus of inquiry must be on the fundamental fairness of the proceeding whose result is being challenged. In every case the court should be concerned with whether, despite the strong presumption of reliability, the result of the particular proceeding is unreliable because of a breakdown in the adversarial process that our system counts on to produce just results.

To the extent that this has already been the guiding inquiry in the lower courts, the standards articulated today do not require reconsideration of ineffectiveness claims rejected under different standards. Cf. Trapnell v. United States, 725 F.2d, at 153 (in several years of applying "farce and mockery" standard along with "reasonable competence" standard, court "never found that the result of a case hinged on the choice of a particular standard"). In particular, the minor differences in the lower courts' precise formulations of the performance standard are insignificant: the different [466 U.S. 668, 697] formulations are mere variations of the overarching reasonableness standard. With regard to the prejudice inquiry, only the strict outcome-determinative test, among the standards articulated in the lower courts, imposes a heavier burden on defendants than the tests laid down today. The difference, however, should alter the merit of an ineffectiveness claim only in the rarest case.

Although we have discussed the performance component of an ineffectiveness claim prior to the prejudice component, there is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one. In particular, a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. The object of an ineffectiveness claim is not to grade counsel's performance. If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.

Courts should strive to ensure that ineffectiveness claims not become so burdensome to defense counsel that the entire criminal justice system suffers as a result.

The principles governing ineffectiveness claims should apply in federal collateral proceedings as they do on direct appeal or in motions for a new trial. As indicated by the "cause and prejudice" test for overcoming procedural waivers of claims of error, the presumption that a criminal judgment is final is at its strongest in collateral attacks on that judgment. See United States v. Frady, 456 U.S. 152, 162 -169 (1982); Engle v. Isaac, 456 U.S. 107, 126 -129 (1982). An ineffectiveness claim, however, as our articulation of the standards that govern decision of such claims makes clear, is an attack on the fundamental fairness of the proceeding whose result is challenged. Since fundamental fairness is the central concern of the writ of habeas corpus, see id., [466 U.S. 668, 698] at 126, no special standards ought to apply to ineffectiveness claims made in habeas proceedings.

Finally, in a federal habeas challenge to a state criminal judgment, a state court conclusion that counsel rendered effective assistance is not a finding of fact binding on the federal court to the extent stated by 28 U.S.C. 2254(d). Ineffectiveness is not a question of "basic, primary, or historical fac[t]," Townsend v. Sain, 372 U.S. 293, 309, n. 6 (1963). Rather, like the question whether multiple representation in a particular case gave rise to a conflict of interest, it is a mixed question of law and fact. See Cuyler v. Sullivan, 446 U.S., at 342. Although state court findings of fact made in the course of deciding an ineffectiveness claim are subject to the deference requirement of 2254(d), and although district court findings are subject to the clearly erroneous standard of Federal Rule of Civil Procedure 52(a), both the performance and prejudice components of the ineffectiveness inquiry are mixed questions of law and fact.

## V

Having articulated general standards for judging ineffectiveness claims, we think it useful to apply those standards to the facts of this case in order to illustrate the meaning of the general principles. The record makes it possible to do so. There are no conflicts between the state and federal courts over findings of fact, and the principles we have articulated are sufficiently close to the principles applied both in the Florida courts and in the District Court that it is clear that the factfinding was not affected by erroneous legal principles. See Pullman-Standard v. Swint, 456 U.S. 273, 291 -292 (1982).

Application of the governing principles is not difficult in this case. The facts as described above, see supra, at 671-678, make clear that the conduct of respondent's counsel at and before respondent's sentencing proceeding cannot be found unreasonable. They also make clear that, even assuming the [466 U.S. 668, 699] challenged conduct of counsel was unreasonable, respondent suffered insufficient prejudice to warrant setting aside his death sentence.

With respect to the performance component, the record shows that respondent's counsel made a strategic choice to argue for the extreme emotional distress mitigating circumstance and to rely as fully as possible on respondent's acceptance of responsibility for his crimes. Although counsel understandably felt hopeless about respondent's prospects, see App. 383-384, 400-401, nothing in the record indicates, as one possible reading of the District Court's opinion suggests, see App. to Pet. for Cert. A282, that counsel's sense of hopelessness distorted his professional judgment. Counsel's strategy choice was well within the range of professionally reasonable judgments, and the decision not to seek more character or psychological evidence than was already in hand was likewise reasonable.

The trial judge's views on the importance of owning up to one's crimes were well known to counsel. The aggravating circumstances were utterly overwhelming. Trial counsel could reasonably surmise from his conversations with respondent that character and psychological evidence would be of little help. Respondent had already been able to mention at the plea colloquy the substance of what there was to know about his financial and emotional troubles. Restricting testimony on respondent's character to what had come in at the plea colloquy ensured that contrary character and psychological evidence and respondent's criminal history, which counsel had successfully moved to exclude, would not come in. On these facts, there can be little question, even without application of the presumption of adequate performance, that trial counsel's defense, though unsuccessful, was the result of reasonable professional judgment.

With respect to the prejudice component, the lack of merit of respondent's claim is even more stark. The evidence that respondent says his trial counsel should have offered at the [466 U.S. 668, 700] sentencing hearing would barely have altered the sentencing profile presented to the sentencing judge. As the state courts and District Court found, at most this evidence shows that numerous people who knew respondent thought he was generally a good person and that a psychiatrist and a psychologist believed he was under considerable emotional stress that did not rise to the level of extreme disturbance. Given the overwhelming aggravating factors, there is no reasonable probability that the omitted evidence would have changed the conclusion that the aggravating circumstances outweighed the mitigating circumstances and, hence, the sentence imposed. Indeed, admission of the evidence respondent now offers might even have been harmful to his case: his "rap sheet" would probably have been admitted into evidence, and the psychological reports would have directly contradicted respondent's claim that the mitigating circumstance of extreme emotional disturbance applied to his case.

Our conclusions on both the prejudice and performance components of the ineffectiveness inquiry do not depend on the trial judge's testimony at the District Court hearing. We therefore need not consider the general admissibility of that testimony, although, as noted supra, at 695, that testimony is irrelevant to the prejudice inquiry. Moreover, the prejudice question is resolvable, and hence the ineffectiveness claim can be rejected, without regard to the evidence presented at the District Court hearing. The



state courts properly concluded that the ineffectiveness claim was meritless without holding an evidentiary hearing.

Failure to make the required showing of either deficient performance or sufficient prejudice defeats the ineffectiveness claim. Here there is a double failure. More generally, respondent has made no showing that the justice of his sentence was rendered unreliable by a breakdown in the adversary process caused by deficiencies in counsel's assistance. Respondent's sentencing proceeding was not fundamentally unfair. [466 U.S. 668, 701]

We conclude, therefore, that the District Court properly declined to issue a writ of habeas corpus. The judgment of the Court of Appeals is accordingly

Reversed.

JUSTICE BRENNAN, concurring in part and dissenting in part.

I join the Court's opinion but dissent from its judgment. Adhering to my view that the death penalty is in all circumstances cruel and unusual punishment forbidden by the Eighth and Fourteenth Amendments, see Gregg v. Georgia, 428 U.S. 153, 227 (1976) (BRENNAN, J., dissenting), I would vacate respondent's death sentence and remand the case for further proceedings. 1  [466 U.S. 668, 702]

## I

This case and United States v. Cronic, ante, p. 648, present our first occasions to elaborate the appropriate standards for judging claims of ineffective assistance of counsel. In Cronic, the Court considers such claims in the context of cases "in which the surrounding circumstances [make] it so unlikely that any lawyer could provide effective assistance that ineffectiveness [is] properly presumed without inquiry into actual performance at trial," ante, at 661. This case, in contrast, concerns claims of ineffective assistance based on allegations of specific errors by counsel - claims which, by their very nature, require courts to evaluate both the attorney's performance and the effect of that performance on the reliability and fairness of the proceeding. Accordingly, a defendant making a claim of this kind must show not only that his lawyer's performance was inadequate but also that he was prejudiced thereby. See also Cronic, ante, at 659, n. 26.

I join the Court's opinion because I believe that the standards it sets out today will both provide helpful guidance to courts considering claims of actual ineffectiveness of counsel and also permit those courts to continue their efforts to achieve progressive development of this area of the law. Like all federal courts and most state courts that have previously addressed the matter, see ante, at 683-684, the Court concludes that "the proper standard for attorney performance is that of reasonably effective assistance." Ante, at 687. And, [466 U.S. 668, 703] rejecting the strict "outcome-determinative" test

employed by some courts, the Court adopts as the appropriate standard for prejudice a requirement that the defendant "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," defining a "reasonable probability" as "a probability sufficient to undermine confidence in the outcome." Ante, at 694. I believe these standards are sufficiently precise to permit meaningful distinctions between those attorney derelictions that deprive defendants of their constitutional rights and those that do not; at the same time, the standards are sufficiently flexible to accommodate the wide variety of situations giving rise to claims of this kind.

With respect to the performance standard, I agree with the Court's conclusion that a "particular set of detailed rules for counsel's conduct" would be inappropriate. Ante, at 688. Precisely because the standard of "reasonably effective assistance" adopted today requires that counsel's performance be measured in light of the particular circumstances of the case, I do not believe our decision "will stunt the development of constitutional doctrine in this area," post, at 709 (MARSHALL, J., dissenting). Indeed, the Court's suggestion that today's decision is largely consistent with the approach taken by the lower courts, ante, at 696, simply indicates that those courts may continue to develop governing principles on a case-by-case basis in the common-law tradition, as they have in the past. Similarly, the prejudice standard announced today does not erect an insurmountable obstacle to meritorious claims, but rather simply requires courts carefully to examine trial records in light of both the nature and seriousness of counsel's errors and their effect in the particular circumstances of the case. Ante, at 695. 2  [466 U.S. 668, 704]

## II

Because of their flexibility and the requirement that they be considered in light of the particular circumstances of the case, the standards announced today can and should be applied with concern for the special considerations that must attend review of counsel's performance in a capital sentencing proceeding. In contrast to a case in which a finding of ineffective assistance requires a new trial, a conclusion that counsel was ineffective with respect to only the penalty phase of a capital trial imposes on the State the far lesser burden of reconsideration of the sentence alone. On the other hand, the consequences to the defendant of incompetent assistance at a capital sentencing could not, of course, be greater. Recognizing the unique seriousness of such a proceeding, we have repeatedly emphasized that "`where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action.'" Zant v. Stephens, 462 U.S. 862, 874 (1983) (quoting Gregg v. Georgia, 428 U.S., at 188 -189 (opinion of Stewart, POWELL, and STEVENS, JJ.)).

For that reason, we have consistently required that capital proceedings be policed at all stages by an especially vigilant concern for procedural fairness and for the accuracy of

factfinding. As JUSTICE MARSHALL emphasized last Term:

> "This Court has always insisted that the need for procedural safeguards is particularly great where life is at stake. Long before the Court established the right to counsel in all felony cases, Gideon v. Wainwright, 372 U.S. 335 (1963), it recognized that right in capital cases, Powell v. Alabama, 287 U.S. 45, 71 -72 (1932). Time [466 U.S. 668, 705] and again the Court has condemned procedures in capital cases that might be completely acceptable in an ordinary case. See, e. g., Bullington v. Missouri, 451 U.S. 430 (1981); Beck v. Alabama, 447 U.S. 625 (1980); Green v. Georgia, 442 U.S. 95 (1979) (per curiam); Lockett v. Ohio, 438 U.S. 586 (1978); Gardner v. Florida, 430 U.S. 349 (1977); Woodson v. North Carolina, 428 U.S. 280 (1976). . . .

> "Because of th[e] basic difference between the death penalty and all other punishments, this Court has consistently recognized that there is `a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case.' Ibid." Barefoot v. Estelle, 463 U.S. 880, 913 -914 (1983) (dissenting opinion).

See also id., at 924 (BLACKMUN, J., dissenting). In short, this Court has taken special care to minimize the possibility that death sentences are "imposed out of whim, passion, prejudice, or mistake." Eddings v. Oklahoma, 455 U.S. 104, 118 (1982) (O'CONNOR, J., concurring).

In the sentencing phase of a capital case, "[w]hat is essential is that the jury have before it all possible relevant information about the individual defendant whose fate it must determine." Jurek v. Texas, 428 U.S. 262, 276 (1976) (opinion of Stewart, POWELL, and STEVENS, JJ.). For that reason, we have repeatedly insisted that "the sentencer in capital cases must be permitted to consider any relevant mitigating factor." Eddings v. Oklahoma, 455 U.S., at 112 . In fact, as JUSTICE O'CONNOR has noted, a sentencing judge's failure to consider relevant aspects of a defendant's character and background creates such an unacceptable risk that the death penalty was unconstitutionally imposed that, even in cases where the matter was not raised below, the "interests of justice" may impose on reviewing courts "a duty to remand [the] case for resentencing." Id., at 117, n., and 119 (O'CONNOR, J., concurring). [466 U.S. 668, 706]

Of course, "[t]he right to present, and to have the sentencer consider, any and all mitigating evidence means little if defense counsel fails to look for mitigating evidence or fails to present a case in mitigation at the capital sentencing hearing." Comment, 83 Colum. L. Rev. 1544, 1549 (1983). See, e. g., Burger v. Zant, 718 F.2d 979 (CA11 1983) (defendant, 17 years old at time of crime, sentenced to death after counsel failed to present any evidence in mitigation), stay granted, post, at 902. Accordingly, counsel's general duty to investigate, ante, at 690, takes on supreme importance to a defendant in the context of developing mitigating evidence to present to a judge or jury considering

the sentence of death; claims of ineffective assistance in the performance of that duty should therefore be considered with commensurate care.

That the Court rejects the ineffective-assistance claim in this case should not, of course, be understood to reflect any diminution in commitment to the principle that "'the fundamental respect for humanity underlying the Eighth Amendment . . . requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death.'" Eddings v. Oklahoma, supra, at 112 (quoting Woodson v. North Carolina, 428 U.S. 280, 304 (1976) (opinion of Stewart, POWELL, and STEVENS, JJ.)). I am satisfied that the standards announced today will go far towards assisting lower federal courts and state courts in discharging their constitutional duty to ensure that every criminal defendant receives the effective assistance of counsel guaranteed by the Sixth Amendment.

## Footnotes

[ Footnote 1 ] The Court's judgment leaves standing another in an increasing number of capital sentences purportedly imposed in compliance with the procedural standards developed in cases beginning with Gregg v. Georgia, 428 U.S. 153 (1976). Earlier this Term, I reiterated my view that these procedural requirements have proven unequal to the task of eliminating the irrationality that necessarily attends decisions by juries, trial judges, and appellate courts whether to take or spare human life. Pulley v. Harris, 465 U.S. 37, 59 (1984) (BRENNAN, J., dissenting). The inherent difficulty in imposing the ultimate sanction consistent with the rule of law, see Furman v. Georgia, 408 U.S. 238, 274 -277 (1972) (BRENNAN, J., concurring); McGautha v. California, 402 U.S. 183, 248 -312 (1971) (BRENNAN, J., dissenting), is confirmed by the extraordinary pressure put on our own deliberations in recent months by the growing number of applications to stay executions. See Wainwright v. Adams, post, at 965 (MARSHALL, J., dissenting) (stating that "haste and confusion surrounding . . . decision [to vacate stay] is degrading to our role as judges"); Autry v. McKaskle, 465 U.S. 1085 (1984) (MARSHALL, J., dissenting) (criticizing Court for "dramatically expediting its normal deliberative processes to clear the way for an impending execution"); Stephens v. Kemp, 464 U.S. 1027, 1032 (1983) (POWELL, J., dissenting) (contending that procedures by which stay applications are considered "undermines public confidence in the courts and in the laws we are required to follow"); Sullivan v. Wainwright, 464 U.S. 109, 112 (1983) (BURGER, C. J., concurring) (accusing lawyers seeking review of their client's death sentences of turning "the [466 U.S. 668, 702]  administration of justice into [a] sporting contest"); Autry v. Estelle, 464 U.S. 1, 6 (1983) (STEVENS, J., dissenting) (suggesting that Court's practice in reviewing applications in death cases "injects uncertainty and disparity into the review procedure, adds to the burdens of counsel, distorts the deliberative process within this Court, and increases the risk of error"). It is difficult to believe that the decision whether to put an individual to death generates any less emotional pressure among juries, trial judges, and appellate courts than it does among

Members of this Court.

[ Footnote 2 ] Indeed, counsel's incompetence can be so serious that it rises to the level of a constructive denial of counsel which can constitute constitutional error without any showing of prejudice. See Cronic, ante, at 659-660; [466 U.S. 668, 704] Javor v. United States, 724 F.2d 831, 834 (CA9 1984) ("Prejudice is inherent in this case because unconscious or sleeping counsel is equivalent to no counsel at all").

JUSTICE MARSHALL, dissenting.

The Sixth and Fourteenth Amendments guarantee a person accused of a crime the right to the aid of a lawyer in preparing and presenting his defense. It has long been settled that "the right to counsel is the right to the effective assistance [466 U.S. 668, 707] of counsel." McMann v. Richardson, 397 U.S. 759, 771, n. 14 (1970). The state and lower federal courts have developed standards for distinguishing effective from inadequate assistance. 1 Today, for the first time, this Court attempts to synthesize and clarify those standards. For the most part, the majority's efforts are unhelpful. Neither of its two principal holdings seems to me likely to improve the adjudication of Sixth Amendment claims. And, in its zeal to survey comprehensively this field of doctrine, the majority makes many other generalizations and suggestions that I find unacceptable. Most importantly, the majority fails to take adequate account of the fact that the locus of this case is a capital sentencing proceeding. Accordingly, I join neither the Court's opinion nor its judgment.

## I

The opinion of the Court revolves around two holdings. First, the majority ties the constitutional minima of attorney performance to a simple "standard of reasonableness." Ante, at 688. Second, the majority holds that only an error of counsel that has sufficient impact on a trial to "undermine confidence in the outcome" is grounds for overturning a conviction. Ante, at 694. I disagree with both of these rulings.

## A

My objection to the performance standard adopted by the Court is that it is so malleable that, in practice, it will either have no grip at all or will yield excessive variation in the manner in which the Sixth Amendment is interpreted and applied by different courts. To tell lawyers and the lower courts that counsel for a criminal defendant must behave [466 U.S. 668, 708] "reasonably" and must act like "a reasonably competent attorney," ante, at 687, is to tell them almost nothing. In essence, the majority has instructed judges called upon to assess claims of ineffective assistance of counsel to advert to their own intuitions regarding what constitutes "professional" representation, and has discouraged them from trying to develop more detailed standards governing the performance of defense counsel. In my view, the Court has thereby not only abdicated its own responsiblity to interpret

the Constitution, but also impaired the ability of the lower courts to exercise theirs.

The debilitating ambiguity of an "objective standard of reasonableness" in this context is illustrated by the majority's failure to address important issues concerning the quality of representation mandated by the Constitution. It is an unfortunate but undeniable fact that a person of means, by selecting a lawyer and paying him enough to ensure he prepares thoroughly, usually can obtain better representation than that available to an indigent defendant, who must rely on appointed counsel, who, in turn, has limited time and resources to devote to a given case. Is a "reasonably competent attorney" a reasonably competent adequately paid retained lawyer or a reasonably competent appointed attorney? It is also a fact that the quality of representation available to ordinary defendants in different parts of the country varies significantly. Should the standard of performance mandated by the Sixth Amendment vary by locale? 2 The majority offers no clues as to the proper responses to these questions.

The majority defends its refusal to adopt more specific standards primarily on the ground that "[n]o particular set of detailed rules for counsel's conduct can satisfactorily take account [466 U.S. 668, 709] of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant." Ante, at 688-689. I agree that counsel must be afforded "wide latitude" when making "tactical decisions" regarding trial strategy, see ante, at 689; cf. infra, at 712, 713, but many aspects of the job of a criminal defense attorney are more amenable to judicial oversight. For example, much of the work involved in preparing for a trial, applying for bail, conferring with one's client, making timely objections to significant, arguably erroneous rulings of the trial judge, and filing a notice of appeal if there are colorable grounds therefor could profitably be made the subject of uniform standards.

The opinion of the Court of Appeals in this case represents one sound attempt to develop particularized standards designed to ensure that all defendants receive effective legal assistance. See 693 F.2d 1243, 1251-1258 (CA5 1982) (en banc). For other, generally consistent efforts, see United States v. Decoster, 159 U.S. App. D.C. 326, 333-334, 487 F.2d 1197, 1203-1204 (1973), disapproved on rehearing, 199 U.S. App. D.C. 359, 624 F.2d 196 (en banc), cert. denied, 444 U.S. 944 (1979); Coles v. Peyton, 389 F.2d 224, 226 (CA4), cert. denied, 393 U.S. 849 (1968); People v. Pope, 23 Cal. 3d 412, 424-425, 590 P.2d 859, 866 (1979); State v. Harper, 57 Wis. 2d 543, 550-557, 205 N. W. 2d 1, 6-9 (1973). 3 By refusing to address the merits of these proposals, and indeed suggesting that no such effort is worthwhile, the opinion of the Court, I fear, will stunt the development of constitutional doctrine in this area. [466 U.S. 668, 710]

## B

I object to the prejudice standard adopted by the Court for two independent reasons. First, it is often very difficult to tell whether a defendant convicted after a trial in which he was ineffectively represented would have fared better if his lawyer had been

competent. Seemingly impregnable cases can sometimes be dismantled by good defense counsel. On the basis of a cold record, it may be impossible for a reviewing court confidently to ascertain how the government's evidence and arguments would have stood up against rebuttal and cross-examination by a shrewd, well-prepared lawyer. The difficulties of estimating prejudice after the fact are exacerbated by the possibility that evidence of injury to the defendant may be missing from the record precisely because of the incompetence of defense counsel. 4 In view of all these impediments to a fair evaluation of the probability that the outcome of a trial was affected by ineffectiveness of counsel, it seems to me senseless to impose on a defendant whose lawyer has been shown to have been incompetent the burden of demonstrating prejudice. [466 U.S. 668, 711]

Second and more fundamentally, the assumption on which the Court's holding rests is that the only purpose of the constitutional guarantee of effective assistance of counsel is to reduce the chance that innocent persons will be convicted. In my view, the guarantee also functions to ensure that convictions are obtained only through fundamentally fair procedures. 5 The majority contends that the Sixth Amendment is not violated when a manifestly guilty defendant is convicted after a trial in which he was represented by a manifestly ineffective attorney. I cannot agree. Every defendant is entitled to a trial in which his interests are vigorously and conscientiously advocated by an able lawyer. A proceeding in which the defendant does not receive meaningful assistance in meeting the forces of the State does not, in my opinion, constitute due process.

In Chapman v. California, 386 U.S. 18, 23 (1967), we acknowledged that certain constitutional rights are "so basic to a fair trial that their infraction can never be treated as harmless error." Among these rights is the right to the assistance of counsel at trial. Id., at 23, n. 8; see Gideon v. Wainwright, 372 U.S. 335 (1963). 6 In my view, the right [466 U.S. 668, 712] to effective assistance of counsel is entailed by the right to counsel, and abridgment of the former is equivalent to abridgment of the latter. 7 I would thus hold that a showing that the performance of a defendant's lawyer departed from constitutionally prescribed standards requires a new trial regardless of whether the defendant suffered demonstrable prejudice thereby.

## II

Even if I were inclined to join the majority's two central holdings, I could not abide the manner in which the majority elaborates upon its rulings. Particularly regrettable are the majority's discussion of the "presumption" of reasonableness to be accorded lawyers' decisions and its attempt to prejudge the merits of claims previously rejected by lower courts using different legal standards.

## A

In defining the standard of attorney performance required by the Constitution, the



majority appropriately notes that many problems confronting criminal defense attorneys admit of "a range of legitimate" responses. Ante, at 689. And the majority properly cautions courts, when reviewing a lawyer's selection amongst a set of options, to avoid the hubris of hindsight. Ibid. The majority goes on, however, to suggest that reviewing courts should "indulge a strong presumption that counsel's conduct" was constitutionally acceptable, ibid.; see ante, at 690, 696, and should "appl[y] a heavy measure of deference to counsel's judgments," ante, at 691.

I am not sure what these phrases mean, and I doubt that they will be self-explanatory to lower courts. If they denote nothing more than that a defendant claiming he was denied effective assistance of counsel has the burden of proof, I [466 U.S. 668, 713] would agree. See United States v. Cronic, ante, at 658. But the adjectives "strong" and "heavy" might be read as imposing upon defendants an unusually weighty burden of persuasion. If that is the majority's intent, I must respectfully dissent. The range of acceptable behavior defined by "prevailing professional norms," ante, at 688, seems to me sufficiently broad to allow defense counsel the flexibility they need in responding to novel problems of trial strategy. To afford attorneys more latitude, by "strongly presuming" that their behavior will fall within the zone of reasonableness, is covertly to legitimate convictions and sentences obtained on the basis of incompetent conduct by defense counsel.

The only justification the majority itself provides for its proposed presumption is that undue receptivity to claims of ineffective assistance of counsel would encourage too many defendants to raise such claims and thereby would clog the courts with frivolous suits and "dampen the ardor" of defense counsel. See ante, at 690. I have more confidence than the majority in the ability of state and federal courts expeditiously to dispose of meritless arguments and to ensure that responsible, innovative lawyering is not inhibited. In my view, little will be gained and much may be lost by instructing the lower courts to proceed on the assumption that a defendant's challenge to his lawyer's performance will be insubstantial.

## B

For many years the lower courts have been debating the meaning of "effective" assistance of counsel. Different courts have developed different standards. On the issue of the level of performance required by the Constitution, some courts have adopted the forgiving "farce-and-mockery" standard, 8 while others have adopted various versions of [466 U.S. 668, 714] the "reasonable competence" standard. 9 On the issue of the level of prejudice necessary to compel a new trial, the courts have taken a wide variety of positions, ranging from the stringent "outcome-determinative" test, 10 to the rule that a showing of incompetence on the part of defense counsel automatically requires reversal of the conviction regardless of the injury to the defendant. 11

The Court today substantially resolves these disputes. The majority holds that the Constitution is violated when defense counsel's representation falls below the level

expected of reasonably competent defense counsel, ante, at 687-691, and so affects the trial that there is a "reasonable probability" that, absent counsel's error, the outcome would have been different, ante, at 691-696.

Curiously, though, the Court discounts the significance of its rulings, suggesting that its choice of standards matters little and that few if any cases would have been decided differently if the lower courts had always applied the tests announced today. See ante, at 696-697. Surely the judges in the state and lower federal courts will be surprised to learn that the distinctions they have so fiercely debated for many years are in fact unimportant.

The majority's comments on this point seem to be prompted principally by a reluctance to acknowledge that today's decision will require a reassessment of many previously rejected ineffective-assistance-of-counsel claims. The majority's unhappiness on this score is understandable, but its efforts to mitigate the perceived problem will be ineffectual. Nothing the majority says can relieve lower courts that hitherto [466 U.S. 668, 715]  have been using standards more tolerant of ineffectual advocacy of their obligation to scrutinize all claims, old as well as new, under the principles laid down today.

### III

The majority suggests that, "[f]or purposes of describing counsel's duties," a capital sentencing proceeding "need not be distinguished from an ordinary trial." Ante, at 687. I cannot agree.

The Court has repeatedly acknowledged that the Constitution requires stricter adherence to procedural safeguards in a capital case than in other cases.

> "[T]he penalty of death is qualitatively different from a sentence of imprisonment, however long. Death, in its finality, differs more from life imprisonment than a 100-year prison term differs from one of only a year or two. Because of that qualitative difference, there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case." Woodson v. North Carolina, 428 U.S. 280, 305 (1976) (plurality opinion) (footnote omitted). 12

The performance of defense counsel is a crucial component of the system of protections designed to ensure that capital punishment is administered with some degree of rationality. "Reliability" in the imposition of the death sentence can be approximated only if the sentencer is fully informed of "all possible relevant information about the individual defendant whose fate it must determine." Jurek v. Texas, 428 U.S. 262, 276 (1976) (opinion of Stewart, POWELL, and STEVENS, JJ.). The job of amassing that information and presenting it [466 U.S. 668, 716]  in an organized and persuasive manner to the sentencer is entrusted principally to the defendant's lawyer. The importance to the process of counsel's efforts, 13 combined with the severity and irrevocability of the

sanction at stake, require that the standards for determining what constitutes "effective assistance" be applied especially stringently in capital sentencing proceedings. 14

It matters little whether strict scrutiny of a claim that ineffectiveness of counsel resulted in a death sentence is achieved through modification of the Sixth Amendment standards or through especially careful application of those standards. JUSTICE BRENNAN suggests that the necessary adjustment of the level of performance required of counsel in capital sentencing proceedings can be effected simply by construing the phrase, "reasonableness under prevailing professional norms," in a manner that takes into account the nature of the impending penalty. Ante, at 704-706. Though I would prefer a more specific iteration of counsel's duties in this special context, 15 I can accept that proposal. However, when instructing lower courts regarding the probability of impact upon the outcome that requires a resentencing, I think the Court would do best explicitly to modify the legal standard itself. 16 In my view, a person on death row, whose counsel's performance fell below constitutionally acceptable levels, should not be compelled to demonstrate a "reasonable probability" [466 U.S. 668, 717] that he would have been given a life sentence if his lawyer had been competent, see ante, at 694; if the defendant can establish a significant chance that the outcome would have been different, he surely should be entitled to a redetermination of his fate. Cf. United States v. Agurs, 427 U.S. 97, 121 -122 (1976) (MARSHALL, J., dissenting). 17

## IV

The views expressed in the preceding section oblige me to dissent from the majority's disposition of the case before us. 18 It is undisputed that respondent's trial counsel made virtually no investigation of the possibility of obtaining testimony from respondent's relatives, friends, or former employers pertaining to respondent's character or background. Had counsel done so, he would have found several persons willing and able to testify that, in their experience, respondent was a responsible, nonviolent man, devoted to his family, and active in the affairs of his church. See App. 338-365. Respondent contends that his lawyer could have and should have used that testimony to "humanize" respondent, to counteract the impression conveyed by the trial that he was little more than a cold-blooded killer. Had this evidence been admitted, respondent argues, his chances of obtaining a life sentence would have been significantly better. [466 U.S. 668, 718]

Measured against the standards outlined above, respondent's contentions are substantial. Experienced members of the death-penalty bar have long recognized the crucial importance of adducing evidence at a sentencing proceeding that establishes the defendant's social and familial connections. See Goodpaster, The Trial for Life: Effective Assistance of Counsel in Death Penalty Cases, 58 N. Y. U. L. Rev. 299, 300-303, 334-335 (1983). The State makes a colorable - though in my view not compelling - argument that defense counsel in this case might have made a reasonable "strategic" decision not to present such evidence at the sentencing hearing on the assumption that an unadorned

acknowledgment of respondent's responsibility for his crimes would be more likely to appeal to the trial judge, who was reputed to respect persons who accepted responsibility for their actions. 19 But however justifiable such a choice might have been after counsel had fairly assessed the potential strength of the mitigating evidence available to him, counsel's failure to make any significant effort to find out what evidence might be garnered from respondent's relatives and acquaintances surely cannot be described as "reasonable." Counsel's failure to investigate is particularly suspicious in light of his candid admission that respondent's confessions and conduct in the course of the trial gave him a feeling of "hopelessness" regarding the possibility of saving respondent's life, see App. 383-384, 400-401. [466 U.S. 668, 719]

That the aggravating circumstances implicated by respondent's criminal conduct were substantial, see ante, at 700, does not vitiate respondent's constitutional claim; judges and juries in cases involving behavior at least as egregious have shown mercy, particularly when afforded an opportunity to see other facets of the defendant's personality and life. 20 Nor is respondent's contention defeated by the possibility that the material his counsel turned up might not have been sufficient to establish a statutory mitigating circumstance under Florida law; Florida sentencing judges and the Florida Supreme Court sometimes refuse to impose death sentences in cases "in which, even though statutory mitigating circumstances do not outweigh statutory aggravating circumstances, the addition of nonstatutory mitigating circumstances tips the scales in favor of life imprisonment." Barclay v. Florida, 463 U.S. 939, 964 (1983) (STEVENS, J., concurring in judgment) (emphasis in original).

If counsel had investigated the availability of mitigating evidence, he might well have decided to present some such material at the hearing. If he had done so, there is a significant chance that respondent would have been given a life sentence. In my view, those possibilities, conjoined with the unreasonableness of counsel's failure to investigate, are more than sufficient to establish a violation of the Sixth Amendment and to entitle respondent to a new sentencing proceeding.

I respectfully dissent.

[ Footnote 1 ] See Note, Identifying and Remedying Ineffective Assistance of Criminal Defense Counsel: A New Look After United States v. Decoster, 93 Harv. L. Rev. 752, 756-758 (1980); Note, Effective Assistance of Counsel: The Sixth Amendment and the Fair Trial Guarantee, 50 U. Chi. L. Rev. 1380, 1386-1387, 1399-1401, 1408-1410 (1983).

[ Footnote 2 ] Cf., e. g., Moore v. United States, 432 F.2d 730, 736 (CA3 1970) (defining the constitutionally required level of performance as "the exercise of the customary skill and knowledge which normally prevails at the time and place").

[ Footnote 3 ] For a review of other decisions attempting to develop guidelines for

assessment of ineffective-assistance-of-counsel claims, see Erickson, Standards of Competency for Defense Counsel in a Criminal Case, 17 Am. Crim. L. Rev. 233, 242-248 (1979). Many of these decisions rely heavily on the standards developed by the American Bar Association. See ABA Standards for Criminal Justice 4-1.1 - 4-8.6 (2d ed. 1980).

[ Footnote 4 ] Cf. United States v. Ellison, 557 F.2d 128, 131 (CA7 1977). In discussing the related problem of measuring injury caused by joint representation of conflicting interests, we observed:

> "[T]he evil . . . is in what the advocate finds himself compelled to refrain from doing, not only at trial but also as to possible pretrial plea negotiations and in the sentencing process. It may be possible in some cases to identify from the record the prejudice resulting from an attorney's failure to undertake certain trial tasks, but even with a record of the sentencing hearing available it would be difficult to judge intelligently the impact of a conflict on the attorney's representation of a client. And to assess the impact of a conflict of interests on the attorney's options, tactics, and decisions in plea negotiations would be virtually impossible. Thus, an inquiry into a claim of harmless error here would require, unlike most cases, unguided speculation." Holloway v. Arkansas, 435 U.S. 475, 490 -491 (1978) (emphasis in original).

When defense counsel fails to take certain actions, not because he is "compelled" to do so, but because he is incompetent, it is often equally difficult to ascertain the prejudice consequent upon his omissions.

[ Footnote 5 ] See United States v. Decoster, 199 U.S. App. D.C. 359, 454-457, 624 F.2d 196, 291-294 (en banc) (Bazelon, J., dissenting), cert. denied, 444 U.S. 944 (1979); Note, 93 Harv. L. Rev., at 767-770.

[ Footnote 6 ] In cases in which the government acted in a way that prevented defense counsel from functioning effectively, we have refused to require the defendant, in order to obtain a new trial, to demonstrate that he was injured. In Glasser v. United States, 315 U.S. 60, 75 -76 (1942), for example, we held:

> "To determine the precise degree of prejudice sustained by [a defendant] as a result of the court's appointment of [the same counsel for two codefendants with conflicting interests] is at once difficult and unnecessary. The right to have the assistance of counsel is too fundamental and absolute to allow courts to indulge in nice calculations as to the amount of prejudice arising from its denial."

As the Court today acknowledges, United States v. Cronic, ante, at 662, n. 31, whether the government or counsel himself is to blame for the inadequacy of the legal assistance received by a defendant should make no difference in deciding whether the defendant

must prove prejudice.

[ Footnote 7 ] See United States v. Yelardy, 567 F.2d 863, 865, n. 1 (CA6), cert. denied, 439 U.S. 842 (1978); Beasley v. United States, 491 F.2d 687, 696 (CA6 1974); Commonwealth v. Badger, 482 Pa. 240, 243-244, 393 A. 2d 642, 644 (1978).

[ Footnote 8 ] See, e. g., State v. Pacheco, 121 Ariz. 88, 91, 588 P.2d 830, 833 (1978); Hoover v. State, 270 Ark. 978, 980, 606 S. W. 2d 749, 751 (1980); Line v. State, 272 Ind. 353, 354-355, 397 N. E. 2d 975, 976 (1979).

[ Footnote 9 ] See, e. g., Trapnell v. United States, 725 F.2d 149, 155 (CA2 1983); Cooper v. Fitzharris, 586 F.2d 1325, 1328-1330 (CA9 1978) (en banc), cert. denied, 440 U.S. 974 (1979).

[ Footnote 10 ] See, e. g., United States v. Decoster, 199 U.S. App. D.C., at 370, and n. 74, 624 F.2d, at 208, and n. 74 (plurality opinion); Knight v. State, 394 So.2d 997, 1001 (Fla. 1981).

[ Footnote 11 ] See n. 7, supra.

[ Footnote 12 ] See also Zant v. Stephens, 462 U.S. 862, 884 -885 (1983); Eddings v. Oklahoma, 455 U.S. 104, 110 -112 (1982); Lockett v. Ohio, 438 U.S. 586, 604 (1978) (plurality opinion).

[ Footnote 13 ] See Goodpaster, The Trial for Life: Effective Assistance of Counsel in Death Penalty Cases, 58 N. Y. U. L. Rev. 299, 303 (1983).

[ Footnote 14 ] As JUSTICE BRENNAN points out, ante, at 704, an additional reason for examining especially carefully a Sixth Amendment challenge when it pertains to a capital sentencing proceeding is that the result of finding a constitutional violation in that context is less disruptive than a finding that counsel was incompetent in the liability phase of a trial.

[ Footnote 15 ] See Part I-A, supra. For a sensible effort to formulate guidelines for the conduct of defense counsel in capital sentencing proceedings, see Goodpaster, supra, at 343-345, 360-362.

[ Footnote 16 ] For the purposes of this and the succeeding section, I assume, solely for the sake of argument, that some showing of prejudice is necessary to state a violation of the Sixth Amendment. But cf. Part I-B, supra.

[ Footnote 17 ] As I read the opinion of the Court, it does not preclude this kind of adjustment of the legal standard. The majority defines "reasonable probability" as "a probability sufficient to undermine confidence in the outcome." Ante, at 694. In view of

the nature of the sanction at issue, and the difficulty of determining how a sentencer would have responded if presented with a different set of facts, it could be argued that a lower estimate of the likelihood that the outcome of a capital sentencing proceeding was influenced by attorney error is sufficient to "undermine confidence" in that outcome than would be true in an ordinary criminal case.

[ Footnote 18 ] Adhering to my view that the death penalty is unconstitutional under all circumstances, Gregg v. Georgia, 428 U.S. 153, 231 (1976) (MARSHALL, J., dissenting), I would vote to vacate respondent's sentence even if he had not presented a substantial Sixth Amendment claim.

[ Footnote 19 ] Two considerations undercut the State's explanation of counsel's decision. First, it is not apparent why adducement of evidence pertaining to respondent's character and familial connections would have been inconsistent with respondent's acknowledgment that he was responsible for his behavior. Second, the Florida Supreme Court possesses - and frequently exercises - the power to overturn death sentences it deems unwarranted by the facts of a case. See State v. Dixon, 283 So.2d 1, 10 (1973). Even if counsel's decision not to try to humanize respondent for the benefit of the trial judge were deemed reasonable, counsel's failure to create a record for the benefit of the State Supreme Court might well be deemed unreasonable.

[ Footnote 20 ] See, e. g., Farmer & Kinard, The Trial of the Penalty Phase (1976), reprinted in 2 California State Public Defender, California Death Penalty Manual N-33, N-45 (1980). [466 U.S. 668, 720]

---

Company | Privacy Policy | Disclaimer

Copyright © 1994-2007 FindLaw

590 P.2d 859

23 Cal.3d 412, 590 P.2d 859, 152 Cal.Rptr. 732, 2 A.L.R.4th 1
**(Cite as: 23 Cal.3d 412, 590 P.2d 859)**

People v. Pope
Cal., 1979.

Supreme Court of California, In Bank.
The PEOPLE, Plaintiff and Respondent,
v.
Joseph Glenn POPE, Defendant and Appellant.
Cr. 20359.

Feb. 22, 1979.
As Modified on Denial of Hearing March 28, 1979.

Defendant was convicted in the Superior Court, Sonoma County, Rex H. Sater, J., of second-degree robbery, and he appealed. The Supreme Court, Bird, C. J., held that: (1) in view of silence of record on reasons why no mental defense was presented, defendant's claim of ineffective assistance of counsel on such basis would be more appropriately made in petition for habeas corpus, and (2) defendant failed to establish ineffective assistance of counsel on ground that counsel did not interview or subpoena two other suspects before trial.

Affirmed.

Clark, J., filed concurring opinion.

Mosk, J., dissented and filed opinion which Newman, J., joined.
West Headnotes
**[1] Criminal Law 110        641.13(1)**

110 Criminal Law
  110XX Trial
    110XX(B) Course and Conduct of Trial in General
      110k641 Counsel for Accused
        110k641.13        Adequacy        of Representation
          110k641.13(1) k. In General. Most Cited Cases

Neither State nor Federal Constitution is satisfied by a standard which requires trial to have been reduced to a farce or sham to constitute ineffective assistance of counsel. West's Ann.Const. art. 1, § 15 ; U.S.C.A.Const. Amend. 6.

**[2] Criminal Law 110        641.13(3)**

110 Criminal Law
  110XX Trial
    110XX(B) Course and Conduct of Trial in General
      110k641 Counsel for Accused
        110k641.13        Adequacy        of Representation
          110k641.13(2) Particular Cases and Problems
            110k641.13(3) k. Indigent's or Incompetent's Counsel and Public Defenders. Most Cited Cases
Since State is constitutionally required to provide indigent defendant with counsel, conviction may not be upheld if State has furnished an indigent with representation of lower quality than that of reasonably competent attorney acting as a diligent, conscientious advocate. West's Ann.Const. art. 1, § 15; U.S.C.A.Const. Amend. 6.

**[3] Criminal Law 110        641.13(1)**

110 Criminal Law
  110XX Trial
    110XX(B) Course and Conduct of Trial in General
      110k641 Counsel for Accused
        110k641.13        Adequacy        of Representation
          110k641.13(1) k. In General. Most Cited Cases
Reviewing courts should avoid second-guessing counsel's informed choice among tactical alternatives, but defense attorney's freedom to make such decisions is not without limits. West's Ann.Const. art. 1, § 15; U.S.C.A.Const. Amend. 6.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

590 P.2d 859                                                                                    Page 2

23 Cal.3d 412, 590 P.2d 859, 152 Cal.Rptr. 732, 2 A.L.R.4th 1
(Cite as: 23 Cal.3d 412, 590 P.2d 859)

**[4] Criminal Law 110          641.1**

110 Criminal Law
    110XX Trial
        110XX(B) Course and Conduct of Trial in
General
            110k641 Counsel for Accused
                110k641.1 k. In General. Most Cited
Cases
Every person accused of a criminal offense is
entitled to constitutionally adequate legal
assistance. West's Ann.Const. art. 1, § 15;
U.S.C.A.Const. Amend. 6.

**[5] Criminal Law 110          641.13(1)**

110 Criminal Law
    110XX Trial
        110XX(B) Course and Conduct of Trial in
General
            110k641 Counsel for Accused
                110k641.13          Adequacy          of
Representation
                    110k641.13(1) k. In General. Most
Cited Cases
Right to effective assistance of counsel is denied if
trial counsel makes a critical tactical decision which
would not be made by diligent, ordinarily prudent
lawyers in criminal cases even if decision were not
made from ignorance of law or fact. West's
Ann.Const. art. 1, § 15; U.S.C.A.Const. Amend. 6.

**[6] Criminal Law 110          641.13(1)**

110 Criminal Law
    110XX Trial
        110XX(B) Course and Conduct of Trial in
General
            110k641 Counsel for Accused
                110k641.13          Adequacy          of
Representation
                    110k641.13(1) k. In General. Most
Cited Cases
Burden of proving claim of inadequate trial
assistance is on defendant; thus, defendant must
show that trial counsel failed to act in manner to be
expected of reasonably competent attorneys acting
as diligent advocates and that counsel's acts or
omissions resulted in withdrawal of potentially

meritorious defense. West's Ann.Const. art. 1, § 15;
U.S.C.A.Const. Amend. 6.

**[7] Criminal Law 110          641.13(1)**

110 Criminal Law
    110XX Trial
        110XX(B) Course and Conduct of Trial in
General
            110k641 Counsel for Accused
                110k641.13          Adequacy          of
Representation
                    110k641.13(1) k. In General. Most
Cited Cases
Once a defendant has met burden of proving claim
of inadequate trial assistance, appellate court must
look to see if record contains any explanation for
challenged aspect of representation, and if it does,
court must inquire whether explanation
demonstrates that counsel was reasonably
competent and acting as a conscientious, diligent
advocate. West's Ann.Const. art. 1, § 15;
U.S.C.A.Const. Amend. 6.

**[8] Criminal Law 110          641.13(1)**

110 Criminal Law
    110XX Trial
        110XX(B) Course and Conduct of Trial in
General
            110k641 Counsel for Accused
                110k641.13          Adequacy          of
Representation
                    110k641.13(1) k. In General. Most
Cited Cases
Where record shows that defense counsel's
omissions resulted from an informed tactical choice
within range of reasonable competence, conviction
must be affirmed against claim of ineffective
assistance of counsel. West's Ann.Const. art. 1, § 15
; U.S.C.A.Const. Amend. 6.

**[9] Criminal Law 110          1166.10(1)**

110 Criminal Law
    110XXIV Review
        110XXIV(Q) Harmless and Reversible Error
            110k1166.5 Conduct of Trial in General
                110k1166.10 Counsel for Accused

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

590 P.2d 859    Page 3

23 Cal.3d 412, 590 P.2d 859, 152 Cal.Rptr. 732, 2 A.L.R.4th 1
(Cite as: 23 Cal.3d 412, 590 P.2d 859)

110k1166.10(1) k. In General. Most Cited Cases
(Formerly 110k1166.11(5), 110k1166.11)
Where record shows that defense counsel failed to research law or investigate facts in manner of diligent and conscientious advocate, conviction should be reversed since defendant has been deprived of adequate assistance of counsel. West's Ann.Const. art. 1, § 15; U.S.C.A.Const. Amend. 6.

**[10] Criminal Law 110    641.13(1)**

110 Criminal Law
  110XX Trial
    110XX(B) Course and Conduct of Trial in General
      110k641 Counsel for Accused
        110k641.13    Adequacy    of Representation
          110k641.13(1) k. In General. Most Cited Cases
In absence of explanation in record, appellate courts should not speculate that trial counsel's failure to present particular defense resulted from incompetence; to justify relief for ineffective assistance of counsel, defendant must be able to point to something in record showing that counsel had no satisfactory rationale for what was done or not done. West's Ann.Const. art. 1, § 15; U.S.C.A.Const. Amend. 6.

**[11] Criminal Law 110    1134(3)**

110 Criminal Law
  110XXIV Review
    110XXIV(L) Scope of Review in General
      110k1134 Scope and Extent in General
        110k1134(3) k. Questions Considered in General. Most Cited Cases
        (Formerly 197k25.1(6))
Where record does not illuminate basis for challenged acts or omissions, claim of ineffective assistance of counsel is more appropriately made in a petition for habeas corpus where there is opportunity in an evidentiary hearing to have trial counsel fully describe his or her reasons for acting or failing to act in manner complained of. West's Ann.Const. art. 1, § 15; West's Ann.Pen.Code, §§ 1483, 1484; U.S.C.A.Const. Amend. 6.

**[12] Criminal Law 110    1134(3)**

110 Criminal Law
  110XXIV Review
    110XXIV(L) Scope of Review in General
      110k1134 Scope and Extent in General
        110k1134(3) k. Questions Considered in General. Most Cited Cases
        (Formerly 197k25.1(6))
To promote judicial economy in direct appeals where record contains no explanation for challenged acts or omissions, appellate counsel who wish to raise issue of inadequate trial representation should join a verified petition for habeas corpus. West's Ann.Const. art. 1, § 15; West's Ann.Pen.Code, §§ 1483, 1484; U.S.C.A.Const. Amend. 6.

**[13] Criminal Law 110    1166.10(1)**

110 Criminal Law
  110XXIV Review
    110XXIV(Q) Harmless and Reversible Error
      110k1166.5 Conduct of Trial in General
        110k1166.10 Counsel for Accused
          110k1166.10(1) k. In General. Most Cited Cases
          (Formerly 110k1166.11(5), 110k1166.11)
Claim of ineffective assistance of counsel does not exist as a tool for reversing validly obtained convictions, but as a means of assuring that criminal defendants receive legal assistance to which they are constitutionally entitled. West's Ann.Const. art. 1, § 15; U.S.C.A.Const. Amend. 6.

**[14] Criminal Law 110    1119(1)**

110 Criminal Law
  110XXIV Review
    110XXIV(G) Record and Proceedings Not in Record
      110XXIV(G)15 Questions Presented for Review
        110k1113 Questions Presented for Review
          110k1119 Conduct of Trial in General
            110k1119(1) k. In General. Most Cited Cases

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

590 P.2d 859                                                    Page 4

23 Cal.3d 412, 590 P.2d 859, 152 Cal.Rptr. 732, 2 A.L.R.4th 1
(Cite as: 23 Cal.3d 412, 590 P.2d 859)

Where record included neither an explanation as to why defense counsel did not raise any of potential mental defenses nor an indication that she was asked for an explanation, defendant's claim of ineffective assistance of counsel based on failure of counsel to make use of record of defendant's limited intelligence was not determined on direct appeal and was more appropriately left for petition for habeas corpus. West's Ann.Const. art. 1, § 15; West's Ann.Pen.Code, §§ 1483, 1484; U.S.C.A.Const. Amend. 6.

**[15] Criminal Law 110    641.13(6)**

110 Criminal Law
    110XX Trial
        110XX(B) Course and Conduct of Trial in General
            110k641 Counsel for Accused
                110k641.13 Adequacy of Representation
                    110k641.13(2) Particular Cases and Problems
                        110k641.13(6) k. Evidence; Procurement, Presentation and Objections. Most Cited Cases
Although defense preparation was less than exemplary, defendant failed to demonstrate constitutionally inadequate preparation of counsel based on counsel's failure to interview or subpoena two suspects before trial commenced. West's Ann.Const. art. 1, § 15; U.S.C.A.Const. Amend. 6.

**\*417 \*\*\*734 \*\*861** Paul N. Halvonik, State Public Defender, Clifton R. Jeffers, Chief Asst. State Public Defender, and Ezra Hendon, Deputy State Public Defender, for defendant and appellant.
Evelle J. Younger, Atty. Gen., Jack R. Winkler, Chief Asst. Atty. Gen., Edward P. O'Brien, Asst. Atty. Gen., W. Eric Collins and Nathan D. Mihara, Deputy Attys. Gen., for plaintiff and respondent.
BIRD, Chief Justice.
Appellant, Joseph Glenn Pope, appeals from his conviction for second degree robbery. His sole contention is that he was denied his constitutional right to the effective assistance of counsel at trial.

**I**

Late in the evening of February 24, 1976, Herman E. Brower was robbed in a parking lot outside a bar in Cotati. Brower had just left the Trade Winds bar where he had been drinking. Brower testified that he had paid for a drink with a $20 bill and that a black man, with whom Brower had been chatting, had picked up the change and put it in his pocket. This man suggested that they go out for dinner and started to leave. Brower followed.

**\*418** Once outside the bar, Brower heard footsteps behind him. The black man said to Brower, "He's coming with us." The next thing Brower remembered was being shoved to the ground by the black man, who then held Brower's legs for a white man, who removed Brower's wallet. Although intoxicated at the time of the robbery, Brower later identified appellant from a photographic line up as his black assailant. Brower could not identify appellant at trial.

The day after the robbery, Cotati police arrested appellant and seized a wallet which contained $56. [FN1]At the stationhouse, appellant was advised of his Miranda rights, with an additional admonition by the police: "Further, you have the right to make any statement you wish which might clarify or explain your position in this matter."Appellant stated that he understood his rights and signed a waiver form.

    FN1. The police later showed the wallet to Brower who could not identify it. The prosecution introduced the wallet and its contents into evidence at trial without objection.

After initially denying that he had even spoken to Brower at the Trade Winds bar, appellant changed his story several times, each time admitting a greater degree of involvement as the police confronted him with additional pieces of information. Ultimately, after trying to "make a deal, " appellant told police he had witnessed the robbery which he said was committed by two white men and a black. Although the two white men, Harbin and

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

590 P.2d 859                                                                                        Page 5

23 Cal.3d 412, 590 P.2d 859, 152 Cal.Rptr. 732, 2 A.L.R.4th 1
(Cite as: 23 Cal.3d 412, 590 P.2d 859)

Stoker, became police suspects in the robbery, it appears ***735 **862 that only appellant was charged with the crime.

Two and one-half months before trial, the Sonoma County Public Defender was appointed to represent appellant. However, it was not until four working days before trial that the office assigned a deputy public defender to try the case. [FN2]

> FN2. Trial counsel was at least the fourth attorney from the office to represent appellant in proceedings related to the case. At trial she was assisted by the head of the office.

Before trial, the court appointed a psychiatrist to assist in appellant's defense. Although the augmented record on appeal does not include the psychiatrist's report, the record does contain two previous psychological evaluations which showed that appellant's mental capabilities were limited. These reports, written in 1973 and 1975, placed appellant's intelligence in the "borderline defective" category of retardation.[FN3]The *419 doctors who examined appellant stated that he "function(ed) intellectually like a child"; that he could not make change or drive a car; that he was gullible and suggestible; that instructions to him must be couched in "simple, concrete terms"; and that he had a "poor tolerance for ambiguity." [FN4]

> FN3. These evaluations were read and considered by the trial judge after trial and before he ordered appellant committed for diagnosis pursuant to Penal Code section 1203.03. The diagnostic report and the report of another psychiatrist who examined appellant before sentencing were consistent with the conclusions of the 1973 and 1975 evaluations.

The record does not show whether trial counsel obtained copies of the 1973 and 1975 evaluations before trial, or whether she knew of their existence at that time. However, counsel was aware of appellant's mental limitations, as indicated by her opening statement in which she asserted that "Mr.

Pope has a borderline intelligence."

> FN4. The record does not establish that appellant suffered from any emotional illness or that he could not tell right from wrong. Before sentencing, the trial judge characterized appellant as a man "who appears to be responsible for his actions in a purely legal sense, but that's about all."

No evidence as to appellant's limited intelligence was introduced at trial or used before trial to challenge the admissibility of appellant's out-of-court statements to police. The sole defense presented by appellant's counsel was that the robbery was committed by the two other suspects, Harbin and Stoker. There was testimony that the two men were troublemakers and that they had followed appellant and the victim out of the bar on the night of the robbery. Appellant's counsel did not seek to subpoena Harbin and Stoker before trial.

In cross-examining a police officer, appellant's counsel sought to elicit extrajudicial statements made by one suspect to the other. The officer had overheard Harbin tell Stoker that "we were seen leaving the Trade Winds (but the police) haven't got any evidence and we don't have anything to worry about."The prosecutor objected on the grounds that such hearsay could not be admitted unless counsel made a showing that the declarant was unavailable. [FN5] Trial was adjourned to give defense counsel an opportunity to subpoena Harbin and Stoker.

> FN5.Evidence Code section 1230 provides in pertinent part: "Evidence of a statement by a declarant having sufficient knowledge of the subject is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and the statement, when made, . . . so far subjected him to the risk of civil or criminal liability . . . that a reasonable man in his position would not have made the statement unless he believed it to be true."

On the following day, the deputy public defender produced Harbin and called him as a witness. On

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

590 P.2d 859

Page 6

23 Cal.3d 412, 590 P.2d 859, 152 Cal.Rptr. 732, 2 A.L.R.4th 1
(Cite as: 23 Cal.3d 412, 590 P.2d 859)

advice of a newly appointed private counsel, Harbin invoked his Fifth Amendment privilege.[FN6] Stoker, on the other hand, was not located and the prosecution questioned whether the public defender's office had exercised "reasonable diligence" in seeking *420 to procure Stoker's attendance.***736 **963 [FN7] Defense counsel acknowledged that the only efforts to obtain Stoker's presence at trial had been made by telephone. When the court asked if counsel had reached Stoker, counsel responded: "No, your Honor, we were unable to. We did attempt to contact him last week. This case was actually assigned to an attorney on Tuesday. That particular attorney, being myself, was in hearing on Tuesday, Wednesday, Thursday and Friday, so the calls were made in the late afternoon, when he was apparently still at work, but those messages were not returned." [FN8]

FN6. Exercise of this privilege rendered Harbin "unavailable as a witness" within the meaning of Evidence Code section 240, which provides in part: "(a) Except as otherwise provided in subdivision (b), ' unavailable as a witness' means that the declarant is: (1) (e)xempted or precluded on the ground of privilege from testifying concerning the matter to which his statement is relevant . . . ."

FN7.Evidence Code section 240, subdivision (a)(5) provides that a declarant is "unavailable as a witness" if he is " (a)bsent from the hearing and the proponent of his statement has exercised Reasonable diligence but has been unable to procure his attendance by the court's process."(Emphasis added.) The issue of Stoker's unavailability arose because defense counsel indicated that hearsay statements made by Stoker might be introduced.

FN8. The head of the public defender's office, who was also present at trial, added: "I might state the comment, if I may, by (the deputy public defender), although she was in hearings, I

know from personal knowledge that she worked on the case mornings and evenings and then had the benefit of all the other lawyers that were involved in Mr. Pope's case, including myself and others, and we, hopefully, were completely prepared to proceed. "

Counsel also offered an explanation as to why the calls were not returned: "Unfortunately, you see, Harbin's a client of ours, and he knows we are representing Pope, and he is not answering the phone calls."

The court accepted the deputy public defender's explanation and held that there had been due diligence in seeking to secure Stoker's presence. Later, Harbin's extrajudicial statement to Stoker was admitted into evidence.

In closing argument, defense counsel argued that the only direct evidence of appellant's participation in the robbery was the identification by the victim, who had been drinking on the night of the incident. At one point, counsel sought to minimize the significance of appellant's inconsistent statements to the police, suggesting that the inconsistency resulted from appellant's limited mental capacity. However, the court ordered her to discontinue that line of argument since no evidence had been introduced on that issue.

The jury found appellant guilty of second degree robbery. Following a diagnostic study and recommendation by the Department of Corrections, appellant was sentenced to state prison.

*421 II

This court must determine whether appellant's legal representation at trial was inadequate. Two basic grounds are advanced by appellant: (1) the failure by counsel to make use of the record of appellant's limited intelligence; and (2) her failure to interview or subpoena the two other suspects, Harbin and Stoker, before trial commenced. In order to assess the adequacy of the legal assistance appellant received, this court must determine the proper standard by which trial counsel's performance is to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

590 P.2d 859

23 Cal.3d 412, 590 P.2d 859, 152 Cal.Rptr. 732, 2 A.L.R.4th 1
(Cite as: 23 Cal.3d 412, 590 P.2d 859)

be measured.[FN9]

> FN9. Appellant was indigent and represented by appointed counsel at trial. Thus, the present case does not involve the appropriate standard for adequate representation by a retained criminal attorney. This court need not decide whether that standard would differ from the one described herein.

In People v. Ibarra (1963) 60 Cal.2d 460, 464, 34 Cal.Rptr. 863, 866, 386 P.2d 487, 490, this court articulated a strict standard to measure the constitutional right to " 'effective aid in the preparation and trial of the case.'(Powell v. State of Alabama, 287 U.S. 45, 71, 53 S.Ct. 55, 77 L.Ed. 158.)"In order to obtain relief on appeal, "(i)t must appear that counsel's lack of diligence or competence reduced the trial to a 'farce or a sham.' (Citations.)" (People v. Ibarra, supra, 60 Cal.2d at p. 464, 34 Cal.Rptr. at p. 866, 386 P.2d at p. 490.)

In several cases, this court has moved away from the "farce or sham" standard. For example, some decisions of this court have held that a defendant is entitled to counsel " 'reasonably likely to render, And rendering reasonably effective assistance.' ***737 **864 (Citations.)" (In re Saunders (1970) 2 Cal.3d 1033, 1041, 88 Cal.Rptr. 633, 638, 472 P.2d 921, 926, original emphasis; In re Williams (1969) 1 Cal.3d 168, 176, 81 Cal.Rptr. 784, 460 P.2d 984.)Other decisions employ the alternative test of whether counsel "effectively suppl(ied) to a defendant those skills and legal knowledge which we can reasonably expect from any member of the bar."(People v. Cook (1975) 13 Cal.3d 663, 672-673, 119 Cal.Rptr. 500, 506, 532 P.2d 148, 154;People v. Steger (1976) 16 Cal.3d 539, 551, 128 Cal.Rptr. 161, 546 P.2d 665;People v. Camden (1976) 16 Cal.3d 808, 815, 129 Cal.Rptr. 438, 549 P.2d 1110.)[FN10]

> FN10. These decisions apply this test conjunctively with the "farce or sham" standard. Still other opinions of this court have applied the "farce or sham" standard

exclusively. (E. g., People v. Jenkins (1975) 13 Cal.3d 749, 753, 119 Cal.Rptr. 705, 532 P.2d 857;People v. McDaniel (1976) 16 Cal.3d 156, 179, 127 Cal.Rptr. 467, 545 P.2d 843.)

Insofar as it survives, the "farce or sham" standard (or its alter ego, the "farce and mockery" standard) has been widely criticized by legal *422 scholars. (See generally, e. g., Bazelon, The Defective Assistance of Counsel (1973) 42 U.Cin.L.Rev. 1, 28; Finer, Ineffective Assistance of Counsel (1973) 58 Cornell L.Rev. 1077, 1078-1081; Note, Ineffective Representation as a Basis for Relief from Conviction: Principles for Appellate Review (1977) 13 Colum.J. of L. & Soc. Prob. 1, 32-37.) A growing number of other jurisdictions have repudiated it outright. (E. g., Moore v. United States (3d Cir. 1970) 432 F.2d 730, 737 (en banc); United States ex rel. Williams v. Twomey (7th Cir. 1975) 510 F.2d 634, 641;State v. Harper (1973) 57 Wis.2d 543, 552, 557, 205 N.W.2d 1, 6, 9;People v. Garcia (1976) 398 Mich. 250, 266, 247 N.W.2d 547, 553.)Significant among these jurisdictions is the federal Court of Appeals for the District of Columbia, the very court which enunciated the "farce and mockery" rule in the first instance. (See United States v. DeCoster (1973) 159 U.S.App.D.C. 326, 330-331, 487 F.2d 1197, 1201-1202;Beasley v. United States (6th Cir. 1974) 491 F.2d 687, 693-694.)

The reasons set forth by these courts and commentators for replacing the "farce or sham" standard are compelling. The standard originated in decisions which held that the right to competent representation derived solely from the due process clause of the Constitution and not from the provision guaranteeing the right to the assistance of counsel. (Diggs v. Welch (1945), 80 U.S.App.D.C. 5, 6-7, 148 F.2d 667, 668-669;Jones v. Huff (1945), 80 U.S.App.D.C. 254, 255, 152 F.2d 14, 15.)[FN11] This view has been thoroughly discredited, for courts now recognize that the right to competent representation at trial is grounded in the constitutional right to the assistance of counsel. (See McMann v. Richardson (1970) 397 U.S. 759, 771, fn. 14,90 S.Ct. 1441, 25 L.Ed.2d 763.) Accordingly, constitutionally adequate assistance

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

590 P.2d 859                                                                                                     Page 8

23 Cal.3d 412, 590 P.2d 859, 152 Cal.Rptr. 732, 2 A.L.R.4th 1
(Cite as: 23 Cal.3d 412, 590 P.2d 859)

can no longer be measured by the due process standard of Ibarra, but instead must be determined by a standard bottomed on the Sixth Amendment of the United States Constitution and article I, section 15 of the California Constitution.[FN12](See generally, Comment, The Right to Competent Defense Counsel: Emergence of a Sixth Amendment Standard of Review on Appeal and the Persistence of the "Sham and Farce" Rule in California, supra, 15 Santa Clara Law. 355.)

FN11. The "farce or sham" rule announced in Ibarra may be traced back to Diggs v. Welch, supra, 80 U.S.App.D.C. 5, 148 F.2d 667.(See Comment, The Right to Competent Defense Counsel: Emergence of a Sixth Amendment Standard of Review on Appeal and the Persistence of the " Sham and Farce" Rule in California (1975) 15 Santa Clara Law. 355, 377.) Further, the due process roots of Ibarra are evident in that decision's explicit reliance on Jones v. Huff, supra, 80 U.S.App.D.C. 254, 152 F.2d 14. (See People v. Ibarra, supra, 60 Cal.2d at p. 465, 34 Cal.Rptr. 863, 386 P.2d 487.)

FN12. Both constitutional provisions accord defendants in criminal cases a right to the "assistance of counsel." The California Constitution's right to counsel provision "was adopted to secure to the accused person all the benefits which may flow from the employment of counsel to conduct his defense (citation) . . . ." ( People v. Avilez (1948) 86 Cal.App.2d 289, 294, 194 P.2d 829, 833, discussing former Cal.Const., art. I, s 13, now art. I, s 15.)

**\*423 \*\*\*738 \*\*865 [1]** The constitutional right to the adequate assistance of counsel suggests a focus on the quality of the representation provided the accused, while due process concerns itself with the fairness of the trial as a whole. "One may receive ineffective assistance of counsel even though the proceedings have not been a farce or mockery. (Citation.)" (Herring v. Estelle (5th Cir. 1974) 491

F.2d 125, 128.)Indeed, a substantial portion of the obligation counsel owes is not directly connected with the trial but involves investigation and advice at pretrial and posttrial stages. (See generally, ABA Project on Standards for Crim. Justice, Stds. Relating to the Prosecution Function and the Defense Function (Approved Draft 1971) pp. 147-148, 225-228.) Thus, neither the Sixth Amendment nor article I, section 15 is satisfied by a standard which requires the trial to have been reduced to a farce or sham.

Further, the Ibarra standard is vague and subjective. As described by one federal court of appeals, "The phrase 'farce and mockery' has no obvious intrinsic meaning. What may appear a 'farce' to one court may seem a humdrum proceeding to another. The meaning of the Sixth Amendment does not, of course, vary with the sensibilities and subjective judgments of various courts. The law demands objective explanation, so as to ensure the even dispensation of justice."(Beasley v. United States, supra, 491 F.2d at p. 692.)[FN13]

FN13. Case-by-case analyses confirm the disparate and inequitable results which the "farce and mockery" standard generates among different courts. (See Comment, The Right to Competent Defense Counsel: Emergence of a Sixth Amendment Standard of Review on Appeal and the Persistence of the "Sham and Farce" Rule in California, supra, 15 Santa Clara Law at p. 362.) The reason for such disparity is evident. "The use of a short negative statement mandating what a trial should not be offers no guidance to an appellate court trying to decide what constitutes effective representation."(Note, Ineffective Representation as a Basis for Relief from Conviction: Principles for Appellate Review, supra, 13 Colum.J. of L. & Soc.Prob. 1, 37.)

In McMann v. Richardson, supra, 397 U.S. at page 771, 90 S.Ct. 1441, the United States Supreme Court set forth a more objective standard for testing the adequacy of counsel's representation. The court

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

23 Cal.3d 412, 590 P.2d 859, 152 Cal.Rptr. 732, 2 A.L.R.4th 1
(Cite as: 23 Cal.3d 412, 590 P.2d 859)

stated that defense counsel's pretrial advice must be "within the range of competence demanded of attorneys in criminal cases."(Accord, Tollett v. Henderson (1973) 411 U.S. 258, 264, 93 S.Ct. 1602, 36 L.Ed.2d 235.)Following McMann, the Court of Appeals for the District of Columbia held that "A defendant is entitled to the reasonably competent assistance of an attorney acting as his diligent conscientious advocate."(United States v. DeCoster, supra, 159 U.S.App.D.C. at 326, 487 F.2d at p. 1202, emphasis original.)

**\*424** [2] The DeCoster rule expresses counsel's duty to act as "an active advocate on behalf of his client" (Anders v. California (1967) 386 U.S. 738, 744, 87 S.Ct. 1396, 1400, 18 L.Ed.2d 493), while testing counsel's actions by the familiar and objective standard of the ordinarily prudent lawyer. (Cf. Smith v. Lewis (1975) 13 Cal.3d 349, 358-359, 118 Cal.Rptr. 621, 530 P.2d 589 (attorney's civil liability for malpractice measured by standard of reasonableness).) The chief virtue of this standard lies in its ability to uphold the guarantees of the Sixth Amendment and article I, section 15. Since the state is constitutionally required to provide indigent defendants with counsel (Gideon v. Wainwright (1963) 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799; see Gordon v. Justice Court (1974) 12 Cal.3d 323, 332, 115 Cal.Rptr. 632, 525 P.2d 72), a conviction may not be upheld if the state has furnished an indigent with representation of lower quality than that of a reasonably competent attorney acting as a diligent, conscientious advocate.

[3][4][5] In addition, the standard of reasonably competent representation affords a measureable guide for evaluating the quality of trial counsel's decisionmaking. "Defense strategy and tactics which lawyers of ordinary training and skill in the criminal law would not consider competent deny a criminal defendant the effective assistance **\*\*\*739 \*\*866** of counsel, if some other action would have better protected a defendant and was reasonably foreseeable as such before trial. (Citation.)" ( Beasley v. United States, supra, 491 F.2d at p. 696.) Reviewing courts should avoid second-guessing counsel's informed choice among tactical alternatives, but a defense attorney's freedom to make such decisions is not without limits. Every

person accused of a criminal offense is entitled to constitutionally adequate legal assistance. (E. g., In re Saunders, supra, 2 Cal.3d at p. 1041, 88 Cal.Rptr. 633, 472 P.2d 921.)That right is denied if trial counsel makes a critical tactical decision which would not be made by diligent, ordinarily prudent lawyers in criminal cases. This is true even if the decision were not made from ignorance of the law or a fact.

To render reasonably competent assistance, an attorney in a criminal case must perform certain basic duties.[FN14](See generally, ABA Project on Standards for Crim. Justice, Stds. Relating to the Prosecution Function and the Defense Function, Supra, p. 141 et seq.) Generally, the Sixth Amendment and article I, section 15 require counsel's "diligence and active participation in the full and effective preparation of his client's **\*425** case."(People v. Vest (1974) 43 Cal.App.3d 728, 736, 118 Cal.Rptr. 84, 88.)Criminal defense attorneys have a " 'duty to investigate carefully all defenses of fact and of law that may be available to the defendant . . . .' " (In re Williams, supra, 1 Cal.3d at p. 175, 81 Cal.Rptr. at p. 789, 460 P.2d at p. 989.)This obligation includes conferring with the client "without undue delay and as often as necessary . . . to elicit matters of defense. . . . ." ( Coles v. Peyton (4th Cir. 1968) 389 F.2d 224, 226.) "Counsel should promptly advise his client of his rights and take all actions necessary to preserve them. . . . Counsel should also be concerned with the accused's right to be released from custody pending trial, and be prepared, where appropriate, to make motions for a pretrial psychiatric examination or for the suppression of evidence. (Fns. omitted.)"(United States v. DeCoster, supra, 159 U.S.App.D.C. at p. 327, 487 F.2d at p. 1203; People v. Whittington (1977) 74 Cal.App.3d 806, 818-819, fn. 6,141 Cal.Rptr. 742.)If counsel's failure to perform these obligations results in the withdrawal of a crucial or potentially meritorious defense,[FN15]" 'the defendant has not had the assistance to which he is entitled.'" (In re Saunders, supra, 2 Cal.3d at p. 1042, 88 Cal.Rptr. at p. 638, 472 P.2d at p. 926.)

FN14. The duties described herein are not

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

23 Cal.3d 412, 590 P.2d 859, 152 Cal.Rptr. 732, 2 A.L.R.4th 1
(Cite as: 23 Cal.3d 412, 590 P.2d 859)

meant as an exhaustive list of a lawyer's constitutional obligations in a criminal case.

FN15. A crucial defense is not necessarily one which, if presented, "would result inexorably in a defendant's acquittal."( People v. Rodriguez (1977) 73 Cal.App.3d 1023, 1028, 141 Cal.Rptr. 118, 121; accord People v. Shells (1971) 4 Cal.3d 626, 631, 94 Cal.Rptr. 275, 483 P.2d 1227.)Ibarra itself teaches that by failing to obtain an adjudication of the stronger of two potential defenses, trial counsel deprived his client of constitutionally adequate assistance. (60 Cal.2d at pp. 465-466,34 Cal.Rptr. 863, 386 P.2d 487.)

[6] Of course, the burden of proving a claim of inadequate trial assistance is on the appellant. ( People v. Camden, supra, 16 Cal.3d at p. 816, 129 Cal.Rptr. 438, 549 P.2d 1110.)Thus, appellant must show that trial counsel acted or failed to act in a manner to be expected of reasonably competent attorneys acting as diligent advocates. In addition, appellant must establish that counsel's acts or omissions resulted in the withdrawal of a potentially meritorious defense.

[7][8][9] Once an appellant has met these burdens, the appellate court must look to see if the record contains any explanation for the challenged aspect of representation. If it does, the court must inquire whether the explanation demonstrates that counsel was reasonably competent and acting as a conscientious, diligent advocate. For example, where the record shows that counsel's omissions resulted from an informed tactical choice within the range of reasonable competence, the conviction must be affirmed. (E. g., People v. Fain (1969) 70 Cal.2d 588, 600, 75 Cal.Rptr. 633, 451 P.2d 65.)In contrast, where the record shows that counsel has failed to research the law ***740 **867 or investigate the facts in the manner of a diligent and conscientious advocate, the conviction should be reversed since the *426 defendant has been deprived of adequate assistance of counsel. (E. g., People v. McDowell (1968) 69 Cal.2d 737, 73 Cal.Rptr. 1, 447 P.2d 97.)

[10] In some cases, however the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged. In such circumstances, unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation, these cases are affirmed on appeal.[FN16](E. g., People v. Miller (1972) 7 Cal.3d 562, 572-574, 102 Cal.Rptr. 841, 498 P.2d 1089.)Otherwise, appellate courts would become engaged "in the perilous process of second-guessing."(Id., at p. 573, 102 Cal.Rptr. at p. 848, 498 P.2d at p. 1096.)Reversals would be ordered unnecessarily in cases where there were, in fact, good reasons for the aspect of counsel's representation under attack. Indeed, such reasons might lead a new defense counsel on retrial to do exactly what the original counsel did, making manifest the waste of judicial resources caused by reversal on an incomplete record.

FN16. It has been said that an appellant must prove inadequate assistance as "a demonstrable reality and not a speculative matter."(People v. Stephenson (1974) 10 Cal.3d 652, 661, 111 Cal.Rptr. 556, 562, 517 P.2d 820, 826.)This formulation of the heavy burden on a party alleging inadequate assistance was intended to summarize, in concise fashion, the rules just described: in the absence of an explanation in the record, appellate courts should not speculate that trial counsel's failure to present a particular defense resulted from incompetence. To justify relief, appellant must be able to point to something in the record showing that counsel had no satisfactory rationale for what was done or not done.

Although concise, the Stephenson formulation is subject to misinterpretation. The language demanding proof of incompetence as "a demonstrable reality and not a speculative matter" may be misunderstood to require inadequate assistance throughout the proceeding, when in fact, a single inexcusable error which withdraws a potentially meritorious defense is sufficient. (E. g., People v. Shells, supra, 4 Cal.3d 626, 94 Cal.Rptr. 275, 483 P.2d 1227.)To avoid such confusion, the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

23 Cal.3d 412, 590 P.2d 859, 152 Cal.Rptr. 732, 2 A.L.R.4th 1
(Cite as: 23 Cal.3d 412, 590 P.2d 859)

Stephenson formulation should be replaced with the analysis of appellant's burden set forth in this opinion.

[11][12][13] Where the record does not illuminate the basis for the challenged acts or omissions, a claim of ineffective assistance is more appropriately made in a petition for habeas corpus. In habeas proceedings, there is an opportunity in an evidentiary hearing to have trial counsel fully describe his or her reasons for acting or failing to act in the manner complained of. (See Pen. Code, ss 1483 and 1484; e. g., In re Williams, supra, 1 Cal.3d 168, 81 Cal.Rptr. 784, 460 P.2d 984.)For example, counsel may explain why certain defenses were or were not presented. Having afforded the trial attorney an opportunity to explain, courts are in a position to intelligently evaluate whether counsel's acts or omissions were within the range of reasonable competence. [FN17]

> FN17. To promote judicial economy in direct appeals where the record contains no explanation, appellate counsel who wish to raise the issue of inadequate trial representation should join a verified petition for habeas corpus. (See, e. g., People v. Apodaca (1978) 76 Cal.App.3d 479, 489, fn. 3, 142 Cal.Rptr. 830.)

The dissent argues that resolution of claims of ineffective representation is preferable on direct appeal rather than in habeas corpus proceedings because the latter are both potentially duplicative and potentially harmful to the convicted defendant's claim. (Dis. opn., Post, p. 749 of 152 Cal.Rptr., p. — of — P.2d.) As indicated above, however, where the record does not illuminate the reasons for counsel's actions, reversal on appeal may often result in unwarranted retrials, a result serving neither justice nor economy.

As for the dissent's second rationale, the fact that a habeas proceeding "is not without its potential pitfalls" for convicted defendants does not lead to the conclusion that such proceedings should be avoided. The claim of ineffective assistance does not exist as a tool for reversing validly obtained convictions, but as a means of assuring that criminal defendants receive the legal assistance to which they are constitutionally entitled. Convictions should not be reversed on appeal because it might be discovered in a habeas proceeding that, to use the dissent's examples, the reason counsel did not call certain witnesses was either to avoid producing false testimony or to protect his client. Nonmeritorious claims of incompetent representation will be discouraged to the extent that there is an opportunity to determine the actual, as opposed to hypothesized, reasons for counsel's acts or omissions. That habeas corpus may be "a double-edged sword" is no reason why direct appeal should be made available as a shield for defendants with nonmeritorious claims of inadequate representation.

***741 **868 *427 III

With these principles in mind, this court must determine whether appellant received the kind of legal assistance to be expected of a reasonably competent attorney acting as a conscientious, diligent advocate. Appellant contends that his trial counsel's representation was inadequate because she failed to use significant evidence of his mental deficiency. He asserts that given this evidence, a reasonably competent counsel would have taken one or more of the following steps: (1) sought a pretrial hearing to determine appellant's competence to stand trial (see Pen. Code, s 1368); (2) moved to suppress appellant's postarrest statements to police on the ground that appellant was mentally incapable of knowingly, intelligently and voluntarily waiving his Miranda rights; (3) introduced evidence of appellant's mental deficiency at trial once having lost the pretrial suppression motion in order to argue the insignificance of the inconsistent statements; and (4) developed and presented a defense of diminished capacity.

It is difficult to understand why the deputy public defender took none of these steps. Given the substantial record of appellant's mental retardation, these defenses were certainly crucial in the sense that they had potential merit. Particularly troublesome is counsel's failure to seek suppression of appellant's inconsistent statements to the police. Following a standard Miranda warning, the officer suggested to appellant that he "ha(d) a right to . . .

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

590 P.2d 859                                                                                       Page 12

23 Cal.3d 412, 590 P.2d 859, 152 Cal.Rptr. 732, 2 A.L.R.4th 1
(Cite as: 23 Cal.3d 412, 590 P.2d 859)

clarify or explain (his) position in this matter."This *428 invitation to speak and appellant's "suggestibility" formed a strong basis for urging exclusion of the damaging statements. A reasonably competent and diligent counsel would ordinarily be expected to make such a motion.

Nonetheless, appellant's claim of inadequate assistance cannot be resolved on appeal. The record includes neither an explanation as to why counsel did not raise any of the potential mental defenses nor an indication that she was asked for an explanation.[FN18]This is not a case where this court can conceive of no satisfactory explanation for counsel's omissions. For example, the report of the appointed defense psychiatrist, which is not part of the record on appeal, may have included information upon which a diligent, conscientious and reasonably competent attorney would have chosen to forego any mental defense. In addition, appellant may have instructed trial counsel that he did not want records of his mental retardation introduced into evidence.

FN18. This conclusion does not make "obiter dictum" of today's holding that an indigent criminal defendant is entitled to the assistance of a reasonably competent attorney acting as his diligent, conscientious advocate. (Dis. opn., Post, p. 743 of 152 Cal.Rptr., p. -- of --P.2d.)As set forth above, an analysis of a claim of inadequate trial representation necessarily begins by measuring counsel's performance against the applicable standard. Only where appellant identifies acts or omissions falling below that standard does an appellate court examine whether the record includes an explanation for the apparently inadequate representation. Thus, definition of the standard is a necessary element of today's decision.

Moreover, Justice Mosk apparently approves of the standard which this opinion has derived from United States v. DeCoster, supra, 159 U.S.App.D.C. 326, 487 F.2d 1197.(Dis. opn., Post, p. 748, of 152 Cal.Rptr., p. -- of -- P.2d.)

Interestingly, after enunciating the standard in DeCoster, Judge Bazelon did not reverse the conviction but remanded the case for an evidentiary hearing where proof could be adduced as to counsel's explanations for his apparent inadequacy. ( DeCoster, supra, at 333-334, 487 F.2d at pp. 1204-1205.)Nonetheless, the dissent itself properly characterizes the DeCoster standard as the Holding of that case. (Dis. opn., Post, p. 748, of 152 Cal.Rptr., p. -- of -- P.2d.)

[14] In view of the silence of the record on the reasons why no mental defense was presented, appellant's claim would be more appropriately made in a petition for habeas corpus. Indeed, if presented in a verified petition, appellant's allegations concerning the substantial mental defenses which were not offered would undoubtedly present a **869 colorable claim entitling appellant to an evidentiary hearing. (See Pen.Code, ***742 ss 1483 and 1484; In re Hochberg (1970) 2 Cal.3d 870, 873-874, fn. 2, 87 Cal.Rptr. 681, 471 P.2d 1.) At such a hearing, appellant would be able to produce evidence on matters merely alleged before this court.

Appellant next contends that he was denied competent representation because counsel did not interview or subpoena before trial the two other suspects, Harbin and Stoker. Appellant points out that the question *429 of counsel's diligence in seeking to subpoena the two suspects was raised in the trial when counsel sought to introduce extrajudicial statements by the two men who were not present in court. At that time, counsel had an opportunity to describe fully her efforts to contact Harbin and Stoker, and she stated that her only attempts to reach them were by telephone. Appellant claims that such limited efforts precluded his obtaining potentially exculpatory evidence.

There is no doubt from the record that appellant's case was hastily prepared under intense time pressure. Trial counsel was assigned to the case only four working days before trial. During each of those days, she was occupied with hearings in other cases.

[15] While it is clear that defense preparation was less than exemplary, appellant has not demonstrated

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

590 P.2d 859                                                    Page 13

23 Cal.3d 412, 590 P.2d 859, 152 Cal.Rptr. 732, 2 A.L.R.4th 1
(Cite as: 23 Cal.3d 412, 590 P.2d 859)

constitutionally inadequate preparation on the limited facts available to this court. The trial judge found that the public defender's office had exercised due diligence in seeking to produce Stoker at trial. The record also indicates that the office had been trying to contact Harbin up until the time of the trial.

Further, defense counsel's statements about trying to telephone Harbin and Stoker were made in response to questions concerning her efforts to secure the two men as witnesses. Her statements in this regard do not preclude the possibility that she or some other member of the office made more substantial efforts to interview them as part of a pretrial investigation. Indeed, it is possible that another attorney or investigator actually interviewed one or both of the other suspects before trial and found that their testimony would not be favorable to appellant. Since the appellate record is ambiguous on this issue, the court cannot conclude that appellant has established that defense counsel conducted an inadequate investigation.[FN19]

> FN19. Appellant also asserts that counsel should have sought to suppress the wallet and $56 which were seized from appellant at the time of his arrest. He contends that the wallet was (1) the fruit of an illegal search and (2) irrelevant since the victim could not identify it. However, since the victim could not identify the wallet at trial, the "(f)ailure to object to admission of the items seized may have been . . . a strategic judgment that the items were not particularly damaging."(People v. Steger, supra, 16 Cal.3d at p. 552, 128 Cal.Rptr. at p. 169, 546 P.2d at p. 673.)

The record reveals one other disturbing suggestion regarding the public defender's representation in this case. To explain her lack of success in trying to reach Harbin by telephone, counsel told the trial judge, "Harbin's a client of ours, and he knows we are representing Pope, and he is not answering our phone calls."From this statement an inference **430 arises that the public defender's office may have undertaken simultaneous representation of clients with conflicting interests.

Nonetheless, there are two compelling reasons for not resolving this issue at present. First, appellant's appointed counsel on appeal, who has vigorously challenged the other aspects of trial counsel's representation, has made no claim of any inadequacy based on a conflict of interest. Second, as already suggested, an evidentiary hearing is highly appropriate in this case if a verified petition for habeas corpus is filed. (See Ante, pp. 741, 742 of 152 Cal.Rptr., p. -- of -- P.2d.) In view of the likelihood of such a petition and the absence of any claim of conflict at trial or on appeal, this court is persuaded that resolution of this potential issue should await an evidentiary hearing in which all claims of inadequate**870 assistance may be fully explored in a single proceeding.

The judgment is affirmed.

***743 TOBRINER, RICHARDSON and MANUEL, JJ., concur.CLARK, Justice, concurring.
I concur in the judgment and in the opinion of the court insofar as it reaffirms the principle that a judgment of conviction may not be set aside on the basis of speculation, and that the claim of incompetence of trial counsel must be rejected on appeal when, as in this case, the record does not reveal counsel's reasons for acting or failing to act in the manner complained of. I concur in the dissenting opinion insofar as it contends that the discussion in the majority opinion as to the appropriate standard for resolving claims of incompetence of trial counsel is dictum. Therefore, I consider it neither necessary nor appropriate to address that issue at this time.

MOSK, Justice, dissenting.
I dissent.

The majority, despite obvious misgivings, appear to believe they have no choice on the present record but to affirm the judgment of conviction. I conclude, to the contrary, that our only rational choice is to declare that the patent inadequacy of counsel was the equivalent of denial of counsel and to reverse the conviction of this borderline mentally defective defendant.

While I have no quarrel with the majority analysis

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

23 Cal.3d 412, 590 P.2d 859, 152 Cal.Rptr. 732, 2 A.L.R.4th 1
(Cite as: 23 Cal.3d 412, 590 P.2d 859)

of counsel incompetency problems, unfortunately their views have no binding effect. *431 Defendant Pope, found guilty of second degree robbery, appeals to this court for a reversal of his conviction. The majority, declaring the record inadequate to reveal incompetency of trial counsel, affirm the conviction. That is the only rule of law in this case. Any additional discussion of tests to weigh competency of counsel If the record had been adequate does not rise above mere obiter dictum. [FN1]

> FN1. Dictum, however well-motivated at the time, frequently receives imperious treatment in subsequent decisions. See, e. g., disparaging references to an earlier opinion in Hollister Convalescent Hosp. Inc. v. Rico (1975) 15 Cal.3d 660, 671-674, 125 Cal.Rptr. 757, 542 P.2d 1349, using such expressions as " panoramic dicta," "erroneous dicta," " ill-considered dicta," "persistent dicta" and "unnecessary and overbroad dicta."

I am convinced that the record demonstrates the legal inadequacy of trial counsel under virtually any known test, that the lack of constitutionally adequate representation requires reversal of defendant's conviction and that we can devise and apply in the case before us a revised standard that will have precedential value.

I

Repetition of the facts surrounding the crime and the arrest contained in the record, some of which are recited in the majority opinion, is unnecessary, although they reveal to any alert counsel the potential defenses of Miranda violations and defendant's limited mental capacity. At the threshold the record discloses that this defendant received only superficial pretrial attention from his counsel, a fact that explains the obviously casual defense, including failure to attempt to subpoena the prime witnesses until after the trial was under way.

Two and one-half months before trial ample time for preparation the Sonoma County Public Defender was appointed to represent defendant. In multiple proceedings before the trial, the defendant was represented by four separate attorneys from that office, only one of whom appeared with him in any two different proceedings. Four working days before trial, a fifth attorney, a deputy public defender, was assigned to try the case. On each of those four days the deputy was involved in other hearings.

Before trial, the court appointed a psychiatrist to assist the defense. Although the augmented record on appeal does not include this psychiatrist's report, the record does contain the expert opinions of several psychologists and psychiatrists embodied in **871 four separate reports made in 1973, 1975 and 1976, all being received post trial. These reports *432 uniformly characterize defendant as a borderline mental defective with a fourth or fifth grade intellectual achievement level. His probation report ***744 filed on June 15, 1976, indicates he has an I.Q. of 72; this places him in the third percentile range when compared to I.Q. test standardization norms.

The reports, available to us on this appeal, note that defendant last attended school at the age of 17 when he was in the 9th grade. He was enrolled in "Special Education Classes for the mentally retarded throughout most of the period of his junior high school and high school attendance."The reports state that he "functioned intellectually like a child"; that he could not make change or drive a car; that he was gullible and suggestible; that he could not manage his own finances; that communication with him had to be couched in the "most elementary . . . vocabulary and sentence structure . . . if there is to be any expectation that he (will) understand"; and that he had a poor tolerance for ambiguity. Defendant was also characterized as having a " penchant for naive fabrications," and "a blanket denial mechanism" a psychological, defense technique he used to justify himself. The evaluations also note his impaired memory, disoriented temporal sense, and limited attention span. In addition, they state he is easily manipulated by his age group peers, and that he displays the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

590 P.2d 859                                                                         Page 15

23 Cal.3d 412, 590 P.2d 859, 152 Cal.Rptr. 732, 2 A.L.R.4th 1
(Cite as: 23 Cal.3d 412, 590 P.2d 859)

impaired judgment, immaturity, and impulsivity of a child.

The trial judge read and considered these evaluations after trial but before he ordered defendant committed for diagnosis. The record does not reveal whether the public defender, Ms. Young, obtained copies of the 1973 and 1975 evaluations before trial, or whether she knew of their existence at that time. There can be no doubt, however, that she was aware of the defendant's mental limitations because in her opening statement at trial she described him as having borderline intelligence. Nevertheless no evidence of defendant's limited intelligence was introduced at trial or used before trial to challenge the admissibility of his out-of-court statements to police or for any other purpose.

During the trial, the only defense presented was that the robbery was committed by the two other suspects, Harbin and Stoker. There was evidence that one of these two or both of them might have been involved in the robbery or that they were percipient witnesses with testimony of potentially enormous significance to the case: they were both in the bar at the same time as Brower, the victim; Harbin may have been sitting next to Brower in the bar and might have talked with him for 30 to 40 minutes *433 prior to the robbery; Harbin may have had ample opportunity to notice the money in Brower's wallet; both Harbin and Stoker followed Brower and defendant out of the bar; an investigating officer testified that both Brower and defendant had identified Harbin from a photographic lineup; Harbin had inadvertently made an inculpatory admission in the presence of another investigating officer; and both of them were listed in a police report as additional suspects. Defendant's counsel knew, or should have known, of the foregoing evidence. Nevertheless prior to trial she failed to subpoena either Harbin or Stoker.

During the trial, in cross-examining the police officer who had talked to Harbin and Stoker, defense counsel asked about the inculpatory statement Harbin was heard to make. When the prosecution successfully objected on the ground that such hearsay could not be admitted unless

counsel made a showing that the declarant was unavailable, only then, at that late date, did Ms. Young ask that the trial recess to give her an opportunity to subpoena Harbin and Stoker. The next day, counsel produced Harbin and called him as a witness, but he invoked his Fifth Amendment privilege and Stoker was not located on such short notice.

The prosecution offered into evidence a statement defendant made, after he had purportedly waived his Miranda rights, containing certain inculpatory and inconsistent statements. No objection was made to the **872 admissibility of these statements. In fact, during the trial, defense counsel made no substantial objections, called no significant witness on his behalf, and made no helpful motions for him either before, during or after trial. It is difficult to detect what ***745 role defense counsel played at the trial other than that of a casual observer.

In her opening statement, Ms. Young declared " . . . Mr. Pope has a borderline intelligence, He does not understand a large percentage of what you are going to tell him and he's very agreeable to go along with just about anything the police tell him . . . . " (Italics added.) Thus the record discloses defense counsel's knowledge of defendant's mental capacity existed from the very beginning of the trial. In closing argument, counsel argued that the only direct evidence that defendant participated in the robbery was the identification by Brower, who had been drinking before the crime occurred. She attempted to minimize Pope's inconsistent statements to the police by suggesting that they resulted from defendant's limited mental capacity. Thus, on the trial record, it is clear that counsel was aware of her client's mental limitations, although she had failed to present any evidence on the subject during the trial. As a result the court *434 curtailed the closing argument when the prosecution objected on the ground that no evidence had been introduced as to defendant's mental capacity.

The jury found defendant guilty of second degree robbery. Upon receiving the probation report, the trial judge ordered defendant committed for diagnosis pursuant to Penal Code section 1203.03. The court wrote the Director of Corrections in order

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

23 Cal.3d 412, 590 P.2d 859, 152 Cal.Rptr. 732, 2 A.L.R.4th 1
(Cite as: 23 Cal.3d 412, 590 P.2d 859)

to relate his concern for a defendant with a marginal mental capacity "who appears to be responsible for his actions in a purely legal sense, but that's about all."Following receipt of the diagnostic study and recommendation by the Department of Corrections, defendant was sentenced to state prison.

After sentencing, the court wrote the Director of Corrections again, this time to express concern over the conclusion of the diagnostic report that defendant's incarceration would be only a " temporary expedient" and that there was no reason to believe he would be more adaptive after it.

Thus it is clear that the defendant's mental condition was apparent even to the trial judge. Yet defense counsel made no motion in opposition to the sentence or the verdict, and made no comment on defendant's behalf at the time of sentencing.

To suggest that the foregoing all in the record before us does not reveal inadequacy of trial counsel is to trifle with reality. The majority term the defense preparation "less than exemplary." I deem it, beyond any doubt, less than adequate.

## II

The record reveals another ground, glossed over by the majority, for finding defense counsel's representation not only inadequate but improper. In explaining reasons for difficulty in obtaining Harbin's appearance, Ms. Young told the court: " Unfortunately, you see, Harbin's a client of ours, and he knows we are representing Pope, and he is not answering the phone calls."(Italics added.)

Since the defendant intended to, and did, attempt to blame Harbin and Stoker for the robbery, it should have been clear to members of the public defender's office that a conflict of interest existed. Manifestly the public defenders could not effectively represent a client who was implicating another client of their office in a serious felony. (*435Rule 5-102(B), Rules of Professional Conduct.) Indeed the court ultimately though perforce late recognized the conflict. After the public defender's investigator brought Harbin into court in an office automobile,

the court appointed independent counsel "to represent Mr. Harbin and advise him regarding his testifying."

As a result, when defense counsel called their client, Harbin, to the stand, upon the advice of his new temporary court-designated attorney Harbin asserted his Fifth Amendment rights.

It is difficult, on this record, to see how defense counsel could adequately represent **873 defendant, who desired to implicate Harbin, when up to the moment Harbin appeared in court he was represented by the same office.***746 The patent conflict necessarily resulted in inadequate representation. (See Glasser v. United States (1942) 315 U.S. 60, 76, 62 S.Ct. 457, 467, 86 L.Ed. 680 (" The right to have the assistance of counsel is too fundamental and absolute to allow courts to indulge in nice calculations as to the amount of prejudice arising from its denial.").) [FN2]Also see Holloway v. Arkansas (1978) 435 U.S. 475, 489, 98 S.Ct. 1173, 1181, 55 L.Ed.2d 426 ('Joint representa- tion of conflicting interests is suspect because of what it tends to prevent the attorney from doing.')

FN2. With respect to conflicts of interest, it is clear that a public defender's office must be treated the same as a law firm. Thus, as one commentator has observed, " The reason for viewing the office of the public defender as a firm for purposes of ethical regulation is a sound one. . . . (T)he close association of the attorneys in the public defender's office makes it possible that confidential information will be inadvertently circulated. The necessity of utilizing the services of the same investigator, the inevitable discussions occurring in the office among the attorneys, and the overlapping sources of information from identical witnesses all contribute to this possibility. Furthermore, public confidence in the public defender and the Bar as a whole must be maintained. In order to do this, lawyers must 'not only avoid evil, but also the appearance of evil.' . . . By appointing

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

590 P.2d 859    Page 17

23 Cal.3d 412, 590 P.2d 859, 152 Cal.Rptr. 732, 2 A.L.R.4th 1
**(Cite as: 23 Cal.3d 412, 590 P.2d 859)**

separate attorneys for individual defendants where there is alleged conflict, the courts uphold not only the individual's constitutional rights and protections, but also the integrity of the entire criminal justice system."(Fns. omitted.) (Comment, (1977) 5 Fla.St.L.Rev. 492, 504-505).

### III

Assuming, as we are permitted no alternative from the record, that defense counsel was well aware of defendant's mental limitations, we must consider whether some strategic purpose could have induced counsel to forego presentation of any testimony on the subject. It is difficult indeed, I find it impossible to conjure up any theory for the abandonment of what appears to be a ready-made defense: that the defendant did not have the mental capacity to form the intent to commit the offense with which he was charged, or to understand the nature of the acts which he admitted to the police, or to understand the potential *436 consequence of his admissions. (But see Arenella, The Diminished Capacity and Diminished Responsibility Defenses: Two Children of a Doomed Marriage (1977) 77 Colum.L.Rev. 827.)

Nevertheless, if we assume arguendo that counsel had some shrewd, if well-concealed, tactical purpose in mind, still another problem emerges. Should counsel alone be permitted to abandon her client's clearly available and potentially effective defense, or should defendant be required, on the record, to waive that defense personally? A jury trial may be waived only by consent "expressed in open court by the defendant" And his counsel ( Cal.Const., art. I, s 16). To enter a guilty plea we require recitation of a litany to demonstrate defendant is aware of, and personally waives, his several constitutional rights. Even in the less exacting civil context we have held that an attorney may bind his client in procedural matters "but he may not impair the client's substantial rights . . . . " ( Linsk v. Linsk (1969) 70 Cal.2d 272, 276, 74 Cal.Rptr. 544, 546, 449 P.2d 760, 762.)He clearly may not eliminate an essential defense. (Fresno City High School Dist. v. Dillon (1939) 34 Cal.App.2d 636, 644, 94 P.2d 86.)Justice Traynor in People v.

Ibarra (1963) 60 Cal.2d 460, 464, 34 Cal.Rptr. 863, 866, 386 P.2d 487, 490, declared that withdrawal of a crucial defense denies defendant "the assistance to which he is entitled."

I suggest that in the circumstances at hand, if counsel had a legitimate purpose in waiving defenses based on defendant's mental limitations, she had a duty to spread on the record her abandonment of the defenses and to obtain defendant's personal acquiescence in the waiver. Failure to do so is further indication of counsel's inadequate representation of the defendant.

### IV

The farce, sham or mockery test, if it still exists intact, is due for revision. The expression usually only two of the three terms are employed in any one case is **874 vague, uncertain, enigmatic, and results in denial of defendants' grievances in all but the most egregious circumstances, as, e. g., People v. Corona (1978) 80 Cal.App.3d 684, 145 Cal.Rptr. 894 (hg. den.). As stated in ***747 Scott v. United States (1970), 138 U.S.App.D.C. 339, 340, 427 F.2d 609, 610,"That standard is no longer valid as such but exists in the law only as a metaphor that the defendant has a heavy burden to show requisite unfairness."The difficulty is in devising an alternative test.

Parenthetically, we need not decide in this case whether different standards apply to defendants who have retained counsel, as distinguished*437 from those for whom the state has provided counsel. (Compare Fitzgerald v. Estelle (5th Cir. 1975) 505 F.2d 1334,cert. den.(1975) 422 U.S. 1011, 95 S.Ct. 2636,45 L.Ed.2d 678 with Moore v. United States (3d Cir. 1970) 432 F.2d 730, 736; also see Note (1976) 89 Harv.L.Rev. 593.)Here counsel was court-appointed, which directly involves state action; thus we have no problem with prerequisites for considering questions of due process and right to counsel.

The United States Supreme Court has never relied on a sham or farce test, nor on any of that genre. In McMann v. Richardson (1970) 397 U.S. 759, 90

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

23 Cal.3d 412, 590 P.2d 859, 152 Cal.Rptr. 732, 2 A.L.R.4th 1
(Cite as: 23 Cal.3d 412, 590 P.2d 859)

S.Ct. 1441, 25 L.Ed.2d 763, a case involving effective assistance of counsel on a guilty plea, the court spoke of "the range of competence demanded of attorneys in criminal cases" (Id., p. 771, 90 S.Ct. p. 1449), but it did not define more precisely the acceptable range of competence demanded. Other federal courts e. g., Bruce v. United States (1967), 126 U.S.App.D.C. 336, 340, 379 F.2d 113, 117 recognized that "It would not be fruitful to attempt further delineation of the applicable standard by reference to generalities, . . ." The applicable standard applied in Bruce was "gross incompetence of counsel and that this has in effect blotted out the essence of a substantial defense either in the (trial) Court or on appeal."(Id. 126 U.S.App.D.C. at p. 116, 379 F.2d at pp. 116-117.)

Analysis of cases reveals that most attempts to define a standard with precision result in a frustrating tautology. For example, the so-called Maryland rule holds an accused has received incompetent counsel when, under all the circumstances of the case, the accused has not been afforded genuine and effective representation. ( Slater v. Warden, Maryland Penitentiary (Md.1966) 217 A.2d 344, 346;Harris v. State (Del.Supr.1973) 305 A.2d 318, 319.)Other illustrations abound. ( People v. Camden (1976) 16 Cal.3d 808, 815, 129 Cal.Rptr. 438, 442, 549 P.2d 1110, 1114 (" ' "an extreme case must be disclosed " (citations)' ( People v. Ibarra (1963) 60 Cal.2d 460, 464, 34 Cal.Rptr. 863, 386 P.2d 487) in which counsel 'did not effectively supply to a defendant those skills and legal knowledge which we can reasonably expect from any member of the bar.'(People v. Cook (1975) 13 Cal.3d 663, 672-673, 119 Cal.Rptr. 500, 532 P.2d 148.)"); United States v. Reincke (2d Cir. 1967) 383 F.2d 129, 132 ("so 'horribly inept' as to amount to a 'breach of his legal duty faithfully to represent his client's interests' "); Dillane v. United States (1965) 121 U.S.App.D.C. 354, 355, 350 F.2d 732, 733 ("extraordinary inattention to a client's interests"); Hickock v. Crouse (10th Cir. 1964) 334 F.2d 95, 100-101,cert. den.(1965) 379 U.S. 982, 85 S.Ct. 689, 13 L.Ed.2d 572 (requires " good-faith representation, with all the skill which counsel possesses"); *438Edgerton v. State of North Carolina  (4th Cir. 1963) 315 F.2d 676, 678 ("not afforded in any substantial sense professional

advice and guidance"); Cofield v. United States (9th Cir. 1959) 263 F.2d 686, 688, sentence vacated (1959) 360 U.S. 472, 79 S.Ct. 1430, 3 L.Ed.2d 1531 (effective assistance "contemplates the conscientious service of competent counsel," not " mere perfunctory appearance"); Maye v. Pescor (8th Cir. 1947) 162 F.2d 641, 643 ("an extreme case must be disclosed"); State v. Osgood (Minn.1963) 123 N.W.2d 593, 600, fn. 2 (consultations must be "sufficiently adequate to inform the accused of all of his legal rights under the law and facts involved"); see also **875 Chambers v. Maroney (1970) 399 U.S. 42, 60, 90 S.Ct. 1975, 26 L.Ed.2d 419 (Harlan, J., conc. and dis.) (whether, in the total picture, defendant was " deprived of rudimentary legal assistance").)

Given the proliferation of standards, a serious question can be raised as to whether any precise standard is pragmatically helpful.***748 No test yet proposed is self-determinative; all are deliberately vague and dependent upon subjective interpretation. It is inevitable that each will be applied in an ad hoc manner, with ad hoc results.

The American Bar Association has defined the lawyer's obligation in this manner: "The basic duty the lawyer for the accused owes to the administration of justice is to serve as the accused's counselor and advocate, with courage, devotion and to the utmost of his learning and ability, and according to law."(ABA Standards Relating to the Prosecution Function and the Defense Function (1971) p. 153.) The flaw in that definition is that the utmost of the attorney's learning and ability may still fall short of providing the defendant with the defense he needs and deserves.

In the final analysis, a readily adaptable standard for determining an unacceptable performance in a particular case should be stated in terms of reasonable competence. In rejecting a requirement of showing "gross incompetence," the court in United States v. DeCoster (1973) 159 U.S.App.D.C. 326, 331, 487 F.2d 1197, 1202, on appeal remanded the case to the trial court, holding that "a defendant is entitled to the reasonably competent assistance of an attorney acting as his diligent conscientious advocate."

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

23 Cal.3d 412, 590 P.2d 859, 152 Cal.Rptr. 732, 2 A.L.R.4th 1
**(Cite as: 23 Cal.3d 412, 590 P.2d 859)**

The foregoing, though imprecise, is probably sufficient for guidance of the courts. Professor Strazzella explains the result: "The courts continue to reach for appropriate standards. There is a transition from the older standards to articulation of stricter but equally vague standards of performance. However, . . . the standards articulated for measuring *439 ineffective counsel may be necessarily and intentionally vague. This is probably one of those areas of the law, so rich in variables, in which the courts wish to avoid imposing rigid rules and probably could not devise a rigid list if they attempted to do so. The result leaves maneuvering room for the courts as they seek, in applying the standards, to assess each claim in the totality of the circumstances."(Strazzella, Ineffective Assistance of Counsel (1977) 19 Ariz.L.Rev. 443, 454.)

With application to the case at hand, we need only to turn to People v. McDowell (1968) 69 Cal.2d 737, 73 Cal.Rptr. 1, 447 P.2d 97.Our observations on that case fit the instant circumstances with remarkable relevance: "A defendant who pleads not guilty manifests his desire to contest the issue by every means lawfully at his disposal, and it is the duty of his counsel to assist him in this endeavor by the preparation and presentation of his defense. Under our adversary system, of course, the choice of strategy and tactics remains committed to counsel's judgment. Accordingly, in appropriate cases counsel may justifiably decide to offer no affirmative defense and stand instead upon the presumption of innocence; or counsel may, as here, offer a defense on one count only of a multiple charge, standing on the presumption as to the remainder. But either of these courses of action presupposes that counsel is fully informed of the defenses that could actually be interposed on behalf of his client. 'It is counsel's duty to investigate carefully all defenses of fact and of law that may be available to the defendant, and if his failure to do so results in withdrawing a crucial defense from the case, the defendant has not had the assistance to which he is entitled.'(People v. Ibarra (1963) supra, 60 Cal.2d 460, 464, 34 Cal.Rptr. 863, 386 P.2d 487, and cases cited.)

"It is settled in this state that on the trial of the

issues raised by a plea of not guilty to a charge of a crime which requires proof of a specific mental state, competent evidence is admissible to show that because of mental abnormality not amounting to legal insanity the defendant did not possess that mental state at the time he committed the act. As we said of the search and seizure principle involved in **876People v. Ibarra (1963) supra, 60 Cal.2d 460, 465, 34 Cal.Rptr. 863, 386 P.2d 487,'This rule should be a commonplace to any attorney engaged in criminal trials.'It was established almost two decades ago: 'the defense, generally, has been well recognized since People v. Wells (1949) 33 Cal.2d 330, 202 P.2d 53.'(In re ***749 Hawley (1967) 67 Cal.2d 824, 829 fn. 4,63 Cal.Rptr. 831, 433 P.2d 919.)It was further developed in People v. Gorshen (1959) supra, 51 Cal.2d 716, 336 P.2d 492, and has frequently been discussed in appellate opinions, in law review articles, and in the standard works of reference. 'It can no longer be doubted that the defense *440 of mental illness not amounting to legal insanity is a "significant issue" in any case in which it is raised by substantial evidence. . . .' "(Id. at pp. 746-747,73 Cal.Rptr. at p. 7, 447 P.2d at p. 2.) To the same effect see United States v. Brawner (1972) 153 U.S.App.D.C. 1, 30, 471 F.2d 969, 998.

V

The claim of ineffective trial counsel is preferably to be litigated on direct appeal in all cases in which the record includes sufficient information to do so. (Brody & Albert, Ineffective Representation as a Basis for Relief from Conviction: Principles for Appellate Review (1977) 13 Colum.J.Law & Soc.Prob. 1, 87 ("Every effort should be made to deal with the claim on direct appeal rather than in a collateral proceeding . . . ."); Bines, Remedying Ineffective Representation in Criminal Cases: Departures from Habeas Corpus (1973) 59 Va.L.Rev. 927, 939-940 fn. 66; see also Strazzella, Ineffective Assistance of Counsel (1977) 19 Ariz.L.Rev. 443, 460.)This avoids the necessity of a second proceeding, with potentially duplicative hearings and appeals, and with the resultant burden on the judicial process.

There is an additional reason why resort to the trial

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

590 P.2d 859

23 Cal.3d 412, 590 P.2d 859, 152 Cal.Rptr. 732, 2 A.L.R.4th 1
**(Cite as: 23 Cal.3d 412, 590 P.2d 859)**

record is preferred to institution of separate habeas corpus proceedings.

A petitioner for habeas corpus may learn, to his sorrow, that by opening up the issue of his trial attorney's ability in a new proceeding he waives much of the attorney-client privilege. A trial attorney whose competence is assailed by his former client must be able to adequately defend his professional reputation, even if by doing so he relates confidences revealed to him by the client. For example, the attorney who is criticized for failing to call alibi witnesses to the stand should be permitted to explain that the client admitted to him he was at the scene of the crime and that the alibi was fabricated. Counsel should also be allowed to explain that other witnesses not produced might, under cross-examination, have implicated the client in other uncharged criminal activities.

In short, those who exercise 20/20 hindsight and instigate separate proceedings to assail the performance of trial attorneys must realize that the procedure is not without its potential pitfalls. The sword may be double-edged, both of them blunt. Resort to such proceedings should consequently not be judicially required in cases such as the one before us, *441 because the record clearly reveals that counsel's representation was ineffective and therefore makes it possible to avoid these pitfalls.

For all of the foregoing reasons I reject the majority's invitation for a whole new round of duplicative litigation. On the present record I would reverse the judgment and remand for a new trial in which the defendant would have adequate representation.

NEWMAN, J., concurs.
Hearing denied; MOSK, J., dissenting.
Cal., 1979.
People v. Pope
23 Cal.3d 412, 590 P.2d 859, 152 Cal.Rptr. 732, 2 A.L.R.4th 1

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

90 Cal.App.3d 851

90 Cal.App.3d 851, 153 Cal.Rptr. 695, 12 A.L.R.4th 301
(Cite as: 90 Cal.App.3d 851)

People v. Farley
Cal.App., 1979.

Court of Appeal, Second District, Division 4,
California.
The PEOPLE, Plaintiff and Respondent,
v.
Terry **FARLEY**, Defendant and Appellant.
In re Terry FARLEY on Habeas Corpus.
Cr. Nos. 32411, 32901.

March 22, 1979.
Rehearing Denied April 10, 1979.
Hearing Denied May 17, 1979.

Defendant was convicted before the Superior Court, Los Angeles County, Eli Chernow, J., of murder in the first degree and on two counts of robbery, and defendant appealed and filed a petition for a writ of habeas corpus. The Court of Appeal, Jefferson, J., held that: (1) absent defendant's consent, transportation of defendant to police station and detention of defendant at police station solely for purpose of taking his photograph to be used in photographic identification procedure was constitutionally impermissible, even though initial detention had been proper but circumstances had been insufficient to constitute probable cause for arrest; (2) defendant had standing to urge that testimony of codefendant was product of illegal actions of officers in transporting codefendant to police station for purpose of having codefendant's photograph taken; (3) under particular circumstances, failure of defendant's trial counsel to make appropriate suppression of evidence motions thus raising issues of validity of identification testimony constituted denial to defendant of constitutional right to effective assistance of counsel requiring reversal of conviction so that defendant could be tried after issues of admissibility of evidence were properly determined, and (4) conflicting evidence capable of divergent inferences regarding the "preliminary fact"

of whether ten-year-old witness had capacity to understand duty of a witness to tell the truth required Court of Appeal to hold that trial judge's ruling in favor of competency was supported by substantial evidence.

Judgment reversed; petition denied.

Alarcon, J., concurred in judgment.
West Headnotes
**[1] Arrest 35    63.5(9)**

35 Arrest
   35II On Criminal Charges
      35k63.5 Investigatory Stop or Stop-And-Frisk
         35k63.5(9) k. Duration of Detention and Extent or Conduct of Investigation or Frisk. Most Cited Cases
Absent defendant's consent, transportation of defendant to police station and detention of defendant at police station solely for purpose of taking his photograph to be used in photographic identification procedure was constitutionally impermissible, even though initial detention had been proper but circumstances had been insufficient to constitute probable cause for arrest. U.S.C.A.Const. Amend. 4.

**[2] Criminal Law 110    394.5(2)**

110 Criminal Law
   110XVII Evidence
      110XVII(I) Competency in General
         110k394 Evidence Wrongfully Obtained
            110k394.5 Objections to Evidence
               110k394.5(2) k. Persons Entitled to Object. Most Cited Cases
Defendant had standing to urge that testimony of codefendant was product of illegal actions of officers in transporting codefendant to police station for purpose of having codefendant's photograph taken and identified by witnesses as one of perpetrators of gas station robberies and murder.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

90 Cal.App.3d 851                                                        Page 2

90 Cal.App.3d 851, 153 Cal.Rptr. 695, 12 A.L.R.4th 301
(Cite as: 90 Cal.App.3d 851)

**[3] Criminal Law 110        641.13(6)**

110 Criminal Law
    110XX Trial
        110XX(B) Course and Conduct of Trial in
General
            110k641 Counsel for Accused
                110k641.13        Adequacy        of
Representation
                    110k641.13(2) Particular Cases and
Problems
                        110k641.13(6)    k.    Evidence;
Procurement, Presentation and Objections. Most
Cited Cases

**Criminal Law 110        1166.10(1)**

110 Criminal Law
    110XXIV Review
        110XXIV(Q) Harmless and Reversible Error
            110k1166.5 Conduct of Trial in General
                110k1166.10 Counsel for Accused
                    110k1166.10(1) k. In General. Most
Cited Cases
        (Formerly 110k1166.11(5), 110k1166.11)
Under    particular    circumstances,    failure    of
defendant's trial counsel to make appropriate
suppression of evidence motions thus raising issues
of validity of identification testimony constituted
denial to defendant of constitutional right to
effective assistance of counsel requiring reversal of
conviction so that defendant could be retried after
issues of admissibility of evidence were properly
determined. U.S.C.A.Const. Amend. 4.

**[4] Witnesses 410        78**

410 Witnesses
    410II Competency
        410II(A) Capacity and Qualifications in
General
            410k78 k. Evidence as to Competency in
General. Most Cited Cases
If evidence on issue of capacity of a proffered
witness to understand duty of a witness to tell the
truth is conflicting, proffered witness must be held
competent or qualified to be a witness unless the
objecting party establishes, by a preponderance of
evidence,    a    lack    of    capacity.    West's

Ann.Evid.Code, §§ 405, 405 comment, 701.

**[5] Criminal Law 110        1158(4)**

110 Criminal Law
    110XXIV Review
        110XXIV(O) Questions of Fact and Findings
            110k1158 In General
                110k1158(4) k. Reception of Evidence.
Most Cited Cases
Conflicting    evidence    capable    of    divergent
inferences regarding the "preliminary fact" of
whether ten-year-old witness had capacity to
understand duty of a witness to tell the truth
required Court of Appeal to hold that trial judge's
ruling in favor of competency was supported by
substantial evidence. West's Ann.Evid.Code, §§ 405
, 405 comment, 701.

*855 **696 Russell Iungerich, Los Angeles, under
appointment by the Court of Appeal, for defendant
and appellant.
Evelle J. Younger, Atty. Gen., Jack R. Winkler,
Chief Asst. Atty. Gen., S. Clark Moore, Asst. Atty.
Gen., Norman H. Sokolow and John R. Gorey,
Deputy Attys. Gen., for plaintiff and respondent.
*856 JEFFERSON, Associate Justice.
By an amended information defendant was charged
with three offenses. In count I he was charged with
the murder (Pen. **697 Code, s 187) of Sang Bong
Park. In count II, he was charged with robbery (
Pen. Code, s 211) of Park. In count III he was
charged with robbery (Pen. Code, s 211) of Hwan
Han Jong. In each count it was also alleged that, in
the commission of the offense, defendant used a
firearm a revolver within the meaning of Penal
Code sections 12022.5 and 1203.06(a)(1).[FN1]

>    FN1. Named as a codefendant in each
>    count was Reginald Fields. Separate trials
>    were ordered for the two codefendants.

Defendant entered pleas of not guilty and denied the
use allegations. Trial was by jury. Defendant was
found guilty of murder of the first degree as charged
in count I and guilty of robbery as charged in counts
II and III. The robberies of both Park and Jong

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

90 Cal.App.3d 851

90 Cal.App.3d 851, 153 Cal.Rptr. 695, 12 A.L.R.4th 301
(Cite as: 90 Cal.App.3d 851)

were found to be first degree robberies. With respect to all three offenses, the jury found to be true the firearm-use allegations. Probation was denied and defendant was sentenced to state prison for the term prescribed by law as to each count. The sentences as to counts II and III were stayed pending appeal and service of sentence as to count I. The stay was to become permanent at the conclusion of service of the sentence as to count I. Defendant has appealed from the judgment of conviction and has filed a petition for a writ of habeas corpus.

I

*The Factual Background*

The evidence tended to prove the following: On October 1, 1976, at approximately 7:30 p. m., Fields, aged 16, met defendant at 26th and Hooper Streets in Los Angeles. The two walked to the vicinity of a Shell gas station at Adams and Central and decided to rob the station upon its closing. Defendant gave Fields a loaded .38 caliber revolver and kept the same type of revolver for his own use.

At approximately 8:40 p. m., Park and Jong, who were the attendants at the gas station, started turning off the lights and closing various doors as part of the process of closing the station. Park walked out to his Volkswagen vehicle, which was parked by a gas island in front of the front office. Defendant and Fields approached Park. Defendant pointed *857 his revolver at Park and grabbed Park by the collar. Defendant and Fields went through Park's pockets as the latter had his hands on the top of the roof of his vehicle.

Defendant then pushed Park into the lube bay portion of the station. Park began to scream. Jong, who was in the storage area, ran into the lube bay area. Fields ordered Jong into the back office where the cashbox was located. Defendant forced Park to lie down on the floor. Defendant held his revolver close to Park's head. Inside the back office, Fields, with his revolver pointed at Jong, forced the latter to open the cashbox. After Jong

opened the cashbox, Fields took approximately $21 in bills and six to seven dollars in coins and put this money in his pocket.

As Fields was removing the money from the cashbox defendant's gun was fired. Fields saw Park bleeding from the head. Defendant and Fields then ran out of the gas station, down an alley and on 28th Street towards Central Avenue. Park was taken to the hospital and died the next morning as a result of extensive brain damage due to a penetrating gunshot wound to the head.

At the trial, Jong was unable to identify either Fields or defendant. Jong was able to describe the robbers generally as a shorter man, 15 to 16 years of age, and a taller man, 18 to 20 years of age. A Mr. and Mrs. Griffith (Joe and Brenda) stopped their car at the gas station to make a telephone call. They both observed some portions of the robbery and saw defendant and Fields run from the gas station. The Griffiths then drove their vehicle to 28th Street and Central Avenue and parked. Mrs. Griffith remained in the car and saw Fields and defendant run past her on 28th Street. Mr. **698 Griffith, who got out of the vehicle, also observed the two men running down 28th Street. Mr. Griffith saw defendant go into a poolroom for a few seconds, exit, and follow Fields down 28th Street where they became lost from view.

At a vacant lot in back of buildings on 27th Street, defendant and Fields climbed a steel fence at a point where defendant lived in an apartment on 27th Street. Fields and defendant went first into defendant's apartment where the loot from the robbery was divided. After the money was divided, Fields and defendant ran down the driveway on to 27th Street, Virgie Weeks, ten years of age, lived in an apartment in front of the defendant's apartment. She observed defendant and Fields climb the fence and heard a "jingling" sound from Fields' pocket, similar to that made by coin money. At the time of the fence climbing, a police *858 helicopter was flying overhead. Virgie saw defendant and Fields run "very fast" from defendant's apartment down the driveway past her. Fields ran across 27th Street and defendant down an alley.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

90 Cal.App.3d 851                                                            Page 4

90 Cal.App.3d 851, 153 Cal.Rptr. 695, 12 A.L.R.4th 301
(Cite as: 90 Cal.App.3d 851)

Fields testified against defendant after entering a plea of guilty to second-degree murder pursuant to a plea-bargain agreement. Defendant's defense was an alibi.

## II

### Contentions on Appeal

Defendant advances the following contentions on appeal: (1) that he was denied effective assistance of trial counsel; (2) that the trial court erred in holding that ten-year old Virgie was competent to testify as a witness; (3) that the testimony of Virgie Weeks and evidence of her out-of-court statements constitute insubstantial evidence; (4) that there was a lack of corroborating evidence for the accomplice's testimony.

## III

### The Issue of A Denial of Effective Assistance of Trial Counsel

Defendant advances the contention that he was denied effective assistance of trial counsel because his trial counsel did not move (1) to suppress the in-court testimonial identification of defendant made by Joe and Brenda Griffith, and (2) to suppress the testimony of Reginald Fields on the ground that his testimony was the product of his illegal transportation, detention and arrest.

We start with a consideration of the legal principles involved in a determination of whether an indigent defendant has been denied his constitutional right to effective assistance of counsel. The ineffective assistance complained of must be of substantial proportion and, because of such ineffective assistance, the trial must have been reduced to a " farce or a sham." (People v. Ibarra (1963) 60 Cal.2d 460, 464, 34 Cal.Rptr. 863, 386 P.2d 487.)

It is well established that an errorless trial is not required for effective assistance of counsel.

Equally extant is the principle that an unfortunate choice of trial strategy by defense counsel will not, in and *859 of itself, constitute an inadequacy that mandates a reversal of defendant's conviction. The rule was set forth in People v. Floyd (1970) 1 Cal.3d 694, 709, 83 Cal.Rptr. 608, 617, 464 P.2d 64, 73, that "(i)t is not sufficient to allege merely that the attorney's tactics were poor, or that the case might have been handled more effectively. (Citations.) (P) Rather, the defendant must affirmatively show that the omissions of defense counsel involved a critical issue, and that the omissions Cannot be explained on the basis of any knowledgeable choice of tactics."(Emphasis added.)

A major tenet of the principle of constitutionally ineffective assistance of counsel is defined in terms of the attorney's actions or failures having the result of withdrawing from the trial the Adjudication of a crucial defense."It is counsel's duty to investigate carefully all defenses of fact and law that may be available to the defendant, and if his failure to do so results in withdrawing a crucial defense from the case, the defendant has not had the assistance to which he is entitled."(Ibarra, supra, 60 Cal.2d 460, 464, 34 Cal.Rptr. 863, 866, 386 P.2d 487, 490.)It is significant that the Ibarra court "does Not hold that the 'adjudication' of which defendant has been deprived by the **699 failure of counsel would result inexorably in a defendant's acquittal. It is the failure to have an appropriate Adjudication of a defense that reduces the trial to a 'farce or a sham,' and which thus renders a defendant's trial fundamentally unfair in violation of the constitutional due process rights guaranteed to a defendant."(People v. Rodriguez (1977) 73 Cal.App.3d 1023, 1028, 141 Cal.Rptr. 118, 121.) (Latter emphasis in original.)

In People v. Pope (1979) 23 Cal.3d 412, 152 Cal.Rptr. 732, 590 P.2d 859, our high court discarded the Ibarra standard for ineffective assistance of counsel and declared that "a conviction may not be upheld if the state has furnished an Indigent with representation of lower quality than that of a reasonably competent attorney acting as a diligent, conscientious advocate."(Id. at p. 424, 152 Cal.Rptr. at p. 738, 590 P.2d at p. 865.) (Emphasis added.) The Pope court imposed on a

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

90 Cal.App.3d 851                                                    Page 5

90 Cal.App.3d 851, 153 Cal.Rptr. 695, 12 A.L.R.4th 301
**(Cite as: 90 Cal.App.3d 851)**

defendant-appellant the burden of proving a claim of inadequate trial assistance by showing "that trial counsel acted or failed to act in a manner to be expected of reasonably competent attorneys acting as diligent advocates. In addition, appellant must establish that counsel's acts or omissions resulted in the withdrawal of a potentially meritorious defense." (Pope, supra, 23 Cal.3d 412, 425, 152 Cal.Rptr. 732, 739, 590 P.2d 859, 866.)

The Pope case also indicates that, if the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged, and counsel was not asked for an explanation, the appellate court should not speculate on the explanation but should affirm the conviction, insofar *860 as the inadequate representation contention is concerned, and leave the determination of inadequacy of counsel representation to be made at an evidentiary hearing in a habeas corpus proceeding, unless the appellate court determines that there simply could not be a satisfactory explanation for trial counsel's actions or failures.

At defendant's trial, his attorney made a motion to exclude any in-trial identification testimony of Joe Griffith and Brenda Griffith on the ground that such testimony was tainted as the result of illegality flowing from an impermissibly suggestive pretrial photographic identification and pretrial line-up identification of defendant made by the Griffiths. This motion was denied. Thereafter, both of the Griffiths testified to an in-court identification of defendant and also to a pretrial photographic and a line-up identification of defendant as one of the two robbers of the gas station attendants and as the robber who had a gun pointed at Park, who died as a result of a gunshot wound.

It is defendant's contention before us that his trial counsel should have made a pretrial motion to suppress the in-court identification testimony of the Griffiths as being tainted by the illegal photographing of defendant resulting from his illegal transportation and his subsequent illegal arrest.

To assess the validity of this contention, we consider the circumstances leading up to the pretrial photographic identification of defendant by the Griffiths.

As of October 4, 1976, several days after the date of the offenses involved in the case before us, police officers had secured information which led them to suspect that defendant and Fields had committed the gas station robberies and murder. But this information was insufficient to constitute probable cause for an arrest. Thus, at the hearing on the motion which defense counsel made to prevent introduction of an inculpatory statement made by defendant at the time of his initial detention, Officer Furr testified: "We further had information from a James Smith who lives in the neighborhood that both Terry Farley and Reginald Fields had robbed the service station and that, in fact, Terry Farley had done the shooting."On the night of October 4, 1976, after securing this information, Police Officer Furr and his partner Jimmy L. Smith went first to the residence of Fields and saw Fields in front of his residence. According to the officers, Fields got into the police vehicle after he and his grandmother consented that he be taken to **700 the police station for photographing. Then the officers saw defendant walking down *861 the street. They stopped him and asked his name. Defendant replied: "Terry Farley."

Officer Furr testified that he then said to defendant: "In essence it was that we were investigating a homicide which occurred at the service station; that we would like to talk to him in regards to it. We would like to take his photograph."According to Furr, defendant gave his consent to go to the police station for photographing. Defendant denied that he consented. At any rate, defendant got into the police vehicle with Fields and they were transported to the police station without being handcuffed.

At the station, defendant and Fields were photographed. Prior to this photographing, the officers had been photographing numerous young black males whom they saw in the neighborhood. The photographs of defendant and Fields, along with these photographs of other young black males, were then taken by a police officer to the home of the Griffiths. The Griffiths made a tentative identification of defendant's photograph. The

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

90 Cal.App.3d 851                                              Page 6

90 Cal.App.3d 851, 153 Cal.Rptr. 695, 12 A.L.R.4th 301
(Cite as: 90 Cal.App.3d 851)

officer returned to the station. Receiving a telephone call from the Griffiths, he went back to the Griffiths' home with the photographs. The Griffiths again identified the photographs of defendant and Fields. After the second visit to the Griffiths this same evening, the officer returned to the station and defendant and Fields were then placed under arrest.

Defendant asserts that, following his initial detention, his transportation to the police station and his detention there for the purpose of obtaining his photograph to be used in a photographic identification procedure for the Griffiths was an illegal transportation and detention, thus making his photographic identification by the Griffiths and his arrest thereafter and the subsequent line-up identification by them several days later, and their in-court identification testimony the fruit of the poisonous tree all the product of an illegal transportation to the police station and detention there, which would have been suppressed had defense counsel made an evidence-suppression motion on this ground. Defendant relies primarily on People v. Harris (1975) 15 Cal.3d 384, 124 Cal.Rptr. 536, 540 P.2d 632, and Davis v. Mississippi (1969) 394 U.S. 721, 89 S.Ct. 1394, 22 L.Ed.2d 676. The Harris court observed: "A detention of an individual which is reasonable at its inception may exceed constitutional bounds when extended beyond what is reasonably necessary under the circumstances."(Harris, supra, 15 Cal.3d 384, 390, 124 Cal.Rptr. 536, 539, 540 P.2d 632, 635.)

In People v. Courtney (1970) 11 Cal.App.3d 1185, 1192, 90 Cal.Rptr. 370, 374, the court observed: " We recognize that it is only in a rare case *862 where, absent probable cause for arrest, the removal of a suspect to a police station for further investigation is constitutionally permissible."In a similar vein, the Harris court remarked: "As a general proposition, despite defendant's urging, we are disinclined to hold that under no circumstances short of probable cause to arrest may we officer transport a suspect to another location for further interrogation or possible identification."(Harris, supra, 15 Cal.3d 384, 390, 124 Cal.Rptr. 632, 539-40, 540 P.2d 632, 635-636.)In Harris,

defendants, after an initial proper detention, were transported to the house of victims for possible identification as burglary perpetrators. They failed to make an identification but this was followed by further interrogation and inspection of the defendant's apparel which yielded identification of shoes and currency. The Harris court concluded that "(u)nder the facts of this case the officers' procedures violated defendant's constitutional rights. . . . It is a fundamental principle in our jurisprudence that an illegal police procedure cannot be justified by its fruits."(Id. at pp. 391-392, 124 Cal.Rptr. at pp. 540-541, 540 P.2d at p. 636-637.)

In Davis v. Mississippi, supra, the nation's highest court declared that a detention for the purpose of obtaining fingerprints which were used at the suspect's trial constituted a violation of the Fourth Amendment right to be free of an unreasonable seizure of one's person. In so holding the court explained:**701 "Detentions for the sole purpose of obtaining fingerprints are no less subject to the constraints of the Fourth Amendment."(Davis, supra, 394 U.S. 721, 727, 89 S.Ct. 1394, 1397.)

[1] In the case before us, defendant was transported to the police station and detained there solely for the purpose of being photographed so that his photographs could be used in a photographic identification procedure. Is there any relevant distinction between a suspect's transportation to the police station and a detention there solely for such purpose and a transportation to the police station and detention there solely for the purpose of obtaining fingerprints condemned in Davis v. Mississippi ? We think not. Although the Harris court indicated that there might be conceivable situations in which a transportation of a suspect from one location to another might be acceptable, there is no indication that a pre-arrest transportation to a police station for the purpose of taking photographs to be used for a photographic identification line-up would be considered a constitutionally permissible procedure. In view of Davis v. Mississippi, the Harris case cannot be interpreted to sanction a suspect's transportation to the police station for the sole purpose of obtaining photographs of the suspect even though the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

90 Cal.App.3d 851

Page 7

90 Cal.App.3d 851, 153 Cal.Rptr. 695, 12 A.L.R.4th 301
**(Cite as: 90 Cal.App.3d 851)**

suspect's initial detention is proper because based on facts justifying a reasonable belief of criminal activity but which is insufficient to constitute probable cause *863 for an arrest. (In re Tony C. (1978) 21 Cal.3d 888, 148 Cal.Rptr. 366, 582 P.2d 957.)

The People assert that the transportation of defendant to the police station and his detention there for photographing was valid because defendant consented to it. We recognize that the Harris court gives its approval to the principle that a consent to pre-arrest transportation does not violate the constitutional prohibition against unreasonable seizure of the person."Ordinarily there exists less intrusive and more reasonable alternatives to pre-arrest transportation. . . . In addition, the consent of the suspect may be sought."(Harris, supra, 15 Cal.3d 384, 391, 124 Cal.Rptr. 536, 540, 540 P.2d 632, 636.)A consent to a pre-arrest transportation and detention constitutes a waiver of a constitutionally protected right just as is a consent to a search a waiver of such a right. (See Schneckloth v. Bustamonte (1973) 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854;People v. Leib (1976) 16 Cal.3d 869, 129 Cal.Rptr. 433, 548 P.2d 1105.)

When the prosecution relies upon a suspect's " consent" to a pre-arrest transportation and detention to justify what would otherwise constitute an invasion of a constitutionally protected right, and the suspect denies giving such "consent," the contested issue becomes one for determination by the court. We find a cogent statement of this principle in Blair v. Pitchess (1971) 5 Cal.3d 258, 274, 96 Cal.Rptr. 42, 53, 486 P.2d 1242, 1253:"(O)ne may waive his Fourth Amendment right to be free from unreasonable searches and seizures. (Citations.) However, it 'cannot be overly stressed that the protections embodied in the Fourth Amendment are so fundamental that they are to be jealously guarded and liberally construed.' (Citation.) 'It has been pointed out that "courts indulge every reasonable presumption against waiver " of fundamental constitutional rights and that we "do not presume acquiescence in the loss of fundamental rights."...' (Citation.)"

Thus, the People have the burden of proving by a preponderance of the evidence that a defendant did in fact give his consent and "that the defendant's manifestation of consent was the product of his free will and not a mere submission to an express or implied assertion of authority."(People v. James (1977) 19 Cal.3d 99, 106, 137 Cal.Rptr. 447, 450, 561 P.2d 1135, 1138.)In every case the issue of whether defendant did in fact give his consent, and, if so, whether such consent was voluntary is "a question of fact to be determined in the light of all the circumstances."(People v. Michael (1955) 45 Cal.2d 751, 753, 290 P.2d 852, 854.)

*864 In the instant case, the People correctly point out that the evidence on the issue of **702 whether defendant consented to be transported to the police station to be photographed was disputed, with the police officers giving a version different from the version testified to by defendant. But this evidence was Not introduced at any evidentiary admissibility hearing where "Consent " was an issue. This evidence was introduced during a hearing on the admissibility of defendant's statement to the officers that he, the defendant, was not acquainted with Reginald Fields an inculpatory statement made before there was any discussion between defendant and the officers regarding defendant's willingness or unwillingness to be transported to the police station for photographing.

It is significant that the trial court ruled only that defendant's inculpatory statement was admissible because made before any issue of transportation arose between defendant and the officers. The trial court did Not rule on the issue of whether defendant had voluntarily consented to be transported to the police station for the purpose of being photographed, since defense counsel did not seek to exclude the in-court identification testimony of the Griffiths as being the fruit of the poisonous tree of defendant's illegal transportation for photographing and his illegal arrest as a consequence. As conceded by the Attorney General, "(s)ince the issue was not raised, the trial court specifically left open the question whether the transportation of appellant (defendant) to the police station was proper."

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

90 Cal.App.3d 851                                                                                              Page 8

**90 Cal.App.3d 851, 153 Cal.Rptr. 695, 12 A.L.R.4th 301**
**(Cite as: 90 Cal.App.3d 851)**

The record thus demonstrates that a key defense of defendant the inadmissibility of eye-witness identification testimony as being the fruit of an illegal transportation and detention was not submitted to the trial court for determination. We thus are unable to apply the principle of law that " (t) he question of the voluntariness of the consent is to be determined in the first instance by the trier of fact; and in that stage of the process, 'The power to judge credibility of witnesses, resolve conflicts in testimony, weigh evidence and draw factual inferences, is vested in the trial court. On appeal all presumptions favor proper exercise of that power, and the trial court's findings whether express or implied must be upheld if supported by substantial evidence.'(Citations.)" (James, supra, 19 Cal.3d 99, 107, 137 Cal.Rptr. 447, 451, 561 P.2d 1135, 1139.)

The fact that the trial court might have found in favor of the prosecution on the issue of whether defendant voluntarily consented to be transported to the police station for photographing does not solve the *865 problem of whether defendant was denied the constitutional right of effective assistance of counsel by reason of the failure of his counsel to raise the issue. Had the issue been presented to the trial court, that court might have chosen to believe defendant's version of his encounter with the police officers rather than the officers' versions, and decided the issue in defendant's favor. Although not presented with the issue of "consent" for determination, the trial judge gave some indication that he was inclined to believe defendant's version of "no consent" to the transportation. The trial judge stated: "I'm inclined to believe that Mr. Farley was simply told to come into the car . . . I don't think he felt he could have refused to go with them."But what is of greater significance is the fact that a defendant is denied the effective assistance of counsel if, by reason of counsel's failure to perform the obligations imposed upon him, defendant is deprived of an Adjudication of a crucial or potentially meritorious defense. It is not required that defendant establish that the adjudication would Necessarily be in defendant's favor."A crucial defense is not necessarily one which, if presented, ' would result inexorably in a defendant's acquittal.'" (Pope, supra, 23 Cal.3d 412, 425, fn. 15,152 Cal.Rptr. 732, 739 fn. 15,590 P.2d 859, 866 fn. 15.)

Defendant also claims that he was denied effective assistance of counsel because his trial counsel did not move to suppress the testimony of Reginald Fields, the codefendant charged in the information with the same offenses charged against defendant. The issue of the legality of the transportation of Fields to the police station for the purpose of having his photograph taken for **703 identification by the Griffiths is exactly the same as that issue has been discussed above in connection with defendant's transportation to the police station.

[2] But does defendant have standing to raise the issue of the illegality of the officers' actions with respect to Fields? California has adopted a broad application of the constitutionally based exclusionary rule which permits a defendant who is affected by an allegedly unconstitutional search, seizure or detention of another person to challenge its legality. (People v. Martin (1955) 45 Cal.2d 755, 290 P.2d 855;Kaplan v. Superior Court (1971) 6 Cal.3d 150, 98 Cal.Rptr. 649, 491 P.2d 1.) Defendant in the case before us has "standing," therefore, to urge that the testimony of Fields was the product of illegal actions of the officers in transporting Fields to the police station for the purpose of having Fields' photograph taken and identified by the Griffiths as one of the perpetrators of the gas station robberies and murder.

The People urge, primarily, two points for their view that defendant was not denied effective assistance of trial counsel. It is suggested that *866 defense counsel's failure to make the suppression-of-evidence motions which defendant on appeal argues should have been made was the result of a choice of trial tactics. But we have searched the record in vain to find some answer to the question of why defense counsel failed to make the suppression-of-evidence motion which resulted in the withdrawal of a potentially meritorious defense."Ibarra itself teaches that by failing to obtain an Adjudication of the stronger of two potential defenses, trial counsel deprived his client of constitutionally adequate assistance."(Pope, supra, 23 Cal.3d 412, 425, fn. 15,152 Cal.Rptr. 732, 739, fn. 15,590 P.2d 859, fn. 15) Our review of the record tells us that, even if defense counsel had been asked to provide an explanation for his failure

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

90 Cal.App.3d 851                                                                                    Page 9

90 Cal.App.3d 851, 153 Cal.Rptr. 695, 12 A.L.R.4th 301
(Cite as: 90 Cal.App.3d 851)

to make the suppression-of-evidence motions discussed herein, there simply could be no satisfactory explanation. (See Pope, supra, 23 Cal.3d 412, 425, 152 Cal.Rptr. 732, 590 P.2d 859.)

A second point urged by the People is that, had the trial court addressed the issue of the admissibility of the in-court identification testimony of the Griffiths on the basis that it was the product of defendant's and Fields' illegal transportation for photographing, a ruling would have been compelled that such testimony had an independent source and was freed of the taint of illegality. In Wong Sun v. United States (1963) 371 U.S. 471, 488, 83 S.Ct. 407, 417, 9 L.Ed.2d 441, the issue is stated to be " 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.' "

But once an initial illegality has been established, the burden is on the prosecution to prove, by the Clear-and-convincing-proof standard, that the objected-to evidence is free of the taint of the initial illegality. (People v. Martin (1970) 2 Cal.3d 822, 834, 87 Cal.Rptr. 709, 471 P.2d 29.)"(T)he admission of an in-court identification which has a source or origin 'independent' of the illegal pretrial confrontation (identification) is not error, whereas the admission of an in-court identification which is not shown to be 'independent' of such a confrontation (identification) is error of constitutional dimension and compels reversal unless shown to be 'harmless beyond a reasonable doubt' under the standard of Chapman v. California (1967) 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 . . . ." (Martin, supra, 2 Cal.3d 822, 831, 87 Cal.Rptr. 709, 716, 471 P.2d 29, 36.)One means of meeting this burden is to establish that the information obtained illegally would have been discovered anyway by the police during the normal course of ( a lawfully conducted investigation. ( Krauss v. Superior Court (1971) 5 Cal.3d 418, 96 Cal.Rptr. 455,487 P.2d 102;*867Lockridge v. Superior Court (1970) 3 Cal.3d 166, 89 Cal.Rptr. 731, 474 P.2d 683.)Evidence that is subject to " inevitably discovery" is held admissible, regardless of the initial illegal manner of discovery. (People v.

Aylwin (1973) 31 Cal.App.3d 826, 107 Cal.Rptr. 824.)

**704 The People assert that, in the instant case, the information already in the possession of the police regarding defendant and Fields and their possible connection with the gas station offenses was such as to lead inevitably to the Griffiths' identification of them as the perpetrators so that the trial court would be required to hold that Fields' testimony against defendant and the Griffiths' in-court identification testimony were purged on the taint of illegality. However, we are unable to conclude that, as a matter of law, had there been a hearing on the " independent source" and "inevitable discovery" rules, that the prosecution would have met its burden of proof on this issue by the clear-and-convincing-proof standard. The failure of defendant's trial counsel to make appropriate suppression-of-evidence motions precluded any hearing and determination by the trial court, and we cannot speculate what the trial court rulings would have been.

The fact that the Griffiths testified at trial that their in-court identification of defendant had a source independent of the pretrial photographic identification simply does not affect the issue. In Martin, supra, 2 Cal.3d 822, 87 Cal.Rptr. 709, 471 P.2d 29, on a motion for new trial, the trial judge, for the first time, determined that a pre-trial confrontation had been violative of United States v. Wade (1967) 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149, but that the in-court identification had had an origin independent of that confrontation because the victim had testified as to her specific observations at the time and place of the robbery charged against the defendant. But in rejecting the argument that the trial court had made a definitive ruling in favor of the in-court identification as having had an independent origin, the Martin court made the observation that "(w)e do not think that the trial court's consideration of the matter of independent origin on the motion for new trial was the legal equivalent of such consideration and determination at trial. . . . Clearly a quite different attitude is required when the court undertakes to determine and assess 'preliminary' or 'foundational ' facts upon which the admissibility of evidence

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

90 Cal.App.3d 851, 153 Cal.Rptr. 695, 12 A.L.R.4th 301
(Cite as: 90 Cal.App.3d 851)

depends."(Martin, supra, 2 Cal.3d 822, 832, .87 Cal.Rptr. 709, 716, 471 P.2d 29, 36.)(Emphasis added.)

It is abundantly clear that, in light of Martin, defendant in the case before us was entitled to an adjudication, under the appropriate burden-of-proof standards, of the issues of (1) whether defendant had given a voluntary consent to his transportation to the police station to have his photograph taken for identification purposes; and (2) assuming a *868 finding that he had not given such consent, whether the Griffiths' in-court identification of defendant and Fields' testimony against defendant were the product of independent origins or inevitable discovery to dissipate the taint of illegality flowing from defendant's invalid transportation to the police station to have his photograph taken which resulted in the Griffiths' and Fields' testimony.

[3] The failure of defendant's trial counsel to make the appropriate suppression-of-evidence motions and raise these issues constitutes a denial to defendant of his constitutional right to effective assistance of counsel. The violation of defendant's constitutional right to the effective assistance of counsel compels a reversal of the judgment of conviction so that defendant can be tried after crucial issues of the admissibility of evidence have properly been determined.

Since a new trial is necessary in the instant case, we turn to a consideration of other issues raised by defendant which could be of significance on a new trial.

IV

*The Competency of the Ten-Year-Old Witness To Testify*

Defendant contends that the trial court abused its discretion in holding that Virgie Weeks, ten years of age, was competent to testify. This witness was a reluctant witness. She was fearful and obviously didn't want to testify. Virgie's mother made it **705 clear that she didn't want her daughter to testify

basically out of fear for the girl's safety. Although Virgie stated she knew the difference between telling the truth and not telling the truth, and that she would get a whipping if she did not tell the truth, she stated several times on the witness stand that she would Not tell the truth. But she also said that she would tell the truth. Although it was a laborious undertaking, answers were elicited from Virgie to the effect that, on the evening of the gas station offenses, she saw defendant and Fields climb over the fence, with the sound of coin money jingling in Fields' pocket, and with Fields running across the street and defendant down an alley.

Evidence Code section 701 provides that a person is disqualified to be a witness if he is: "(a) Incapable of expressing himself concerning the matter so as to be understood, either directly or through interpretation by one who can understand him; or (P) (b) Incapable of understanding the duty of a witness to tell the truth."The burden of proof on the *869 issue of incompetency that a person is incapable of understanding the duty of a witness to tell the truth is upon the objecting party to establish this fact to the judge's satisfaction by a preponderance of the evidence. (Evid. Code, s 405.)

[4] The fact of Capacity of a person to understand the duty of a witness to tell the truth is a preliminary fact to competency of a person to testify as a witness. If the evidence on the issue of the Capacity of a proffered witness to understand the duty of a witness to tell the truth is conflicting, the proffered witness must be held competent or qualified to be a witness unless the objecting party establishes, by a preponderance of the evidence, a Lack of capacity. (See Comment of Assembly Committee on Judiciary to Evid. Code, s 405.) In the absence of a clear abuse of discretion the trial court's decision on the issue of competency to be a witness under Evidence Code section 701 will not be disturbed on appeal. (See People v. Blagg (1970) 10 Cal.App.3d 1035, 89 Cal.Rptr. 446;People v. Yarbrough (1974) 37 Cal.App.3d 454, 112 Cal.Rptr. 391.)

[5] In the case at bench, the evidence was conflicting and capable of divergent inferences regarding the "preliminary fact" of whether ten-year-old Virgie Weeks had the capacity to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

90 Cal.App.3d 851                                                    Page 11

90 Cal.App.3d 851, 153 Cal.Rptr. 695, 12 A.L.R.4th 301
**(Cite as: 90 Cal.App.3d 851)**

understand the duty of a witness to tell the truth. In light of such conflict, we must hold that the trial judge's ruling is supported by substantial evidence.

## V

*The Testimony of the Ten-Year Old Witness as Substantial Evidence and the Question of Corroboration of the Accomplice's Testimony*

Defendant argues that the testimony of ten-year-old Virgie Weeks should be deemed lacking in substantiality and insufficient to corroborate the testimony of the accomplice, Reginald Fields. Although there were some inconsistencies in Virgie's testimony, and although there is no doubt that she and her mother were desirous of her not testifying at all, there is nothing inherent in Virgie's testimony or the surrounding circumstances which would cause her testimony to be lacking in solid value.

Defendant's contention that the accomplice's testimony was not corroborated as required by Penal Code section 1111 is manifestly lacking in merit. We need not further lengthen this opinion by reciting the evidence which meets the test of corroboration as set forth in People v. Perry (1972) 7 Cal.3d 756, 103 Cal.Rptr. 161, 499 P.2d 129.

**\*870** In view of our disposition of the appeal, we deny the petition for a writ of habeas corpus.

The judgment is reversed.

KINGSLEY, Acting P. J., concurs.
ALARCON, J., concurs in the judgment.
Hearing denied; CLARK, J., dissenting.
Cal.App., 1979.
People v. Farley
90 Cal.App.3d 851, 153 Cal.Rptr. 695, 12 A.L.R.4th 301

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

418 F.3d 1050                                                                Page 1

418 F.3d 1050, 2005 Daily Journal D.A.R. 9691, 05 Cal. Daily Op. Serv. 7085
**(Cite as: 418 F.3d 1050)**

C

United States Court of Appeals,Ninth Circuit.
Jose de Jesus ALVAREZ-BARAJAS,
Petitioner-Appellant,
v.
Alberto R. GONZALES, Attorney General;
Anthony Esposito, Interim Bice Western Region
Director; Wayne K. Wills, District Director for
Interior Enforcement, Respondents-Appellees.
No. 04-55733.

Argued and Submitted July 12, 2005.
Filed Aug. 11, 2005.

**Background:** Alien filed petition for habeas
corpus review of order of the Board of Immigration
Appeals (BIA) affirming immigration judge's
determination that he was ineligible for relief under
either the former Immigration and Nationality Act
(INA) or a waiver under the INA. The United States
District Court for the Southern District of
California, William Q. Hayes, J., denied petition,
and alien appealed.

**Holdings:** The Court of Appeals, D.W. Nelson,
Circuit Judge, held that:

(1) alien's habeas corpus petition would be
construed as a timely filed petition for review with
the Court of Appeals, but

(2) alien was not eligible for discretionary relief
from removal.

Petition denied.

Farris, Circuit Judge, concurred in the result.

West Headnotes

**[1] Aliens, Immigration, and Citizenship 24©—
384**

24 Aliens, Immigration, and Citizenship
    24V Denial of Admission and Removal
        24V(G) Judicial Review or Intervention
            24k384 k. In General. Most Cited Cases
            (Formerly 24k54.3(1))
Alien's habeas corpus petition, challenging order of
deportation, which was pending before the circuit
court when the REAL ID Act was enacted, which
required district courts to transfer all habeas
petitions brought by aliens that were pending before
the district court on the effective date of the act to
the appropriate circuit court, would be construed as
a timely filed petition for review with the Court of
Appeals. 28 U.S.C.A. § 2241; Emergency
Supplemental Appropriations Act for Defense, the
Global War on Terror, and Tsunami Relief, 2005, §
106(a)(1)(B), 119 Stat. 231.

**[2] Aliens, Immigration, and Citizenship 24©—
216**

24 Aliens, Immigration, and Citizenship
    24V Denial of Admission and Removal
        24V(A) In General
            24k212 Constitutional and Statutory
Provisions
                24k216 k. Retroactive Operation. Most
Cited Cases
            (Formerly 24k40)

**Aliens, Immigration, and Citizenship 24 ©—321**

24 Aliens, Immigration, and Citizenship
    24V Denial of Admission and Removal
        24V(D) Relief from Denial of Admission or
Removal in General
            24k319 Commission of Crime as Basis for
Denial of Relief
                24k321 k. Aggravated Felonies in

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

418 F.3d 1050, 2005 Daily Journal D.A.R. 9691, 05 Cal. Daily Op. Serv. 7085
**(Cite as: 418 F.3d 1050)**

General. Most Cited Cases
    (Formerly 24k53.10(1))
Expanded aggravated felony definition of the Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA), which expanded the definition of aggravated felonies to include receipt of stolen property if the term of imprisonment was at least one year, could be applied retroactively to alien who pleaded guilty to receipt of stolen property and was sentenced to two years in prison, even though at the time he pled guilty, this conviction was not considered an aggravated felony, and thus alien was not eligible for discretionary relief from removal. Immigration and Nationality Act, § 212(c), 8 U.S.C.(2000 Ed.) § 1182(c).

**[3] Aliens, Immigration, and Citizenship 24⇆ 216**

24 Aliens, Immigration, and Citizenship
    24V Denial of Admission and Removal
        24V(A) In General
                24k212 Constitutional and Statutory Provisions
                24k216 k. Retroactive Operation. Most Cited Cases
    (Formerly 24k40)
Section of Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA) which made aliens convicted of aggravated felonies ineligible for waiver of removal could be applied retroactively to alien who pled guilty to receipt of stolen property and was sentenced to two years in prison, even though at the time he pled guilty, this conviction was not considered an aggravated felony. Immigration and Nationality Act, §§ 212, 242(d)(1), 8 U.S.C.A. §§ 1182(h), 1252(d)(1).

**\*1050** Kaye A.Y. Evans, Beverly Hills, CA, for the petitioner.
**\*1051** Samuel W. Bettwy (argued); Carol C. Lam and Tom Stahl (on the brief), United States Department of Homeland Security, Bureau of Customs and Immigration, San Diego, CA, for the respondent.

Appeal from the United States District Court for the Southern District of California; William Q. Hayes,

District Judge, Presiding.    D.C. No. CV-03-00840-WQH/JFS.

Before FARRIS, D.W. NELSON, and TALLMAN, Circuit Judges.

Opinion by Judge D.W. NELSON; Concurrence by Judge FARRISD.W. NELSON, Circuit Judge.
Jose de Jesus Alvarez-Barajas, a native and citizen of Mexico, appeals the district court's denial of his petition for habeas corpus. In his petition, Alvarez-Barajas argues that the Board of Immigration Appeals (BIA) erred in affirming an Immigration Judge's decision that he is ineligible for relief under either the former Immigration and Nationality Act (INA) § 212(c), 8 U.S.C. § 1182(c) (1996); or a waiver under INA § 212(h), 8 U.S.C. § 1182(h). We agree that Alvarez-Barajas is ineligible for these forms of relief, and therefore deny the petition.

## FACTUAL AND PROCEDURAL BACKGROUND

Alvarez-Barajas first entered the United States in approximately 1986 and became a legal permanent resident in 1990. On May 27, 1996, Alvarez-Barajas pled guilty to receipt of stolen property in violation of California **Penal Code § 496** and was sentenced to two years in prison. Based on this conviction, on April 1, 1997, the Immigration and Naturalization Service (INS) [FN1] issued a notice to appear (NTA) alleging that Alvarez-Barajas was removable pursuant to INA § 237(a)(2)(A)(iii), 8 U.S.C. § 1227(a)(2)(A)(iii), because he had been convicted of an **aggravated felony.**

> FN1. On March 1, 2003, the INS was dissolved as an independent agency within the United States Department of Justice and its functions were transferred to the Department of Homeland Security. Homeland Security Act of 2002, Pub.L. No. 107-296, 116 Stat. 2135, 2192, 2205.

At the time Alvarez-Barajas pled guilty to receipt of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

418 F.3d 1050                                                                 Page 3

418 F.3d 1050, 2005 Daily Journal D.A.R. 9691, 05 Cal. Daily Op. Serv. 7085
(Cite as: 418 F.3d 1050)

stolen property this conviction was not considered an aggravated felony. At that time, a conviction for receipt of stolen property could be considered an aggravated felony only if the prison term imposed was at least five years. 8 U.S.C. § 1101(a)(43)(G) (1996). However, at the time he pled guilty, it was clear that if Alvarez-Barajas had been convicted of an aggravated felony, he would have been ineligible for § 212(c) relief because the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), which made aliens convicted of aggravated felonies ineligible for § 212(c) relief, had already become effective. AEDPA § 440(d), Pub.L. No. 104-132, 110 Stat. 1214 (effective date April 24, 1996).

Following Alvarez-Barajas' conviction, Congress further restricted eligibility for relief from removal for aliens convicted of certain crimes. On April 1, 1997, the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA) became effective and eliminated § 212(c) relief entirely and created in its place a new form of relief called "cancellation of removal." Pub.L. No. 104-208, 110 Stat. 3009; see also 8 U.S.C. § 1229b (codifying cancellation of removal). The IIRIRA also expanded the definition of aggravated felonies to include receipt of stolen property if the term of imprisonment was at least one *1052 year, and made this change retroactive. IIRIRA §§ 321(a) (expanding the definition of aggravated felony) & 321(b) (making this expansion retroactive); see also 8 U.S.C. § 1101(a)(43)(G) (encompassing receipt of stolen property in the aggravated felony definition).

In his hearing before the Immigration Judge (IJ) on May 26, 1998, Alvarez-Barajas conceded deportability, but applied for cancellation of removal under INA § 240A. The same day, the IJ issued an oral decision finding Alvarez-Barajas ineligible for either § 240A relief or any other form of relief, including a waiver under § 212(h), due to his conviction for receiving stolen property, which was by then considered an aggravated felony. The IJ ordered Alvarez-Barajas removed to Mexico. Alvarez-Barajas timely appealed to the BIA, arguing that the IJ erred in finding him ineligible for cancellation of removal or § 212(c) relief, but failing to raise the issue of his eligibility for a §

212(h) waiver.

On March 28, 2003, the BIA affirmed the IJ's decision regarding Alvarez-Barajas' removal and his ineligibility for § 212(c) relief or cancellation of removal. Alvarez-Barajas did not file a petition for review with this circuit, but he filed a motion to reconsider with the BIA regarding his eligibility for a § 212(h) waiver. The BIA eventually denied this motion. Subsequently, Alvarez-Barajas filed a writ of habeas corpus under 28 U.S.C. § 2241 in the United States District Court for the Southern District of California challenging the BIA's findings that he was ineligible for § 212(c) or § 212(h) relief. On October 1, 2003, the district court denied Alvarez-Barajas' petition in part, finding that he was ineligible for § 212(c) relief and rejecting his equal protection challenge to his ineligibility for a § 212(h) waiver. On February 18, 2004, the district court dismissed the balance of Alvarez-Barajas' petition by concluding that IIRIRA's amendments to § 212(h) were intended to apply retroactively and, therefore, that Alvarez-Barajas was ineligible for such a waiver. Alvarez-Barajas timely appealed.

### DISCUSSION

#### I. Jurisdiction and Standard of Review

On May 11, 2005, Congress enacted the REAL ID Act of 2005, which expanded the jurisdiction of the circuit courts over final orders of removal. Most relevant here, the Act makes the circuit courts the "sole" judicial body able to review challenges to final orders of deportation, exclusion, or removal. REAL ID Act, Pub.L. No. 109-13, 119 Stat. 231, § 106(a). To accomplish this streamlined judicial review, the Act eliminated habeas jurisdiction, including jurisdiction under 28 U.S.C. § 2241, over final orders of deportation, exclusion, or removal. Id. at § 106(a)(1)(B) (amending 8 U.S.C. § 1252). In writing the REAL ID Act, Congress expressly made these judicial review provisions retroactive. Id. at § 106(b) ("The amendments made by subsection (a) [relating to judicial review] shall take effect [on May 11, 2005] and shall apply to cases in which the final administrative order of removal,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

418 F.3d 1050                                                                            Page 4

418 F.3d 1050, 2005 Daily Journal D.A.R. 9691, 05 Cal. Daily Op. Serv. 7085
**(Cite as: 418 F.3d 1050)**

deportation, or exclusion was issued *before, on, or after* the date of the enactment of this division.") (emphasis added); *see also Fernandez-Ruiz v. Gonzales,* 410 F.3d 585, 587 (9th Cir.2005) (holding that the REAL ID Act's judicial review provisions apply retroactively).

[1] The REAL ID Act requires district courts to transfer all habeas petitions brought by aliens that were pending before the district court on the effective date of the REAL ID Act (May 11, 2005) to the appropriate circuit court, which must treat the transferred petitions as timely filed *1053 petitions for review. *Id.* at § 106(c).[FN2] In what appears to be an oversight, Congress did not specify how similar habeas petitions pending before circuit courts should be treated. The language and structure of the Act, however, evidences Congress' clear intention to make circuit courts the "sole and exclusive means of judicial review" for challenges to removal. *Id.* at § 106(a). Reading the Act to allow our review of habeas petitions pending before this court advances this congressional intention. Accordingly, we hold that Alvarez-Barajas' habeas petition should be construed as if it were a timely filed petition for review with this court. *See also Bonhometre v. Gonzales,* 414 F.3d 442, 445, 2005 WL 1653641 at *2 (3d Cir. July 15, 2005) (holding that all habeas corpus petitions challenging final orders of deportation, exclusion, or removal pending before the Third Circuit will be construed as timely filed petitions for review). Any other interpretation of the REAL ID Act would create an absurd result where the circuit courts would lack jurisdiction to review habeas petitions by aliens that were pending before the circuits when the REAL ID Act passed, but would allow such review if the petition was still pending before a district court.[FN3]

FN2. Section 106(c) of the REAL ID Act states:
If an alien's case, brought under [28 U.S.C. § 2241], and challenging a final administrative order of removal, deportation, or exclusion, is pending in a district court on the date of the enactment [of this Act], then the district court shall transfer the case ... to the court of appeals

for the circuit in which a petition for review could have been properly filed under [INA § 242(b)(2), 8 U.S.C. § 1252], as amended by this section,.... The court of appeals shall treat the transferred case as if it had been filed pursuant to a petition for review under such section 242, *except that [the 30-day filing deadline] shall not apply.*
(emphasis added).

FN3. Although we hold that converting pending habeas petitions into timely filed petitions for review is the most appropriate way to effectuate the intent of Congress in passing the REAL ID Act in the usual case like the present appeal, we make no comment on what should be done in the more unusual case where the pending habeas petition requires further factual development. In such a case, construing a pending habeas petition as a petition for review might bar this court from remanding the petition for further fact-finding. *See* INA § 242(a)(1), 8 U.S.C. § 1252(a)(1) (precluding circuit courts from remanding petitions for review for further evidentiary fact-finding); *but see* INA § 242(b)(5)(B), 8 U.S.C. § 1252(b)(5)(B) (setting out an exception for claims of nationality).

The fact that we construe Alvarez-Barajas' habeas petition as a petition for review does not affect our standard for review. On petition for review, we review the BIA's decisions regarding purely legal questions de novo, *Simeonov v. Ashcroft,* 371 F.3d 532, 535 (9th Cir.2004), the same standard we apply when reviewing a district court's decision to deny a habeas petition, *Singh v. Ashcroft,* 351 F.3d 435, 438 (9th Cir.2003). The conversion, however, changes the decision we review, and we now review the BIA's decision, not the district court's orders.

*II. Alvarez-Barajas' Eligibility for INA § 212(c) Relief*

Having determined that we have jurisdiction to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

418 F.3d 1050                                                                 Page 5

418 F.3d 1050, 2005 Daily Journal D.A.R. 9691, 05 Cal. Daily Op. Serv. 7085
(Cite as: 418 F.3d 1050)

review Alvarez-Barajas' petition, we turn to the merits of his petition. In light of the Supreme Court's decision in *INS v. St. Cyr,* 533 U.S. 289, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001), Alvarez-Barajas challenges the BIA's conclusion that he is ineligible for relief under the former INA § 212(c).[FN4] But Alvarez-Barajas' case *1054 is factually distinct from St. Cyr's in two ways. First, unlike St. Cyr, under the state of the law at the time Alvarez-Barajas pled guilty, the offense to which he pled was not an aggravated felony, and therefore, was not a deportable offense. Second, by the time Alvarez-Barajas pled guilty to this crime, the law had already changed to make all aliens convicted of aggravated felonies ineligible for relief. Because we find that these factual distinctions are significant, we affirm the BIA's conclusion that Alvarez-Barajas is ineligible for § 212(c) relief.

> FN4. Prior to its repeal, § 212(c) provided that:
> Aliens lawfully admitted for permanent residence who temporarily proceeded abroad voluntarily ... and who are returning to a lawful unrelinquished domicile of seven consecutive years, may be admitted in the discretion of the Attorney General[.]. .[A]n alien who has been convicted of one or more aggravated felonies and has served for such felony or felonies a term of imprisonment of at least 5 years [is not eligible for this relief].
> 8 U.S.C. § 1182(c) (1995).

[2] First, we reject Alvarez-Barajas' argument that § 321 of the IIRIRA, which expanded the aggravated felony definition, cannot be applied retroactively to him because the Supreme Court has indicated otherwise in *St. Cyr.* 533 U.S. at 318-19, 121 S.Ct. 2271. In holding that Congress did not clearly intend for a different section of the IIRIRA to apply retroactively, the Court contrasted this section with § 321(b), which the Court found unambiguously applied retroactively. *Id.* ("IIRIRA's amendment of the definition of 'aggravated felony,' for example, clearly states that it applies with respect to ' conviction[s] ... entered before, on, or after' the statute's enactment date."); *see also Aragon-Ayon*

*v. INS,* 206 F.3d 847, 851 (9th Cir.2000) (holding that Congress "clearly manifested an intent for the amended definition of aggravated felony to apply retroactively"). Because, with respect to this section of the IIRIRA, Congress has satisfied the " demanding" standard for making a law unambiguously retroactive, there can be no doubt that the expanded aggravated felony definition can be applied retroactively to Alvarez-Barajas. *St. Cyr,* 533 U.S. at 316, 121 S.Ct. 2271.

Second, this court's decision in *United States v. Velasco-Medina,* 305 F.3d 839, 849-50 (9th Cir.2002), forecloses Alvarez-Barajas' argument that AEDPA's elimination of § 212(c) relief for all aggravated felons cannot be applied to him, because he pled guilty *after* the effective date of AEDPA. *Cf. United States v. Leon-Paz,* 340 F.3d 1003, 1006-07 (9th Cir.2003) (distinguishing the case of an alien who pled guilty to a non-deportable offense *before* the effective date of AEDPA, and therefore, before the elimination of § 212(c) relief for all aliens convicted of aggravated felonies). For these reasons, we affirm the BIA's decision that Alvarez-Barajas is ineligible for § 212(c) relief.

### III. Alvarez-Barajas' Eligibility for a Wavier under § 212(h)

[3] Alvarez-Barajas' argument that he is eligible for a waiver under § 212(h) also fails.[FN5] In § 348(b) of the IIRIRA, Congress not only made aliens convicted of aggravated felonies ineligible for these waivers, but expressly made this change *1055 retroactive.[FN6] IIRIRA § 348 (stating that the changes were effective "on the date of enactment [April 1, 1997] and shall apply in the case of any alien who is in exclusion or deportation proceedings as of such date unless a final administrative order in such proceedings has been entered as of such date" ). Importantly, the Supreme Court has held out this section of the IIRIRA as an example of where Congress made the "IIRIRA expressly applicable to prior convictions." *St. Cyr,* 533 U.S. at 320 & n. 43, 121 S.Ct. 2271; *see also Valderrama-Fonseca v. INS,* 116 F.3d 853, 856 & n. 6 (9th Cir.1997) (noting in relation to IIRIRA § 348 that "it is apparent that Congress knew how to make

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

418 F.3d 1050                                                                                      Page 6

418 F.3d 1050, 2005 Daily Journal D.A.R. 9691, 05 Cal. Daily Op. Serv. 7085
(Cite as: 418 F.3d 1050)

provisions of IIRIRA applicable to pending proceedings when it wanted to"). Therefore, we conclude that § 348 of IIRIRA can be applied retroactively to Alvarez-Barajas, rendering him ineligible for a § 212(h) waiver.

> FN5. We note that Alvarez-Barajas did not raise the § 212(h) claim in his appeal to the BIA, but raised it to the BIA later in a motion to reopen. We do not decide whether such procedure was sufficient to constitute exhaustion of his administrative remedies. *See* 8 U.S.C. § 1252(d)(1) ("A court may review a final order of removal only if ... the alien has exhausted all administrative remedies available to the alien as of right[.]"). Instead, we conclude that this constitutional challenge to the statute falls within the narrow range of exceptions to the exhaustion requirement. *See Sun v. Ashcroft,* 370 F.3d 932, 944 n. 18 (9th Cir.2004).

> FN6. Before IIRIRA, the waiver was available to any alien satisfying the threshold requirements so long as the alien had not "been convicted of (or ... ha[d][not] admitted committing acts that constitute) murder or criminal acts involving torture, or an attempt or conspiracy to commit murder or a criminal act involving torture." 8 U.S.C. § 1182(h) (1996). After the effective date of IIRIRA, "[n]o waiver [could] be granted ... [to any] alien who ha[d] previously been admitted to the United States as an alien lawfully admitted for permanent residence if ... since the date of admission the alien has been convicted of an aggravated felony. " 8 U.S.C. § 1182(h) (1997).

### CONCLUSION

Accordingly, we hold that Alvarez-Barajas' petition for habeas corpus must be construed as a timely filed petition for review, but deny the petition on the merits.

**PETITION DENIED.**
FARRIS, Circuit Judge, concurring:
I concur in the result.

C.A.9 (Cal.),2005.
Alvarez-Barajas v. Gonzales
418 F.3d 1050, 2005 Daily Journal D.A.R. 9691, 05 Cal. Daily Op. Serv. 7085

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

JS44
(Rev. 07/89)

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE SECOND PAGE OF THIS FORM.)

**FILED**
JAN -2 2008
CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY

**I (a) PLAINTIFFS**

Antonio F. Silveyra

DEFENDANTS

People of the State of California

2254    1983
FILING FEE PAID    Yes    No
HFP MOTION FILED    Yes    No
COPIES SENT TO
Court    Judges (if Known)
INVOLVED

**(b) COUNTY OF RESIDENCE OF FIRST LISTED** Imperial
**PLAINTIFF**
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT _____
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND

**(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)**

Antonio F. Silveyra
1115 North Imperial Avenue
El Centro, CA 92243
A18-499-789

ATTORNEYS (IF KNOWN)

'08 CV 0018 H NLS

**II. BASIS OF JURISDICTION (PLACE AN x IN ONE BOX ONLY)**

☐ 1 U.S. Government Plaintiff
☐ 3 Federal Question
(U.S. Government Not a Party)

☒ 2 U.S. Government Defendant
☐ 4 Diversity (Indicate Citizenship of Parties in Item III

**III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN X IN ONE BOX**
**(For Diversity Cases Only)    FOR PLAINTIFF AND ONE BOX FOR DEFENDANT**

| | PT | DEF | | PT | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. CAUSE OF ACTION (CITE THE US CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY).**

## 28 USC 2241

**V. NATURE OF SUIT (PLACE AN X IN ONE BOX ONLY)**

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reappointment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury-Medical Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | | ☐ 625 Drug Related Seizure of Property 21 USC881 | **PROPERTY RIGHTS** | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 365 Personal Injury - Product Liability | | ☐ 820 Copyrights | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment &Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | ☐ 830 Patent | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | | ☐ 640 RR & Truck | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | ☐ 650 Airline Regs | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment of Veterans Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities Exchange |
| ☐ 160 Stockholders Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 690 Other | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge 12 USC |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | **LABOR** | ☐ 863 DIWC/DIWW (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 195 Contract Product Liability | | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 864 SSID Title XVI | ☐ 892 Economic Stabilization Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 720 Labor/Mgmt. Relations | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act | **FEDERAL TAX SUITS** | ☐ 894 Energy Allocation Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | | ☐ 740 Railway Labor Act | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/Accommodations | ☐ 530 General | ☐ 790 Other Labor Litigation | ☐ 871 IRS - Third Party 26 USC 7609 | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 240 Tort to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | ☐ 791 Empl. Ret. Inc. Security Act | | |
| ☐ 245 Tort Product Liability | ☐ 440 Other Civil Rights | ☒ 540 Mandamus & Other | | | ☐ 950 Constitutionality of State |
| ☐ 290 All Other Real Property | | ☐ 550 Civil Rights | | | ☐ 890 Other Statutory Actions |
| | | ☐ 555 Prisoner Conditions | | | |

**VI. ORIGIN (PLACE AN X IN ONE BOX ONLY)**

☐ 1 Original Proceeding  ☐ 2 Removal from State Court  ☐ 3 Remanded from Appellate Court  ☐ 4 Reinstated or Reopened  ☐ 5 Transferred from another district (specify)  ☐ 6 Multidistrict Litigation  ☐ 7 Appeal to District Judge from Magistrate Judgment

**VII. REQUESTED IN COMPLAINT:** ☐ CHECK IF THIS IS A CLASS ACTION UNDER f.r.c.p. 23    DEMAND $ _____    Check YES only if demanded in complaint:
JURY DEMAND: ☐ YES ☐ NO

**VIII. RELATED CASE(S) IF ANY (See Instructions):** JUDGE _____    Docket Number _____

DATE    1/2/2008    SIGNATURE OF ATTORNEY OF RECORD